## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN DOE 1 and JANE DOE 1, in their own Capacity and as parents of CHILD DOE 1, JOHN DOE 2 and JANE DOE 2, in their own Capacity as parents of CHILD DOE 2, JANE DOE 3, in her own capacity and as parent of CHILD DOE 3 and on behalf of those similarly Situated, | ) ) ) ) ) ) ) | Civil Action No.: 2:22-cv-00287 |
| Plaintiffs | ) ) ) | |
| v. | ) ) ) | |
| PERKIOMEN VALLEY SCHOOL DISTRICT, a Pennsylvania governmental entity, JASON SAYLOR, MATTHEW DORR, ROWAN KEENAN, DON FOUNTAIN, KIM MARES, REENA KOLAR, SARAH EVANS-BROCKETT, LAURA WHITE, and TAMMY CAMPLI, all Individual elected officials sued in their official capacity as members of the BOARD OF SCHOOL DIRECTORS OF THE PERKIOMEN VALLEY SCHOOL DISTRICT, a Pennsylvania elected legislative body, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) ) | |

---

## BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER/PRELIMINARY INJUNCTION SEEKING INJUNCTIVE RELIEF FOR VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT, AND SECTION 504 OF THE REHABILITATION ACT

---

Carmen A. De Gisi
Counsel for Plaintiffs
PA ID No. 208989
De GISI LAW GROUP, LLC
462 Germantown Pike, Suite 11
Lafayette Hill, PA 19444
(610) 897-8721
cdegisilaw@gmail.com

# Table of Contents

Table of Citations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.      Relief Requested . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     Factual Summary Related to Necessity of Universal Masking Accommodation . . . . . . . . 5

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

I.      Medical Evidence Shows Immediate and Irreparable Harm to Children when
        Masking is Optional . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

II.     Plaintiffs Meet the Legal Requirements for the Court to Grant a Temporary
        Restraining Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        A.      Plaintiffs Are Likely to Succeed on the Merits of Their Claims . . . . . . . . . . . . 12

        B.      Plaintiffs' Risk of Exposure to COVID-19 and/or Withdrawal
                from In- Person Classes Constitutes Irreparable Harm . . . . . . . . . . . . . . . . . . 15

        C.      There is No Hardship to Defendants and the Public Interest
                Favors Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

III.    Defendants Violated Title II of the Americans with Disabilities Act and
        Section 504 of the Rehabilitation Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

REQUESTED REMEDY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

# TABLE OF CITATIONS

**Case**                                                                                     **Page**

*Ability Ctr. of Greater Toledo v. City of Sandusky,* 385 F.3d 901 (6th Cir. 2004) . . . . . . . . . . 13

*Acierno v. New Castle County,* 40 F.3d 645 (3d Cir.1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*ARC of Iowa v. Reynolds,* _F.Supp. 3d_, 2021 WL 4166728 (S.D. Iowa Sept. 13, 2021) . . . . . .4

*AT&T v. Winback and Conserve Program, Inc.,* 42 F.3d 1421 (3d Cir. 1994),
*cert. denied,* 514 U.S. 1103 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

*Banks v. Booth,* 2020 U.S. Dist. LEXIS 68287(D.D.C. Apr. 19, 2020) . . . . . . . . . . . . . . . . . . .17

*Basank v. Decker,* No. 20 CIV. 2518 (AT), 2020 WL 1953847 (S.D.N.Y. Apr. 23, 2020) . . . . .17

*Bieros v. Nicola,* 857 F.Supp. 445 (E.D. Pa. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Bircoll v. Miami-Dade Cnty.,* 480 F .3d 1072 (11th Cir.2007) . . . . . . . . . . . . . . . . . . . . . . . . . . .19

*CG v. Penn Dept. of Educ.,* 734 F.3d 229 (3d Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13, 14

*Carter v. City of Philadelphia,* 181 F.3d 339 (3d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*D.S. v. Bayonne Bd. Of Education,* 602 F.3d 553 (3d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . .14

*Duvall v. County of Kitsap,* 260 F.3d 1124 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Earl v. Mervyns, Inc.,* 207 F.3d 1361 (11th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

*Evancho v. Pine-Richland Sch. Dist.,* 237 F. Supp. 3d 267 (W.D. Pa. 2017) . . . . . . . . . . . . . . . 23

*Everett v. Cobb County Sch. Dist.,* 138 F.3d 1407 (11th Cir.1998) . . . . . . . . . . . . . . . . . . . . . . .20

*Good Shepherd Manor Found., Inc. v. City of Momence,* 323 F .3d 557 (7th Cir. 2003) . . . 13, 14

*Gunter v. N Wasco Cnty. Sch. Dist. Bd. of Educ.,* 3:21-cv-1661-YY (D. Or. 12-22-2021) . . . . .16

*Helling v. McKinney,* 509 U.S. 25 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Hostettler v. College of Wooster,* 895 F.3d 844 (6th Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . .18

*In re DeLorean Motor Co.,* 755 F.2d 1223 (6th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Furgess v. Pennsylvania Dept. of Corrections,* 933 F. 3d 285 (3d Cir. 2019) . . . . . . . . . . . . . 13

*Kos Pharm., Inc. v. Andrx Corp.,* 369 F.3d 700 (3d Cir.2004) . . . . . . . . . . . . . . . . . . . . . . . . . . .23

*Neinast v. Bd. of Trs. of the Columbus Metro. Library,* 346 F.3d 585 (6th Cir. 2003) . . . . . . . . 18

*Nken v. Holder,* 556 U.S. 418 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

*One Three Five, Inc. v. City of Pittsburgh,* 951 F. Supp. 2d 788
(W.D. Pa. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Peregrino Guevara v. Witte,* No. 6:20-CV-01200, 2020 WL 6940814
(W.D. La. Nov. 17, 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

*PGA Tour, Inc. v. Martin,* 532 U.S. 661, 675 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

*Phipps v. Sheriff of Cook Cnty.,* 681 F.Supp.2d 899 (N.D.Ill.2009) . . . . . . . . . . . . . . . . . . . . . 19

*Pileggi v. Aichele,* 843 F.Supp.2d 584 (E.D. Pa. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*R.K. by & through J.K. v. Lee,* 2021 WL 5860924 (M.D. Tenn. Dec. 10, 2021) . . . . . . . . . . . . .4

*Ridgewood Bd. of Educ. v. NE.,* 172 F.3d 238 (3d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Sample v. Diecks,* 885 F.2d 1099 (3d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Sch. Bd. of Nassau Cnty., Fla. v. Arline,* 480 U.S. 273 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . .20

*S.H. v. Lower Merion Sch. Dist.,* 729 F.3d 248 (3d Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Talbert v. Corizon Medical,* 605 Fed.Appx. 86 (3d Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Thakker v. Doll,* 451 F. Supp. 3d 358 (M.D. Pa. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Washington v. Indiana High Sch. Athletic Ass 'n, Inc.,* 181 F .3d 840
(7th Cir.1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Wilborn ex rel. Wilborn v. Martin,* 965 F. Supp. 2d 834 (M.D. Tenn. 2013) . . . . . . . . . . . . . . . .18

*Winter v. Nat. Res. Def Council, Inc.,* 555 U.S. 7 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11, 15

*Zibbell v. Mich. Dep't of Human Servs.,* 313 F. App'x 843 (6th Cir. 2009) . . . . . . . . . . . . . . . .12

**Other Authorities Page**

*28 C.F.R. § 35.130(b)(l)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*28 C.F.R. § 35.130(b)(3* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

*28 C.F.R. § 35.130(b)(7* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

*28 C.F.R. § 35.139(b)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

*28 C.F.R. § 35.150* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*28 C.F.R. § 36.208(b.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*34 C.F.R. § 104.4* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*34 C.F.R. § 104.4(b)(l)(i)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*34 C.F.R. § 104.4(b)(l)(ii)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

*34 C.F.R. § 104.4(b)(4)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

*29 U.S.C.S. § 794* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*29 U.S.C.S § 794(a)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14, 19

*42 U.S.C.S. §2000d-7* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*42 U.S.C.S. §2000d-7(a)(l)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

*42 U.S.C.S. §2000d-7(a)(2)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*42 U.S.C. § 12131(1)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*42 U.S.C. § 12132* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12, 14, 19, 20

*42 U.S.C. § 12181* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*42 USC§ 12182(b)(2)(A)(i) )* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*42 USC§ 12182(b)(2)(A)(ii) )* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

*42 USC§ 12182(b)(3) )* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**INTRODUCTION**

**I. Relief Requested**

Plaintiffs are asking this Court to immediately enter a Temporary Restraining Order on an emergency basis, and ultimately grant a Preliminary Injunction to enjoin the Perkiomen Valley School Board from enforcing the mask-optional policy adopted on December 13, 2021, as modified January 2, 2022, to be implemented on January 24, 2022, regardless of the rate of transmission of COVID-19 in Montgomery County.

The rate of transmission is the critical barometer used by the Centers for Disease Control and Prevention ("CDC") and health care professionals to determine what proactive measures must be taken to protect the population from the spread of airborne infection caused by COVID-19.  It is irresponsible, irrational, arbitrary, and capricious for the School Board to choose to eliminate the protection provided by universal masking based upon a random date regardless of the rate of transmission, especially when the known rate of transmission currently is "high" and increasing.

> The level of SARS-CoV-2 transmission for any given area can change rapidly and should be reassessed at least weekly to ensure that the necessary layered prevention strategies are in place. In areas of substantial or high transmission, CDC recommends community leaders encourage vaccination and universal masking in indoor public spaces in addition to other layered prevention strategies to prevent further spread.

https://www.cdc.gov/mmwr/volumes/70/wr/mm7030e2.html (Emphasis added).

It is requested that this Court restore the status quo that existed prior to the School Board's December 13, 2021 vote, wherein the District previously required universal masking in conformance with the Health and Safety Plan of the District, reinforcing that universal masking will be required in the School District so long as the transmission rate of infection from COVID-19 for Montgomery County is in the "Substantial" or "High" categories.

1

Montgomery County has been in the "High" transmission category since August of 2021. With the new wave of infection caused by the Omicron, the "high" transmission rate has spiked even higher and is projected to continue to remain in the "High" category for at least the next six to eight weeks. "Unvaccinated persons, as well as persons with certain immunocompromising conditions, remain at substantial risk for infection, severe illness, and death, especially in areas where the level of SARS-Co V-2 community transmission is high." See https://www.cdc.gov/mmwr/volumes/70/wr/mm7030e2.html.[1]

The Plaintiffs represent a putative class of medically fragile disabled students who will no longer be afforded the protections from the risk of spread of COVID-19 afforded by the "layered approach" recommended by the CDC, an approach which requires universal masking as the corner stone to effective protection.  A layered approach includes vaccination, masking, quarantining, contract tracing, social distancing, and increased building ventilation all of which are required to effectively reduce the spread of COVID-19.  It is the combination of these measures that make them effective and, without any one of them, individuals with disabilities, like Plaintiffs and those similarly situated, are at increased risk of contracting the virus and severe illness or death. Most recently, on January 4, 2022, the CDC again reinforced the significant importance that mask wearing has to reducing the spread of COVID-19: "Mask use and layered prevention strategies, such as receiving all recommended vaccination and booster doses, physical distancing, screening testing, and improved ventilation, are key to preventing COVID-19 and decreasing transmission." https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/quarantine-isolation-background.html

---

[1] Level of SARS-CoV-2 Community Transmission ... "A person's risk for SARS-CoV-2 infection is directly related to the risk for exposure to infectious persons, which is largely determined by the extent of SARS-Co V-2 circulation in the surrounding community." *Id*.

The threat of harm is immediate and real.  The CDC conducted a study of more than 500 counties with and without school-mask requirements.  It found that those counties without such requirements faced more than double the rate of new pediatric COVID-19 cases per day than those with them.  See Samantha E. Budzyn, et al., Pediatric COVID-19 Cases in Counties With and Without School Mask Requirements - United States, July 1 - September 4, 2021, Morbidity & Mortality Wkly. Rep. 2021 (Oct. 1, 2021), http://dx.doi.org.ezproxy.law.duq.edu/10.15585/mmwr.mm7039e3 (last accessed Dec. 22, 2021) ("The average change ... for counties with school mask requirements (16.32 cases per 100, 000 children ... ) was 18.53 cases per 100, 000 per day lower than the average change for counties without school mask requirements (34.85 per 100, 000 per day) .... ").

There is overwhelming evidence that mask-wearing in public schools reduces the spread of COVID-19.  For example, an Arizona State University study found that schools without mask requirements were 350% more likely to have a COVID-19 outbreak.  See Megan Jehn, et al., Association Between K-12 School Mask Policies and School-Associated COVID-19 Outbreaks- Maricopa and Pima Counties, Arizona, July-August 2021, Morbidity & Mortality Wkly. Rep. 2021 (Oct. 1, 2021), http://dx.doi.org.ezproxy.1aw.duq.edu/10.15585/mmwr.mm7039e1 (last accessed Dec. 22, 2021), cited at ECF No. 15 at 9 n.38.

The COVID-19 pandemic has claimed the lives of over three quarters of a million Americans.  Covid Data Tracker, Ctrs. for Disease Control & Prevention, https://covid.cdc.gov/covid-data-tracker/#datatracker-home (last visited Dec. 1, 2021).

The removal of the protections afforded by universal mask wearing by the Board results in discriminatory conduct to the medically fragile, disabled students.  Defendants refusal to take the steps necessary to allow disabled or concerned children to safely access the school buildings and

equal access to education is in direct conflict with the express requirements of the ADA, which Congress created to serve the strong public interest in seeing persons with disabilities treated equally and fairly by society. All authorities agree that in-person instruction is necessary for the well-being of all children and all steps necessary to keep children in school should be followed. See Guidance for COVID-19 Prevention m K-12 Schools, Updated Jan. 6, 2022, https: //www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/k-12-guidance.html #:~:text=CDC%20recommends%20universal%20indoor%20masking,layered%20prevention%20 strategies%20in%20place. ("Students benefit from in-person learning, and safely returning to in-person instruction continues to be a priority.").

To expose a child to an increased risk of contracting COVID-19 actually goes against the requirements of the ADA and 504 of the Rehabilitation Act. Here, the vote of the School Board is causing children to be placed into a position of increased risk of harm from infection, instead of reducing the risk of harm. Under the ADA, and Section 504 the School District is required to make an accommodation for the student which reduces the risk of harm, not increases it. In addition, the accommodation should not place the other students into an increased risk of harm.

Federal courts have recently found that "[a] universal masking requirement instituted by a school is a reasonable modification that would enable disabled students to have equal access to the necessary in-person school programs, services, and activities." *See ARC of Iowa v. Reynolds*, ___ F.Supp. 3D _ , _ , 2021 WL 4166728, at *11 (S.D. Iowa Sept. 13, 2021); *see also R.K. by & through J.K. v. Lee*, 2021 WL 5860924, at *24 (M.D. Tenn. Dec. 10, 2021) (enjoining enforcement of a Tennessee law banning mask mandates in schools that purported to create an "accommodation" for students with disabilities and those in their immediate vicinity for a long duration to wear masks).

4

Plaintiffs will likely prevail on the merits because they include qualified individuals with disabilities under the ADA and Section 504, upon which the Defendants' optional masking policy has the effect of excluding these children from their public institution, or otherwise denying them the opportunity to participate in the services of the school district.

Plaintiffs are asserting that Defendants, their agents, servants, employees, attorneys, and all persons in active concert or participation with any of them, implemented and are going to enforce a policy which violates the Americans with Disabilities Act (ADA), and Section 504 of the Rehabilitation Act, and are asking this Court to enjoin Defendants from taking any other action to enforce such policy that is not in compliance with applicable law, and to restore the status quo of universal masking.

I.      **Factual Summary Related to Necessity of Universal Masking Accommodation**

According to the medical team who advises JANE DOE 1, regarding the medical care and treatment of CHILD DOE 1, universal masking is essential for safe schooling for CHILD DOE 1 because of serious health-related issues.  CHILD DOE 1, who is eight years old, is medically vulnerable and requires individualized adult assistance.  CHILD DOE 1 is classified as Otherwise Health Impaired, with Medical conditions including asthma and vocal cord dysfunction, which require daily breathing exercises and treatments administered by the school nurse.

After the Board voted on December 13, 2021 to remove universal masking, on or about January 3, 2022 , JANE DOE 1, requested the District to make an accommodation to protect her child, CHILD DOE 1 from infection from COVID-19 by having universal masking of all staff and students.  JANE DOE 1 reminded the District that CHILD DOE 1 's medical team has maintained that universal masking is essential for safe schooling.  Additionally, CHILD DOE l's medical team

opines that in-person instruction is necessary for CHILD DOE in a Least Restrictive Environment as required by the ADA and Section 504 of the RA.

As of January 22, 2022, the District has yet to respond the JANE DOE 1's request for an accommodation of universal masking around CHILD DOE 1.  Upon information and belief, the District will deny this request for accommodation as it did with JANE DOE 2.

According to the medical team who advises JANE DOE 2, regarding the medical care and treatment of CHILD DOE 2, universal masking is essential for safe schooling for CHILD DOE 2 because of serious health-related issues.  CHILD DOE 2, who is 7 years of age and is vaccinated but not yet eligible to receive a vaccine booster, is classified as Otherwise  Health Impaired, with Medical conditions including asthma, chronic bronchitis and pneumonia, and takes immunosuppressant medications.  In addition, CHILD DOE 2 was recently diagnosed with a disability falls that under the category of Emotional Disturbance and had to be withdrawn from school during the 2020-21 school year due to difficulty with virtual learning.  Some of the accommodations that CHILD DOE 2 is expected to receive under a 504 Plan include: learning support in an Emotional Support program, school-based therapy, and social work services.  CHILD DOE 2 is directly and most prominently negatively affected by virtual learning.  As such, JOHN DOE 2 and JANE DOE 2, want to keep CHILD DOE 2 educated via in person learning, which requires a layered approach of protection, including universal masking.

JOHN DOE 2 and JANE DOE 2 have legitimate and serious concerns about the District's plan to make masking optional after January 21, 2022.  This decision is causing a great deal of stress and anxiety,  particularly for CHILD DOE 2, as the decision relates to attending school in-person.  CHILD DOE 2's medical team opines that in-person instruction is necessary for CHILD DOE in a Least Restrictive Environment as required by the ADA and Section 504 of the RA.

6

JOHN DOE 2, JANE DOE 2, and CHILD DOE 2 are concerned about the impact of optional masking on CHILD DOE 2's health and safety, as well as on family and friends. Even with universal masking and vaccinations, CHILD DOE 2's disabilities make it challenging to catch up after having missed school. Therefore, all preventative measures for a layered approach from the spread of COVID-19, including universal masking are necessary to help keep CHILD DOE 2 in school in order to provide for CHILD DOE 2's education to be delivered in the Least Restrictive Environment (LRE).

According to the medical team who advises JANE DOE 3, regarding the medical care and treatment of CHILD DOE 3, universal masking is essential for safe schooling for CHILD DOE 3 because of serious health-related issues. CHILD DOE 3, who is 10 years of age and is vaccinated but not yet eligible to receive a vaccine booster, is classified as Otherwise Health Impaired, with Medical conditions including asthma that require prescription medications.

JANE DOE 3 has legitimate and serious concerns about the District's plan to make masking optional after January 21, 2022. This decision is causing a great deal of stress and anxiety, particularly for CHILD DOE 3, as the decision relates to attending school in-person. CHILD DOE 3's medical team opines that in-person instruction is necessary for CHILD DOE in a Least Restrictive Environment as required by the ADA and Section 504 of the RA.

## ARGUMENT

### I.   Medical Evidence Shows Immediate and Irreparable Harm to Children when Masking is Optional.

In view of the serious concern for our nation's children, the CDC issued a strong recommendation for masking of all persons, teachers, students and staff, within the nation's schools, regardless of vaccination status, to create a multilayered approach for fighting COVID

and to keep our schools open for in-person education. See https://www.cdc.gov/mmwr/volumes/70/wr/mm7030e2.html - Guidance for Implementing COVID-19 Prevention Strategies in the Context of Varying Community Transmission Levels and Vaccination Coverage:

> **Until vaccination coverage is high and community transmission is low**, public health practitioners, as well as schools, businesses, and institutions (organizations) **need to regularly assess the need for prevention strategies to avoid stressing health care capacity and imperiling adequate care for both COVID-19 and other non-COVID-19 conditions**. CDC recommends five critical factors be considered to inform local decision-making: 1) level of SARS-Co V-2 community transmission; 2) health system capacity; 3) COVID-19 vaccination coverage; 4) capacity for early detection of increases in COVID-19 cases; and 5) populations at increased risk for severe outcomes from COVID-19. Among strategies to prevent COVID-19, CDC recommends all unvaccinated persons wear masks in public indoor settings. [emphasis added]

Experts agree that COVID-19 is primarily spread through respiratory droplets that are inhaled by people nearby. CDC, Scientific Brief: SARS-CoV-2 Transmission, May 7, 2021, https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/sars-cov-2-transmission.html ("The principal mode by which people are infected with [COVID-19] is through exposure to respiratory fluids carrying infectious virus. Exposure occurs in three principal ways: (1) inhalation of very fine respiratory droplets and aerosol particles, (2) deposition of respiratory droplets and particles on exposed mucous membranes in the mouth, nose, or eye by direct splashes and sprays, and (3) touching mucous membranes with hands that have been soiled either directly by virus-containing respiratory fluids or indirectly by touching surfaces with virus on them.").

Asymptomatic carriers of COVID-19 can also transmit the disease. The current, most prevalent variant of COVID-19, known as the Omicron variant, is extremely infectious and is spread much more readily than either the original SARS-CoV-2 strain or the Delta Variant. See CDC Omicron Variant: What You Need to Know, Updated Dec. 20, 2021 ("The Omicron variant

likely will spread more easily than the original SARS-Co V-2 virus and how easily Omicron spreads compared to Delta remains unknown.  CDC expects that anyone with Omicron infection can spread the virus to others, even if they are vaccinated or don't have symptoms.") https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html.          Unmasked individuals are both at risk of immediate and irreparable harm from COVID-19, as well as can be the cause of a higher risk of spreading COVID-19 and resultant serious illness and/or death.  *Id*.

According to the CDC, the vast number of people who will become infected because of the highly infectious Omicron Variant, along with continued infection from the Delta variant, is going to cause additional stress on the healthcare system:

> "Even if the proportion of infections associated with severe outcomes is lower than with previous variants, given the likely increase in number of infections, the absolute numbers of people with severe outcomes could be substantial.  In addition, demand for ambulatory care, supportive care for treatment of mild cases, and infection control requirements, quarantining/isolation of exposed/infected workforce could also stress the healthcare system.  These stresses likely will be in addition to the ongoing Delta variant infections and a rising burden of illness caused by other respiratory pathogens, such as influenza, which have begun circulating at greater frequencies."

https://www.cdc.gov/coronavirus/2019-ncov/science/forecasting/mathematical-modeling-outbreak.html.

Both the CDC and the United States Environmental Protection Agency provide guidance about the importance of implementing a layered approach of protection from the spread of COVID:

Implementing a Layered Approach to Address COVID-19 in Public Indoor Spaces

**It is essential to implement a multifaceted, layered approach to reduce the risk of indoor airborne transmission of COVID-19**.  It is important to implement engineering controls, administrative controls, and space reconfiguration, adapted for the specific building and situation, to address COVID-19 in public indoor spaces, in addition to physical distancing, adequate ventilation, and avoidance of crowded indoor spaces, **wearing masks**, and other measures recommended by the Centers for Disease Control and Prevention (CDC). Consult guidance from CDC and local authorities on current guidelines on the use of masks.

https://www.epa.gov/coronavirus/implementing-layered-approach-address-covid-19-public-indoor-spaces ( emphasis added).

The need for a layered approach is particularly true in school buildings where many children are in the same building or classroom for hours on end. See https://www.cdc.gov/coronavirus/2019-ncov/community/ventilation.html:

> CDC recommends a layered approach to reduce exposures to SARS-Co V-2, the virus that causes COVID-19. This approach includes using multiple mitigation strategies, including improvements to building ventilation, to reduce the spread of disease and lower the risk of exposure. In addition to ventilation improvements, **the layered approach includes** physical distancing, **wearing face masks**, hand hygiene, and vaccination. [ emphasis added]

A school system should not adopt a tailored approach to use only some of the CDC's guidelines at the exclusion of mask wearing because the exclusion of mask wearing nullifies any attempt at keeping vulnerable children safe. "**It is essential to implement a multifaceted, layered approach to reduce the risk of indoor airborne transmission of COVID-19**." *Id*. The CDC explains:

> **No one strategy is sufficient to prevent transmission, and multiple interventions should be used concurrently to reduce the spread of disease** (6). Proven effective strategies against SARS-Co V-2 transmission, beyond vaccination, **include using masks consistently and correctly** (7 ,8), maximizing ventilation both through dilution (9,10) and filtration (11) of air, and maintaining physical distance and avoiding crowds (12,13).

See https:/ /www.cdc.gov/mmwr/volumes/70/wr/mm7030e2.html ( emphasis added).

The Board's vote of December 13, 2021, which adopts a selective approach to intervention by removing the essential strategy of universal masking, is directly in contradiction to the directions provided by the CDC of the effective strategy of "using masks consistently" as necessary to protect all school children, especially medically fragile disabled children. The CDC has found that "children with medical complexity, with genetic, neurologic, metabolic conditions, or with congenital heart disease can be at increased risk for severe illness from COVID-19." CDC,

10

COVID-19: People with Certain Medical Conditions (May 13, 2021), https://www.cdc.gov/coronavirus/2019-ncov-need-extra-precauations/people-with-medical-conditions.html. "[C]hildren with obesity, diabetes, asthma or chronic lung disease, sickle cell disease, or immunosuppression can also be at increased risk for severe illness from COVID-19." *Id*.

There is no cure for COVID-19. The vaccine is a preventative measure and can prove less effective for those individuals with weakened or compromised immune systems who are unable to produce a robust immune response to the vaccine. Therefore, implementation of a layered approach to the prevention of the spread of COVID-19, which requires universal masking, must be kept in place, so long as the transmission rate for Allegheny County remains in the "Substantial" or "High" category.

II.     **Plaintiffs Meet the Legal Requirements for the Court to Grant Them a Temporary Restraining Order.**

Federal Rule of Civil Procedure 65 governs the granting of injunctive relief such as temporary restraining orders and preliminary injunctions. By design, this relief is extraordinary in nature and available only in limited circumstances. *See AT & T v. Winback and Conserve Program, Inc.*, 42 F.3d 1421, 1426-27 (3d Cir. 1994), *cert. denied*, 514 U.S. 1103 (1995). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

Plaintiffs in this case are able to establish all four elements: (1) likely to succeed on the merits of their claims; (2) likely to suffer irreparable harm in the absence of relief; (3) the issuance

11

of the injunction would not cause harm to others; and ( 4) a TR Olin junction is in the public interest. *Talbert v. Corizon Medical*, 605 Fed.Appx. 86, 87 (3d Cir. 2015).[2]  Where plaintiffs demonstrate "irreparable harm which decidedly outweighs any potential harm to the defendant," the "degree of likelihood of success required" is less, and a plaintiff need only raise "serious questions going to the merits." *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985).

### A.       Plaintiffs Are Likely to Succeed on the Merits of Their Claims.

Plaintiffs are likely to establish that Defendants have violated their rights under the ADA and Section 504 of the Rehabilitation Act.  Section 504 of the Rehabilitation Act is an antidiscrimination statute that provides: "No otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]" *29 U.S.C. § 794(a)*.  Like Section 504, Title II of the Americans with Disability Act ("ADA") is also an antidiscrimination statute and provides:

> No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

*42 U.S.C. § 12132*.  Excluding children from the public-school classrooms on the basis of their medically fragile disability is precisely the type of discrimination and segregation the ADA and its amendments aim to prevent and specifically prohibit. Rehabilitation Act and ADA claims "share the same standard" and Rehabilitation Act claims are reviewed as though brought under the ADA. *Zibbell v. Mich. Dep't of Human Servs.*, 313 F. App'x 843,849 (6th Cir. 2009).

---

[2] The standard for granting a preliminary injunction under Rule 65 is the same as that for issuing a TRO. *Pileggi v. Aichele*, 843 F.Supp.2d 584, 592 (E.D. Pa. 2012) (*citing Bieros v. Nicola*, 857 F.Supp. 445,446 (E.D. Pa. 1994)).

Both the ADA and the Rehabilitation Act require Plaintiffs to establish that: (1) Plaintiffs are qualified individuals with a disability within the meaning of Section 504 of the Rehabilitation Act or the ADA; (2) Plaintiffs will be excluded from participation in or denied benefits of such services, programs, or activities of the public entity, and (3) Plaintiffs' exclusion, denial of benefits, or discrimination occurred by reason of their disability. *Furgess v. Pennsylvania Dept. of Corrections*, 933 F. 3d285, 288-289 (3d Cir. 2019). Together, these laws require public schools to afford students with disabilities an equal opportunity to participate in or benefit from the aids, benefits, or services that are provided to others. *28 C.F.R. §35.130(b)(l), 34 C.F.R. §104.4(b)(l)(ii), (iii), (vii).*

"Title II imposes affirmative obligations on public entities and does not merely require them to refrain from intentionally discriminating against the disabled." *Ability Ctr. of Greater Toledo v. City of Sandusky*, 385 F.3d 901,910 (6th Cir. 2004). When a state entity, like a school board, fails to make reasonable modifications to its facilities and practices, a party may sue the school board by bringing a claim known as a failure-to-accommodate claim under the ADA. *PGA Tour, Inc. v. Martin*, 532 U.S. 661 , 675 (2001) (quotations omitted) (in the ADA, "Congress noted that the many forms such discrimination takes include[ ... ] the 'failure to make modifications to existing facilities and practices'". id. (*quoting 42 U.S.C. § 12101(a)(5)).*

A failure-to-accommodate claim differs from other ADA claims in that the plaintiff is not required to show that his injury was the result of purposeful discrimination. *See Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d557, 561-62 (7th Cir. 2003). Instead, the ADA's "by reason of' language requires a showing of causation: the plaintiff must demonstrate that, but for the failure to accommodate, he would not be deprived of the benefit he seeks. *See id.; CG v. Penn Dept. of Educ.*, 734 F.3d 229, 237 (3d Cir. 2013) (To make out a prima facie claim for

13

disparate impact under the Rehabilitation Act, the plaintiff must show that he or she "has been deprived of meaningful access to a benefit to which he or she was entitled.")

Here, applying the "by reason of" language, Plaintiffs only need to demonstrate that their children are unable to meaningfully participate in the student's classes because the District refused to provide the necessary accommodations. Id. In other words, "but for" the failure to accommodate through universal masking, Plaintiffs' children would be able to have "full participation" in the classes offered to other students.  *See Id.* and *Good Shepherd, supra.*[3]

In this matter, Plaintiffs will likely prevail on the merits because they include qualified individuals with disabilities under the ADA and Section 504, the Defendants' optional mask wearing policy has the effect of excluding these children from their public institution, or otherwise denying them the opportunity to participate in the services of the school district.

Defendant School Board's policy specifically violates the regulations and provisions of the ADA and Section 504, and/or causes the School District to violate the regulations and provisions of the ADA and Section 504 in the following ways:

1. Defendant Board is failing to make a reasonable modification, and/or are preventing the schools from making a reasonable modification, under circumstances where it is required, in violation of *28 C.F.R. § 35.130(b)(7)*;

2. Defendant Board is excluding and/or are causing the schools to exclude Plaintiffs from participation in public education, in violation of *42 U.S.C. § 12132; 28 C.F.R. § 35.130; 29 U.S.C. § 794(a)* and *34 C.F.R. §104.4(b)(l)(i)*;

3. Defendant Board is failing to make and/ or causing the schools to fail to make, their services, programs, and activities "readily accessible" to disabled individuals, in violation of *28 C.F.R. § 35.150*;

---

[3] Although the government is not required to maximize the potential of every handicapped child, it must supply an education that provides "significant learning" and "meaningful benefit" to the child.  *D.S. v. Bayonne Bd. Of Education*, 602 F.3d 553, 556 (3d Cir. 2010) (*citing Ridgewood Bd. of Educ. v. N.E.*, 172 F.3d 238, 247 (3d Cir. 1999)).

4.      Defendants are administering policies that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability and that has the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities, in violation of *28 C.F.R. § 35.130(b)(3))* and *34 C.F.R. § 104.4(b)(4).*

5.      Defendants are using methods of administration that have the effect of subjecting Plaintiffs to discrimination on the basis of disability, in violation of *34 C.F.R. § 104.4(b)(4)*;

Although all school children, and particularly those under age 12 who are just starting to receive the vaccine, face an increased risk of contracting COVID-19 in the absence of universal mask wearing, medically fragile students with certain medical disabilities will be significantly more impacted without this basic protection.  Plaintiffs and others similarly situated have medical disabilities that have been shown to put them at greater risk for being hospitalized, becoming severely ill, or dying as a result of COVID-19.  If they contract COVID-19, each of these Plaintiffs are at a high risk of significant complications such as severe illness, long-lasting disability, and death.

**B.      Plaintiffs' Risk of Exposure to COVID-19 and/or Withdrawal from In- Person Classes Constitutes Irreparable Harm.**

Plaintiffs are likely to suffer irreparable and substantial harm if the School Board's December 13, 2021 and January 2, 2022 votes removing universal masking and permitting optional masking remains in place.  Plaintiffs must show that "irreparable injury is likely in the absence of an injunction."  *Winter, supra*, 555 at 22.  A harm need not be inevitable or have already happened for it to be irreparable; rather, imminent harm is also cognizable harm that merits an injunction. *See Helling v. McKinney*, 509 U.S. 25, 33 (1993).

15

Plaintiffs are likely to suffer probable, irreparable injury if universal masking is removed as shown by the fact that rate of spread of infection of COVID-19 remains in the "high" transmission category in Allegheny County. While a number of other accommodations to limit the spread of COVID-19 are helpful, universal masking is essential in mitigating the spread based on the manner in which COVID-19 is spread and the efficacy of universal masking as compared with other techniques.

Moreover, the best form of instruction for the medically fragile disabled students is in-person due to the necessity of adult supervision and necessary personal individualized attention. "Students benefit from in-person learning, and safely returning to in-person instruction continues to be a priority."  See Guidance for COVID-19 Prevention in K-12 Schools, Updated Jan. 6, 2022, *supra*.  Every day Plaintiffs will have to face the decision of whether to return their children in person for schooling or risk contracting COVID-19 when exposed to their unmasked classmates. Further, having only vulnerable children wear masks, as suggested by proponents of optional masking, is not a viable solution because it violates the Americans with Disabilities Act and "smacks of placing a disabled child in a stigmatizing bubble . . . as if he or she were wearing a badge of infamy."  *R.K. by & through J.K. v. Lee*, 2021 WL 5860924, at *24 (M.D. Tenn. Dec. 10, 2021) (enjoining enforcement of a Tennessee law banning mask mandates in schools that purported to create an "accommodation" for students with disabilities and those in their immediate vicinity for a long duration to wear masks).  It also does not serve to protect other vulnerable persons, such vulnerable family members at home, staff, and contractors. *See also Gunter v. N. Wasco Cnty. Sch. Dist. Bd. of Educ.*, 3:21-cv-1661-YY, at *23 (D. Or. 12-22-2021).

Without the ability to implement a universal mask mandate, Plaintiffs will continue to be exposed to an increased risk of infection, hospitalization, or death because of COVID-19 by simply seeking access to the building, classroom, hallways, and extracurricular activities.

Plaintiffs are particularly vulnerable to the virus both because of their medical conditions, and because some of them remains ineligible to receive the vaccine due to being under the age of 12 years old, or that the efficacy of the vaccine is reduced due to their compromised immune systems.  Frankly, it would be unconscionable to argue that exposure to virus that cause severe ramifications including death is not an irreparable harm incapable of being adequately remedied at law with money damages.  *Peregrino Guevara v. Witte*, No. 6:20-CV-01200, 2020 WL 6940814, at *8 (W.D. La. Nov. 17, 2020) (noting that "[i]t is difficult to dispute that an elevated risk of contracting COVID-19 poses a threat of irreparable harm"); *Banks v. Booth*, 2020 U.S. Dist. LEXIS 68287, at *45 (D.D.C. Apr. 19, 2020) (in granting an injunction the court found "that the number of inmates testing positive for COVID-19 is growing daily.).

Given the gravity of Plaintiffs' asserted injury, as well as the permanence of death, Courts have found that Plaintiffs have satisfied the requirement of facing irreparable harm unless injunctive relief is granted.  *See Thakker v. Doll*, 451 F. Supp. 3d 358, 365 (M.D. Pa. 2020) (in granting an injunction to release petitioners in civil detention who suffered from "chronic medical conditions and face[ d] an imminent risk of death or serious injury if exposed to COVID-19 ," court determined that "[ t ]here [ could] be no injury more irreparable" than the "very real risk of serious, lasting illness or death"); *Basank v .Decker*, No. 20 CIV. 2518 (AT), 2020WL 1953847, at *7 (S.D.N.Y. Apr. 23, 2020) (in granting an injunction to prevent placing petitioners in immigration detention, court noted that "[p]etitioners [were] at particular risk for serious illness or death, because their preexisting medical conditions either [made] them more vulnerable to

contracting COVID-19, or more likely to develop serious complications due to COVID-19, or both" and the possibility of a severe, and "quite possibly fatal" infection constituted irreparable harm that warranted a preliminary injunction).

Accordingly, the Court should find that Plaintiffs have met their standard and demonstrated the substantial likelihood of irreparable harm.

**C.   There is No Hardship to Defendants and the Public Interest Favors Plaintiffs.**

When the government opposes the issuance of a temporary restraining order, the final two factors-the balance of the equities and the public interest-merge.  *See Nken v. Holder*, 556 U.S. 418,435 (2009). The public has an interest in protecting public health.  *See Neinast v. Bd. of Trs. of the Columbus Metro. Library*, 346 F.3d 585, 594 (6th Cir. 2003) (recognizing public health and safety as legitimate government interests).  The public interest is also "served by the enforcement of the ADA." *Wilborn ex rel Wilborn v. Martin*, 965 F. Supp. 2d 834,848 (M.D. Tenn. 2013).

The public interest thus requires that a TRO be granted in order to effectuate the ADA's broad "remedial purposes." *Hostettler v. College of Wooster*, 895 F.3d 844, 853 (6th Cir. 2018).

Moreover, no harm or hardship shall be suffered by Defendants.  The PADOH and the CDC have affirmed that masking is the single best way to protect children at school from infection with COVID-19.

Enjoining the School Board's policy and ordering the School District to comply with the CDC's and PADOH's Orders will cause no harm other than the potential dissatisfaction of some members of the public.  Further, ordering a universal mask mandate will benefit the public by reducing the risk of the spread of COVID-19 in schools and among its children.  It also has the benefits of reducing the stress faced by local hospitals in treating unnecessarily infected children.

18

**III.    Defendants Violated Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act.**

To prevail on a Title II claim, Plaintiff must prove "(1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of [his] disability." *42 U.S.C. § 12132*; *Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1083 (11th Cir.2007).

"' [C]auses of action under Title II of the ADA and the Rehabilitation Act are essentially identical' and may be considered simultaneously." *Everett v. Cobb County Sch. Dist.*, 138 F.3d 1407, 1409 (11th Cir.1998).  Section 504 provides: "[n]o otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." *29 U.S.C. § 794(a)*.

For purposes of injunctive relief, the deliberate indifference standard is not required.  *See Washington v. Indiana High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 846 (7th Cir.1999) ("We cannot accept the suggestion that liability under Title II of the Discrimination Act must be premised on an intent to discriminate on the basis of disability . . . [The Supreme Court] has implied that requiring such proof would be contrary to the intent of Congress."); *Phipps v. Sheriff of Cook Cnty.*, 681 F.Supp.2d 899,917 (N.D.Ill.2009) ("It is necessary to show intentional discrimination in order to recover compensatory damages (as opposed, say, to injunctive relief).").  Therefore, intentional discrimination is not an element of liability under Title II of the ADA or Section 504. *See Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000) ("To establish a prima facie case of discrimination under the ADA, a plaintiff must show ... (3) she was subjected to unlawful discrimination because of her disability.").

19

The term "direct threat" is defined as "a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures or by the provision of auxiliary aids or services." *42 U.S.C. § 12182(b)(3)*.  In determining whether an individual poses a direct threat to the health or safety of others, a public accommodation must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence, to ascertain: The nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures or the provision of auxiliary aids or services will mitigate the risk.  *28 C.F.R. § 36.208(b), 28 C.F.R. § 35.139(b).  See also Sch. Bd. of Nassau Cnty., Fla. v. Arline*, 480 U.S. 273,288 (1987) (Factors to consider in determining a direct threat in a contagious disease case include "(a) the nature of the risk, (b) the duration of the risk, (c) the severity of the risk, and ( d) the probabilities the disease will be transmitted and will cause varying degrees of harm.").

Here, there is no evidence the School Board considered whether permitting children to be unmasked in school created a direct threat to medically fragile students who are disabled.

The School District is a public school district and is subject to the ADA.  *See 42 U.S.C. §12181*.  Title II of the ADA states "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *See 42 U.S.C. §12132*.  Public entity includes "any State or local government; [ and] and department, agency, special purposed district, or other instrumentality of a State or States or local government ... ".  *See 42 U.S.C. § 12131(1)*.

The ADA specifically defines discrimination on the basis of disability to include "the imposition or application of eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any goods, services, privileges, advantages, or accommodations .... "   *See 42 U.S.C. § 12182(b)(2)(A)(i)*.  The ADA prohibits discrimination that includes "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities ... ".  *See 42 U.S.C. § 12182(b)(2)(A)(ii)*.

"Deliberate indifference may be established where [ ... ] where risk of harm is great and obvious." *See Carter v. City of Philadelphia*, 181 F.3d 339, 357 (3d Cir. 1999) (*citing Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989)).  The "deliberate indifference standard" requires "(1) knowledge that a federally protected right is substantially likely to be violated ... and (2) failure to act despite that knowledge." *S.H. v. Lower Merion Sch. Dist.*, 729 F.3d 248,265 (3d Cir. 2013), (*citing Duvall v. County of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001 )).  "Deliberate indifference 'does not require a showing of personal ill will or animosity toward the disabled person.'" *Lower Merion Sch. Dist., supra* at 263.

Risk of harm to Plaintiffs' children and others similarly situated is great and obvious. Defendants, are refusing to provide reasonable accommodations to allow Plaintiffs to receive their education because of their disabilities.  Defendants have thereby discriminated against Plaintiffs in violation of the Americans with Disabilities Act. Defendants' violation of the ADA will cause Plaintiffs the irreparable loss of their educational placement plus reasonable attorney's fees, costs, and interest.

Likewise, under Section 504, no otherwise qualified individual with a disability shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. *29 U.S.C.S. § 794*.

As detailed above, Defendants have intentionally, purposefully, and/or with deliberate indifference, violated the rights of Plaintiffs secured by Section 504 of the Rehabilitation Act of 1973, as amended, *29 U.S.C. § 794 and 34 C.F.R. § 104.4*, by subjecting Plaintiffs to discrimination on the basis of their disabilities or by excluding and/or denying Plaintiffs from participating in, or benefitting from, the Defendants' programs, actives, and services.

Defendant school District is a recipient of Federal money. Defendants' sovereign immunity under the Eleventh Amendment are explicitly abrogated pursuant to *42 U.S. C.S. §2000d-7*. "A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973 [ 29 USCS §794]... . " *42 U.S.C.S. §2000d-7(a)(l).*

In claims against a State for violating Section 504, "remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in the suit against any public or private entity other than a state." *42 U.S.C.S. §2000d-7(a)(2)*.

## REQUESTED REMEDY

Plaintiffs respectfully request the Court to enter the Proposed Order attached to the accompanying Motion, vacate and void the action taken by the School Board at the December 13, 2021 meeting, and to reinstate the status quo by compelling the re-implementation of the universal masking requirement for students, staff, and visitors for grades K-12, while indoors, and riding on school buses effective immediately.

Such action is in line with the Court's authority to restore the status quo that existed prior to the Board's vote on December 13, 2021.  *See One Three Five, Inc. v. City of Pittsburgh*, 951 F. Supp. 2d 788, 807 (W.D. Pa. 2013) quoting *Acierno v. New Castle County*, 40 F.3d 645, 647 (3d Cir.1994).  ("The primary purpose of preliminary injunctive relief 'is maintenance of the status quo until a decision on the merits of a case is rendered.'") "'Status quo' refers to 'the last, peaceable, noncontested status of the parties." *Id*. quoting *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir.2004); *see also Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267,283 (W.D. Pa. 2017) (in case concerning a Board Resolution, the status quo was the "factual state of affairs that existed prior to the resolution").

Dated: January 23, 2022

Respectfully submitted,
De GISI LAW GROUP, LLC

*/s/ Carmen A. De Gisi*
Carmen A. De Gisi
PA ID No. 208989
De GISI LAW GROUP, LLC
462 Germantown Pike, Suite 11
Lafayette Hill, PA 19444
(610) 897-8721
cdegisilaw@gmail.com
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Brief was served by e-mail on this 23rd day of January 2022, addressed to the below parties and counsel:

PVSD SOLICITOR
Brian E. Subers, Esquire
Fox Rothschild LLP
10 Sentry Parkway, Suite 200
P.O. Box 3001
Blue Bell, PA 19422-3001
bsubers@foxrothschild.com

MEMBER SAYLOR
jsaylor@pvsd.org

MEMBER EVANS-BROCKETT
sevansbrockett@pvsd.org

MEMBER WHITE
lrwhite@pvsd.org

MEMBER MARES
kmares@pvsd.org

MEMBER FOUNTAIN
dfountain@pvsd.org

MEMBER CAMPLI
tcampli@pvsd.org

MEMBER KEENAN
rkeenan@pvsd.org

MEMBER DORR
mdorr@pvsd.org

MEMBER KOLAR
rkolar@pvsd.org

PVSD SUPERINTENDENT
brussell@pvsd.org

*/s/ Carmen A. De Gisi*
Carmen A. De Gisi
PA ID No. 208989
De GISI LAW GROUP, LLC
462 Germantown Pike, Suite 11
Lafayette Hill, PA 19444
(610) 897-8721
cdegisilaw@gmail.com
*Counsel for Plaintiffs*