### THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN DOE 1 and JANE DOE 1, in their own Capacity and as parents of CHILD DOE 1, JOHN DOE 2 and JANE DOE 2, in their own Capacity as parents of CHILD DOE 2, JANE DOE 3, in her own capacity and as parent of CHILD DOE 3 on behalf of similarly situated, Plaintiffs | : : : : : : : : : | No. 2:22-cv-00287 |
| v. | : : | |
| PERKIOMEN VALLEY SCHOOL DISTRICT, a Pennsylvania governmental entity, JASON SAYLOR, MATTHEW DOOR, ROWAN KEENAN, DON FOUNTAIN, KIM MARES, REENA KOLAR, SARAH EVANS-BROCKETT, LAURA WHITE and TAMMY CAMPLI, all Individual elected offices sued in their official capacity as members of the BOARD OF SCHOOL DIRECTORS OF THE PERKIOMEN VALLEY SCHOOL DISTRICT, a Pennsylvania elected legislative body, Defendants. | : : : : : : : : : : : : : : : | |

### BRIEF IN SUPPORT OF DEFENDANTS'
### OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

**FOX ROTHSCHILD LLP**
Brian E. Subers, Esquire
Beth N. Shore, Esquire
10 Sentry Parkway, Suite 200
P.O. Box 3001
Blue Bell, PA 19422-3001
Telephone: (610) 397-6500
Fax: (610) 397-0450
bsubers@foxrothschild.com
*Attorneys for Defendants*

130168686.1

## TABLE OF CONTENTS

I.     INTRODUCTION ..................................................................................................... 1

II.    RELEVANT FACTUAL BACKGROUND ............................................................... 2

    A.    The Perkiomen Valley School District .......................................................... 2

    B.    The District's COVID-19 Response. .............................................................. 3

        1.    The 2019-2020 School Year. ............................................................... 3

        2.    The 2020-2021 School Year. ............................................................... 5

        3.    The 2021-2022 School Year ............................................................... 10

    C.    District's Rationale for Revising Mask Mandate to Mask Recommendation. ..... 15

    D.    The District's Willingness and Ability to Accommodate Students with Disabilities Relating to COVID-9 .................................................................. 23

    E.    Other Considerations ..................................................................................... 23

III.   ARGUMENT ........................................................................................................... 25

    A.    Plaintiffs are Unlikely to Prevail on the Merits. ........................................... 26

        1.    Plaintiffs Lack Standing...................................................................... 27

        2.    The Court is Without Jurisdiction to Hear Plaintiffs' Disparate Impact Claim. ....................................................................................... 29

        3.    Even if This Court Has Jurisdiction, Plaintiffs Cannot Show Disparate Impact Discrimination. ....................................................... 32

        4.    Plaintiffs Are Unlikely to Succeed on a Failure to Accommodate Claim. .................................................................................................. 38

    B.    Plaintiffs Have Not Established They Will Be Irreparably Harmed by a Denial of Their Motion. ................................................................................ 42

    C.    The Balance of Equities Weighs in Favor of Defendants and Granting Plaintiffs' Motion is Not in the Public Interest. ............................................ 43

IV.   CONCLUSION ......................................................................................................... 45

130168686.1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. Choate*,
469 U.S. 287 (1985) ................................................................................................32

*Alexander v. Sandoval*,
532 U.S. 275 (2001) .........................................................................................31, 32

*B.C. v. Mount Vernon Sch. Dist.*,
837 F.3d 152 (2d Cir. 2015) ...................................................................................34

*Batchelor v. Rose Tree Media Sch. Dist.*,
759 F.3d 266 (3d Cir. 2014) ...................................................................................39

*Berardelli v. Allied Services Institute of Rehabilitation Medicine*,
900 F.3d 104 (3d Cir. 2018) ...................................................................................41

*C.D. v. New York Dept. of Educ.*,
No. 05 Civ. 7945, 2009 WL 400382 (S.D.N.Y. Feb. 11, 2009) .............................34

*C.G. v. Pennsylvania Dept. of Educ.*,
734 F.3d 229 (3d Cir. 2013) ...................................................................................38

*Campbell Soup Co. v. ConAgra, Inc.*,
977 F.2d 86 (3d Cir. 1992) .....................................................................................25

*Chambers v. Sch. Dist. of Philadelphia*,
587 F.3d 176 (3d Cir. 2009) .............................................................................26, 32

Corman v. Acting Sec'y of Pennsylvania Dep't of Health,
No. 294 M.D. 2021, 2021 WL 5227124 (Pa. Commw. Ct. Nov. 10, 2021) ............18

Corman v. Acting Sec'y of Pennsylvania Dep't of Health,
No. 83 MAP 2021, 2021 WL 6071796 (Pa. Dec. 10, 2021) ...................................18

*D.E. v. Cent. Dauphin Sch. Dist.*,
765 F.3d 260 (3d Cir. 2014) ...................................................................................26

*I.H. ex. rel. D.S. v. Cumberland Valley Sch. Dist.*,
842 F. Supp. 2d 762 (M.D. Pa. 2012) ....................................................................39

*Doe v. Bluecross Blueshield of Tennessee, Inc.*,
926 F.3d 235 (6th Cir. 2019) ............................................................................30, 31

*Doe v. Delaware Valley Sch. Dist.*,
    No. 3:21-cv-1778, 2021 WL 5239734 (M.D. Pa. Nov. 11, 2021) ..............................33, 44, 45

*Doe v. Upper Saint Clair Sch. Dist.*,
    No. 2:22-112, 2002 WL 189691 (Jan. 21, 2022) ...................................................27, 28, 43, 44

*Easley v. Snider*,
    36 F.3d 297 (3d Cir. 1994) ......................................................................................................38

*Ferring Pharm., Inc. v. Watson Pharm., Inc.*,
    765 F.3d 205 (3d Cir. 2014) ....................................................................................................25

*Fry v. Napoleon Comty. Schs.*,
    137 S. Ct. 743 (2017) ........................................................................................................39, 40

*Gerardi v. Pelullo*,
    16 F.3d 1363 (3d Cir. 1994) ....................................................................................................25

*Griggs v. Duke Power Co.*,
    401 U.S. 424 (1971) ................................................................................................................31

*Hibbs v. Arsenberg*,
    276 Pa. 24 (Pa. 1923) ..............................................................................................................44

*In re Horizon Healthcare Servs. Inc. Data Breach Litig.*,
    846 F.3d 625 (3d Cir. 2017) ....................................................................................................29

*Huntington Branch, NAACP v. Huntington*,
    844 F.2d 926 (2d Cir. 1998) ....................................................................................................34

*Kos Pharms. Inc. v. Andrx Corp.*,
    369 F.3d 700 (3d Cir.2004) ....................................................................................................25

*L.R. v. Manheim Twp. Sch. Dist.*,
    540 F. Supp. 2d 603 (E.D. Pa. 2008) ....................................................................................39

*Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*,
    501 U.S. 350 (1991) (Scalia, J., concurring in part and concurring in
    judgment) ................................................................................................................................30

*Landerman v. Churchill Area School Dist.*,
    414 Pa. 530 (Pa. 1964) ............................................................................................................44

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ................................................................................................................27

*Madison Square Garden Corp. v. Braddock*,
    90 F.2d 924 (3d Cir. 1937) ......................................................................................................25

iii

*Mazurek v. Armstrong,*
   520 U.S. 968 (1997)..................................................................................25

*Opticians Ass'n of Am. v. Independent Opticians of Am.,*
   920 F.2d 187 (3d Cir. 1990)....................................................................25

*Pahlavan v. Drexel University College of Medicine,*
   438 F. Supp. 3d 404 (E.D. Pa. 2020) ......................................................41

*Patton v. Phoenix Sch. of Law LLC,*
   No. CV–11–0748–PHX–GMS, 2011 WL 1936920 (D. Ariz. May 20, 2011) .......................41

*R.R. v. Manheim Twp. Sch. Dist.,*
   412 Fed. Appx. 544 (3d Cir. 2011)..........................................................39

*Reilly v. Ceridian Corporation,*
   664 F.3d 38 (3d Cir. 2011)......................................................................28

*Ricci v. Stefano,*
   557 U.S. 577 (2009)................................................................................30

*Ridley Sch. Dist. v. M.R.,*
   680 F.3d 260 (3d Cir. 2012)........................................................26, 32, 41

*S.D. v. Haddon Heights Bd. of Educ.,*
   722 Fed. Appx. 119 (3d Cir. 2018)..........................................................39

*Smith v. City of Jackson,*
   544 U.S. 228 (2008) (1967 Age Act)........................................................31

*Summers v. Earth Island Inst.,*
   555 U.S. 488 (2009)................................................................................27

*Swope v. Central York Sch. Dist.,*
   796 F. Supp. 2d 592 (M.D. Pa. 2011) ......................................................39

*Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.,*
   U.S., 135 S. Ct. 2507 (2015)....................................................................31

*United States. v. Hays,*
   515 U.S. 737 (1995)................................................................................28

*Warth v. Seldin,*
   422 U.S. 490 (1975)................................................................................28

*Zebra v. School Dist. of the City of Pittsburgh,*
   449 Pa. 432 (Pa. 1972)............................................................................44

iv

*ZF Meritor, LLC v. Eaton Corp.*,
  696 F.3d 254 (3d Cir. 2012) ................................................................................ 27

**Statutes**

20 U.S.C. § 1415(l) ................................................................................................ 38, 39

29 U.S.C. § 794(a) ...................................................................................................... 26

29 U.S.C. § 794a ......................................................................................................... 29

42 U.S.C. § 2000d ....................................................................................................... 31

42 U.S.C. § 12132 .................................................................................................. 26, 29

ADA ........................................................................ 26, 29, 30, 32, 34, 35, 38, 39, 40, 41

American Rescue Plan Act of 2021 .............................................................................. 11

Americans with Disabilities Act ................................................................................... 2

Constitution, the Americans with Disabilities Act of 1990 ......................................... 39

Fair Housing Act .......................................................................................................... 31

Individuals with Disabilities Education Act, 20 U.S.C. § 1400, et seq. ........................ 3

Rehabilitation Act of 1973 Section 504 ............................................................. 2, 15, 31

Rehabilitation Act of 1973 title V ............................................................................... 39

Section 504 ........................................... 15, 23, 24, 26, 29, 30, 32, 34, 35, 38, 39, 40, 41

Section 504, Title VI ................................................................................................... 31

**Other Authorities**

34 C.F.R. § 300.516(e) ................................................................................................. 39

"COVID-19 Resources for Pre-K to 12 Schools," available at
  https://www.education.pa.gov/Schools/safeschools/emergencyplanning/COVI
  D-
  19/SchoolReopeningGuidance/ReopeningPreKto12/MaskingOrder/Pages/Mas
  ksSupremeCourtRuling.aspx .................................................................................... 36

Exhibit TT: Washington Post ................................................................................. 22, 43

https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/k-12-
  guidance.html ......................................................................................................... 35

v

IDEA ..................................................................................................15, 23, 24, 38, 39, 40, 41

*Merriam-Webster Dictionary*, available at https://www.merriam-
    webster.com/dictionary/by%20reason%20of ..........................................................................29

Washington Post ...............................................................................................................21

130168686.1

I.      **INTRODUCTION**

The relief Plaintiffs seek here, a preliminary injunction enjoining a public school from enacting a policy that was reasonably calculated to address the health, safety, and education of its students as the COVID-19 pandemic wears on, is an extraordinary request, one which must be denied. Defendants, the Perkiomen Valley School District ("District") and members of the District's Board of School Directors, after nearly two years of creating and modifying numerous plans to address students' education during the COVID-19 pandemic, approved a policy on December 13, 2021, strongly recommending, but not requiring, face masks to be worn in District buildings.

This "recommended-but-not-required" masking policy reflects the reality of what we know and where we are at this stage of the COVID-19 pandemic. The Board's decision came on the heels of all school-aged children being eligible for vaccination and at a time when the Centers for Disease Control and Prevention (CDC) has emphasized vaccination—not universal masking—as the leading public health prevention strategy to end the COVID-19 pandemic. Before all school-aged children were eligible for vaccination, masking was an important measure to prevent the transmission of COVID-19 in schools and to keep students from contracting the disease, and indeed, until this past month, universal masking was required in all District buildings.

But now that vaccines are available, and the scientific and medical community knows more about the limits of mask-wearing, Defendants have determined that mandates for universal masking must take a back seat in favor of giving children the opportunity, for the first time in nearly two years, to learn and socialize in school without wearing a mask, should they and their parents desire it. To be sure, effective masking with high quality masks or respirators has been shown to protect the wearer, and to the extent the Plaintiffs, or others, desire to wear them in school, the District's encourages it, especially to the extent individual students or families have

greater peace of mind masking, until the pandemic is over. But the peace of mind of some, even for families of students with underlying medical conditions, cannot be a basis to force an entire District to act indefinitely under the guise of the antidiscrimination standards set forth in the Americans with Disabilities Act ("ADA") or Section 504 of the Rehabilitation Act of 1973 ("Section 504"). And indeed, neither statute requires it. The Court should accordingly deny Plaintiffs' Motion for a Preliminary Injunction.

## II.    RELEVANT FACTUAL BACKGROUND

### A.    The Perkiomen Valley School District

Defendant, Perkiomen Valley School District is one of the area's premiere school districts. The District serves 5,100 students in the Townships of Perkiomen, Skippack and Lower Frederick, and the Boroughs of Trappe, Collegeville and Schwenksville. The District has a total of eight schools: a high school (grades 9-12), two middle schools (grades 6-8), four elementary schools (grades K-5), and a virtual (K-12) school. Through innovative educational programs, highly trained and deeply dedicated staff, and the support of its community, the District offers students and families a world of opportunities. As stated in its mission statement, the District cultivates an inclusive community of learners empowered to grow intellectually, socially and emotionally.

The District prides itself on being student-centered. The District provides a safe and meaningful learning experience in a fiscally responsible manner to its students. The Perkiomen Valley High School maintains a graduation rate of 95% and of those students, almost 95% further their education at either a 2-year or 4-year college/university, or technical school. The remaining graduates enter the military, workforce, or are undecided.

The District has 325 students in kindergarten through 12th grade that qualify for accommodations under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"). The District has 826 students who qualify for special education and related services under

2

the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, et seq. ("IDEA") or 15.5% of the total District enrollment. Of this total, 22.3% or 184 students[1] qualify for special education and related services under the disability category of other health impairment ("OHI"). See attached Exhibit A: 2020-2021 Penn Data Report.

In the current year, there are 75 identified English Language Developing students speaking any one of 17 foreign languages, and the percentage of students qualifying for gifted services is 8.4%. The percentage of economically disadvantaged students is approximately 17.8% based on the District's October, 2021 enrollment.

B.    **The District's COVID-19 Response.**

1.    **The 2019-2020 School Year.**

In March of 2020, in-person instruction in Montgomery County and across the Commonwealth was transitioned to fully virtual instruction, initially for a period of two weeks and subsequently extended on April 9, 2020, for the remainder of the 2019-2020 school year.  See attached Exhibit B: Education, Press Release: Governor Wolf Extends School Closure for Remainder of Academic Year, April 9, 2020. During the last 12 weeks of the 2019-2020 school year, the District staff quickly pivoted and organized a series of outdoor distributions to provide instructional materials and chromebooks to families, daily meals to those in need, and continued learning experiences via virtual instruction to all students. The year concluded with a virtual graduation ceremony in the hope that cases would decline and the District could return to "normal" for the upcoming school year.

During the summer of 2020, a Task Force was developed under the leadership of the Superintendent, Dr. Barbara Russell, to develop the required Phased School Reopening Health and

---

[1] Plaintiffs have alleged that 22.3% of the District's total student population, or 1,080 students, qualify for special education and related services under the disability classification of OHI.

Safety Plan, as directed by the Pennsylvania Department of Education. School districts were informed that they were eligible to provide in-person instruction after developing a written Health and Safety Plan, securing approval of the plan by the Board of School Directors, and posting the plan on the District's publicly available website. The plan delineated the instructional mode(s) to be offered as well as mitigation measures for in-person instruction in the then yellow and green phase designations. At the time, districts in regions in red phase designations were not permitted to conduct in-person instruction. See attached <u>Exhibit C</u>: Process to Reopen Pennsylvania, Nov. 19, 2020. The Task Force was comprised of stakeholder group representatives that included, teachers, support staff, administrators, parents, Board members and students. They assisted in the development of guidelines for cleaning, sanitizing, and disinfecting District buildings; enhancing ventilation and indoor air quality; implementing social distancing and other safety protocols; monitoring student and staff health; reviewing and analyzing other considerations for student and staff health; implementing professional development; and facilitating health and safety plan communication.

As the District planned to return students to in-person learning for the start of the 2020-2021 school year, administration and staff continually reflected on the mission of the District which is to "cultivate an inclusive community of learners empowered to grow intellectually, socially, and emotionally." While operating under the circumstances of the pandemic, the District consistently demonstrated flexibility, adaptability and attention to those in need. The faculty and staff never lost sight of advancing the District's mission and supporting all students in any manner they could. The District maintained the goal of educating students onsite and in-person as much as possible while upholding health and safety throughout the pandemic. The faculty and staff went to great lengths to accommodate students with special needs and the Board of School Directors approved a plethora of valuable resources in support of their efforts. The District was and continues

4

to be committed to do all that it can to assist students to be successful and remain safe from COVID-19 as the District navigated unprecedented and challenging times.

**2.    The 2020-2021 School Year.**

Guidance provided by the Commonwealth and leading agencies such as the American Academy of Pediatrics was considered as plans were developed to return students to in-person instruction and engage them in extra-curricular activities. The Pennsylvania Department of Education indicated that schools could provide in-person instruction only after developing a written Health and Safety Plan that was approved by the Board of School Directors and made available to the public via the District's website. See attached Exhibit D: Public Health Guidance for School Communities – Phased Reopening of Pre-K to 12 Schools during COVID-19, July 16, 2020, updated on Aug. 13 and 17, 2020.

The American Academy of Pediatrics (AAP) advised schools to start with a goal of having students physically present in school based on how the virus affected children as opposed to more vulnerable segments of the population. The guidance also recognized that students learn more than math, reading and science in school. They also learn social and emotional skills and are provided healthy meals, exercise, mental health support and other benefits that cannot be provided with online learning. See attached Exhibit E: Staying Safe in Schools during COVID-19, July 2, 2020.

The plan for reopening schools for the 2020-2021 school year was developed with assistance from the Task Force and approved by the District's Board of School Directors on July 30, 2020. Per this plan, all students would attend school in a fully virtual mode through September 28, 2020. Select high incidence special education students were transitioned to onsite, in-person instruction prior to September 28 under the leadership of special education staff and in collaboration with parents. Beginning September 29, 2020 all students could attend school in a

hybrid or fully virtual mode. The hybrid model included 2-3 days onsite, in-person instruction alternating with 2-3 days fully virtual instruction during the course of a 5-day week.

On August 24, 2020, the Phased Reopening Health and Safety Plan was modified to include a half-day model for all elementary students (K-5), as opposed to the hybrid model, in addition to the virtual option, to be available as of September 29, 2020. All elementary students attended school onsite, in-person for a half-day and then attended the second half of their day in an asynchronous virtual instruction mode. Secondary level students attended in a hybrid or fully virtual mode. Students were returned to school in a phased manner beginning with K-2 at the elementary level and grade 6 and 9 at the secondary level. All students returned to school in a half-day or hybrid mode by November 9, 2020. The data and guidance referenced in support of the recommendations for returning students to onsite, in-person instruction were included in the July 28, 2020 and August 24, 2020 Superintendent's Reports. See attached Exhibit F: Superintendent's Report, July 28, 2020; and Exhibit G: Superintendent's Report, Aug. 24, 2020.

Of note, the COVID-19 pandemic had shown a markedly low proportion of cases among children. Age disparities in observed cases could be explained by children having lower susceptibility to infection and lower propensity to show clinical symptoms. It was estimated that susceptibility to infection in individuals under 20 years of age was approximately half that of adults aged over 20 years, and that clinical symptoms manifest in 21% (95% credible interval: 12-31%) of infections in 10 to 19 year-olds, rising to 69% (57-82%) of infections in people aged over 70 years. See attached Exhibit H: Nature Medicine: Age Dependent Effects in Transmission and Control of COVID-19 Epidemics, April, 2020; Exhibit I: COVID-19 Researchers Question Policy of Closing Schools After Finding Under 20s Have Low Susceptibility to Virus, June 17, 2020; and Exhibit J: COVID 19 in Children and Adolescents in Europe: A Multinational, Multi-Centre Cohort Student, Sept., 2020 (COVID-19 is generally a mild disease in Children.)

6

In preparing for the return of students in September, 2020, schools were required to enforce universal masking and only permitted to allow students to remove their masks/face coverings when students were eating or drinking when spaced at least 6 feet apart; seated at desks or assigned work spaces at least 6 feet apart; or engaged in any activity at least 6 feet apart (i.e., face covering breaks, recess, etc.) pursuant to the Universal Face-Coverings Order entered by the Secretary of the Pennsylvania Department of Health on July 1, 2020. See attached Exhibit K: Secretary of Health Face Covering Order, July 1, 2020.

As the 2020-21 school year progressed, new mitigation orders were announced by Governor Wolf and Secretary of Health Levine effective on December 12, 2020 through January 4, 2021. See attached Exhibit L: Pennsylvania Department of Education Dear Colleague Letter, Dec. 11, 2020. During this time, all in-person extracurricular school activities sponsored by the school were suspended (but were permitted to be held virtually). These included, but were not limited to, attendance at and participating in musical ensembles, school plays, student councils, clubs, and school dances. Academic and instructional activities, such as tutoring, testing, and supplemental or remedial instructional programs were not considered extracurricular activities for the purpose of this order. All sports at K-12 public schools, nonpublic schools, and private schools were also suspended. The District opted to remain in a fully virtual mode until January 11, 2021 in an effort to account for the "substantial" level of community transmission with recommendations for "full remote learning model." The incidence and positivity rates in Montgomery County as of December 3, 2020 were 325/100,000 people and 10.3%, respectively. See attached Exhibit M: Montgomery County COVID-19 Dashboard, Dec. 3, 2020.

On January 7, 2021, the Pennsylvania Department of Education updated its Level of Community Transmission and Recommended Instructional Model table guiding school districts. In February of 2021, the Superintendent initiated discussions with the Board of School Directors

and various committees regarding the return to full onsite, in-person instruction, 5 days a week. See attached <u>Exhibit N</u>: Superintendent's Report, Feb. 1, 2021. The incidence and positivity rates were trending downward, a COVID-19 vaccine was being deployed, and there was a lack of evidence of any linked transmission in any of the District's schools. The administration visited Souderton Area School District and Holy Cross Regional Catholic School to observe onsite, in-person learning for their students which had been occurring for the majority of the 2020-2021 school year. The District administration observed new measures for mitigating spread of COVID-19 (e.g., increasing the number of plexiglass shields) and the motivation to more actively pursue onsite and in-person instruction full-time. The visits helped to confirm that is was possible to educate our students in-person on a full-time basis under the circumstances of the pandemic.

The Superintendent presented a proposal to the Board of School Directors on February 8, 2021 to return students to full-time onsite, in-person instruction. See attached <u>Exhibit O</u>: Superintendent's Report Part II, Feb. 8, 2021. The recommendation was based on declining incidence and percent positivity rates as well as hospitalizations and the following criteria:

> In-person instruction is based on the recommendation of administration and the Montgomery County Office of Public Health with consideration of the following factors and any required amendments to the district's Health and Safety Plan (updated November 9, 2020):
>
> 1.  COVID testing positivity rate (county and/or local/district levels) at or above 9%;
>
> 2.  Incidence rates per 100,000 residents (county and/or local/district levels) at or above 100;
>
> 3.  Evidence regarding linked transmission in schools;
>
> 4.  PPE supplies;
>
> 5.  Sufficient personnel to deliver all services; and
>
> 6.  Update information about the novel coronavirus and COVID-19 pandemic

8

The District administration relied, in part, on the following research in making its recommendation for return to full-time in-person instruction:

1.    Schools can be open even at the very high levels of [community] spread, provided that they strictly implement strategies of infection control. Schools are able to maintain in-person learning, however must be able to contact trace. See attached Exhibit P: Brown School of Public Health: Schools and the Path to Zero: Strategies for Pandemic Resilience in the Face of High Community Spread, Dec. 18, 2020.

2.    "What we haven't seen are super spreader events" that ignited in schools, says Sallie Permar, MD, PhD, a professor of pediatrics and immunology at Duke. "The fear that you'd have one infected kid come to school and then you'd have many other kids and teachers and relatives [at home] get infected - that hasn't happened." See attached Exhibit Q: Association of American Medical Colleges: Kids, School, and COVID-19: What We Know – and What We Don't, Nov. 5, 2020.

3.    A crucial factor in community transmission is that infected individuals not experiencing symptoms can transmit SARS-CoV-2. Infectiousness may peak before symptom onset. Viral loads appear to be similar between asymptomatic and symptomatic patients, although the implications for infectiousness are unclear. See attached Exhibit R: Science: The Engines of SARS-CoV-2 Spread, Oct. 23, 2020.

4.    For children and adolescents with mental health needs, such closures mean a lack of access to the resources they usually have through schools. See attached Exhibit S: The Lancet: Mental Health Effects of School Closures during COVID-19, June, 2020; and Exhibit T: National Alliance on Mental Illness: School during the Pandemic: Mental Health Impacts on Students, 2020.

On March 1, 2021, the Board of School Directors approved the return of all students to onsite, in-person instruction, 5 days a week beginning March 22. A layered approach to implementing mitigation strategies continued and included universal masking, physical distancing, hand washing/sanitizing and upgrades to ventilation systems district wide (i.e., MERV 13 filter installation). Vaccinations were available to District staff during the month of March. All staff were invited to participate in a vaccine clinic held at the Montgomery County Intermediate Unit and receive the Johnson and Johnson vaccine. The opportunity for District staff as well as other employees in the educational sector across the Commonwealth was facilitated by Governor Wolf

130168686.1

and the COVID-19 Task Force.  See attached <u>Exhibit U</u>: Press Release: Governor Wolf: Teacher and School Staff Vaccinations are Ahead of Schedule, March 19, 2021. Prior to students returning to onsite instruction on March 22, all teachers and support staff were provided the opportunity to be vaccinated.

The 2020-2021 school year concluded with few if any COVID related challenges. The District did not experience any outbreaks originating in any of its schools. Students were thrilled to be back in school and readily participated in both their academics and after school activities. Graduation was held as a drive-through event with students and their families driving through the bus circle at the high school. Graduates exited their cars and walked across an outdoor stage to receive their diploma.

The District initiated increased efforts to reengage students socially and academically during the summer, 2021. The COVID-19 incidence rate, percent positivity, and hospitalizations were all on the decline instilling a hope for a return to normal. The District offered a variety of summer remediation and enrichment experiences to students in kindergarten through 12th grade at no cost with substantial voluntary student participation.

### 3.     The 2021-2022 School Year

The 2021-2022 school year commenced with high hopes of returning to normal. All students returned at the beginning of the year onsite, in-person, 5 days a week. There was no half-day or hybrid model. There was, however, a virtual school that included individual classes led by District teachers for elementary students in kindergarten through 5th grade. There were virtual program offerings for middle school students, 6th through 8th grades, that included both synchronous and asynchronous coursework and high school students were afforded asynchronous virtual learning experiences. The vast majority of students returned to onsite, in-person school.

The following were the goals articulated to the Board of School Directors on August 2, 2021:

1. To operate schools in a manner that maintains the health and safety of the school and larger community.

2. To afford all students the opportunity to attend school in-person, 5 days per week.

3. To offer a virtual instruction alternative to in-person school for those families that preferred it.

4. To safely conduct extra-curricular activities in support of the social and emotional well-being of students.

5. To meet the needs of all students academically, socially and emotionally.

The District's updated Health and Safety Plan was based on the American Rescue Plan Act of 2021, also known as the COVID-19 Stimulus Package, PubL. No. 117-2, H.R. 1319-117[th] Congress (2021-2022), and U.S. Department of Education rules requiring Health and Safety plans to address the following components:

1. How the LEA will, to the greatest extent practicable, implement prevention and mitigation policies in line with the most up-to-date guidance from the Centers for Disease Control and Prevention (CDC) for the reopening and operation of school facilities in order to continuously and safely open and operate schools for in-person learning;

2. How the LEA will ensure continuity of services, including but not limited to services to address the students' academic needs, and students' and staff members' social, emotional, mental health, and other needs, which may include student health and food services; and

3. How the LEA will maintain the health and safety of students, educators, and other staff and the extent to which it has adopted policies, and a description of any such policy on each of the following safety recommendations established by the CDC.

Notably, the ARP Rules and Regulations expressly provided:

Because safe return to and continuity of in-person instruction is fundamental to addressing the lost instruction time and disengagement that many students have experienced during the COVID-19 pandemic, it is essential that these plans contain precise information about how LEAs will focus on prevention and mitigation of

COVID-19 specific to their communities, in order to keep students, staff and families healthy and to avoid future shut-downs. To ensure that each plan contains a sufficient level of specificity, the requirements set forth several aspects of safety that each LEA plan must address. These elements are consistent with current, relevant guidance from the CDC related to the safe reopening of schools. **The requirement does not mandate that an LEA adopt the CDC guidance, but only requires that the LEA describe in its plan the extent to which it has adopted the key prevention and mitigation strategies identified in the guidance.**

Federal Register/Vol. 86, No. 76/Thurs., April 22, 2021/Rules and Regulations, p. 21200.

The Health and Safety Plan for the 2021-2022 school year was approved by the Board of School Directors on July 12, 2021. In this version, masking was recommended but not required for indoor activities, including instruction. On August 9, the plan was updated to include universal making when indoors based upon the increased incidence and percent positivity rates for Montgomery County and the District's six constituent municipalities. Masking remained optional when outdoors. See attached <u>Exhibit V</u>: ARP ESSER Health and Safety Plan Guidance and Template (v7), Aug. 9, 2021.

On October 4, an updated version of the District's Health and Safety Plan was approved by the Board of School Directors to include stipulations about athletics. Masks were required for all District students and staff when indoors. Masks were required for all PIAA athletes when indoors, practicing or on the bench, during substantial and high levels of local transmission. Student athletes were not required to wear masks when engaged in competition or swimming at any time in the pool. Masks remained optional when outdoors. Additionally, the Board passed a resolution to implement assurance testing of unvaccinated, asymptomatic staff through a program offered by the Montgomery County Intermediate Unit (MCIU) and supported by Children's Hospital of Philadelphia (CHOP) called Project ACE-IT. See attached <u>Exhibit W</u>: ARP ESSER Health and Safety Plan Guidance and Template (v9), Oct., 2021. Assurance testing was viewed as

an effective mitigation strategy and added to the "layers" already in existence. See attached <u>Exhibit X</u>: Superintendent's Special Presentation to Board, March 1, 2021.

Beginning in November 2021, the District implemented a Test to Stay (TTS) program for students identified as a close contact (exposed to a COVID-19 positive case) in a school setting. The TTS program did not include close contacts exposed at home, outside of the school setting, or community exposures. The TTS program allowed individuals who are unvaccinated or who are partially vaccinated, asymptomatic and willing to submit to antigen testing cadence for COVID-19 (SARS-CoV-2 virus) (yielding only negative test results) to be able to remain in school and participate in extra-curricular activities over their 7-day quarantine period. Close contacts who tested positive for COVID-19 were directed to isolate. Unvaccinated persons who did not participate in TTS were required to quarantine out of school for 7 or 10 days in accordance with standard requirements of the Montgomery County Office of Public Health. See attached <u>Exhibit Y</u>: Superintendent's Education Updates, Nov., 2021.

On December 6, 2021, the following recommendations were presented by the Superintendent to the Board of School Directors: the elimination of assurance testing of unvaccinated staff, masks to be required for athletes, coaches, and spectators while indoors on the sideline or bench but not while actively practicing or competing, implementation of a Test to Participate (TTP) program allowing athletes competing at out of district venues to demonstrate negative COVID status prior to a competition. See attached <u>Exhibit Z</u>: ARP ESSER Health and Safety Plan Guidance and Template (v11), Dec. 6, 2021. On December 13, the Board of School Directors approved an amended 2021-2022 Health and Safety Plan, version 11, which included a proviso that masks would be strongly recommended but not mandated for all students, staff and administrators commencing January 3, 2022. See attached <u>Exhibit AA</u>: Perkiomen Valley School Board Business Meeting Minutes, Dec. 13, 2021. The motion to approve shifting universal

masking during indoor athletics was tabled and therefore the Athletics Health and Safety Plan (v8) was not approved. The District continued to rely upon v7 of this plan which stipulated that masks were not required during competition, but were required during practice and when on the sidelines, bench or spectating. See attached <u>Exhibit BB</u>: Perkiomen Valley Athletic Health and Safety Plan (v7), Nov. 1, 2021.

In late December 2021, the Montgomery County Office of Public Health (MCOPH) communicated with superintendents and pandemic liaisons that they were planning to update their guidance. One of the updates included not allowing TTS in schools unless universal masking was in place. This meant that unvaccinated students identified as close contacts could not continue to attend school while participating in assurance testing and would therefore miss several days of instruction. It had been noted that past data indicated very low percentages of students in quarantine emerged as positive for COVID-19. See attached <u>Exhibit CC</u>: The Lancet: Daily Testing for Contacts of Individuals with SARS-CoV-2 Infection and Attendance and SARS-CoV-2 Transmission in English Secondary Schools and Colleges: An Open-Label, Cluster-Randomized Trial, Oct. 2, 2021. However, the incidence and percent positivity rates both at the county and local levels were increasing as were the hospitalizations.

The Board of School Directors held a special meeting on January 2, 2022 to discuss the shift to masks becoming strongly recommended beginning January 3, 2022. The superintendent presented an updated plan with a proposal to delay the shift to strongly recommending masks until January 24. The superintendent referred to the plan as a Health and Safety Transition Plan that presented a transition to masks being strongly recommended during after school hours and extra-curricular activities beginning on January 3 and then in school during the day beginning January 24. The updated plan was approved by a vote of 7-2. See attached <u>Exhibit DD</u>: ARP ESSER Health and Safety Transition Plan Guidance and Template (v3), Jan. 2, 2022.

14

In determining its recommendation to transition to strongly recommending masks during the school day, the administration in conjunction with the District's pandemic liaison and nursing team, reviewed the effectiveness of masking as a mitigation strategy for all students and staff as well as the impact of masking on those students with other health concerns such as anxiety, asthma, cardiovascular conditions, and type 1 diabetes, for whom mandated mask wearing was challenging and viewed as potentially exacerbating their conditions. There are currently 38 mask exemptions which have been approved by the District pursuant to its previously established exemption process, which requires a licensed and qualified medical provider to sign off on the exemption request form. An additional 6 District students have been granted mask exemptions under section 504 or the IDEA. The reasonable accommodation of not wearing a mask is documented in these students' Section 504 Plans or Individualized Education Plans ("IEPs"). See attached <u>Exhibit EE</u>: District Mask Exemptions, Jan., 2022.

### C.    <u>District's Rationale for Revising Mask Mandate to Mask Recommendation.</u>

The CDC continues to assert that "vaccination is the leading public health prevention strategy to end the COVID-19 pandemic." See attached <u>Exhibit FF</u>: CDC Guidance for COVID-19 Prevention in K-12 Schools, Jan. 13, 2022. In the development of the Health and Safety Transition Plan v3 final, the administration focused on mitigation strategies that address a lack of transmission; primarily vaccination and symptom monitoring. See attached <u>Exhibit GG</u>: Montgomery County Office of Public Health: Recommendation for COVID-19 Prevention for K to 12 Schools, 2021-2022 School Year, updated Jan. 11, 2021. The District actively encourages daily symptom monitoring, with posted reminders on all entrance doors and communication with District staff, and vaccination.

The District has held a series of vaccination clinics for both adults and children:

15

2/14/2021 Skippack Elementary School (16+ 1st Doses), estimated 996 persons vaccinated

3/7/2021 Skippack Elementary School (16+ 2nd Doses), estimated 925 persons vaccinated

3/14/2021 Skippack Elementary School (16+ 2nd Doses), estimated 1445 persons vaccinated

8/24/2021 Skippack Elementary School (16+ Booster Doses), estimated 45 persons vaccinated

11/6/2021 Perkiomen Valley High School (5-11 Pediatric 1st Doses), estimated 1178 persons vaccinated

11/9/2021 Perkiomen Valley High School (5-11 Pediatric 1st Doses), estimated 521 persons vaccinated

11/29/2021 Skippack Elementary School (5-11 Pediatric 2nd Doses), estimated 1101 persons vaccinated

11/23/2021 Perkiomen Valley High School (16+ Booster Doses), estimated 581 persons vaccinated

12/31/2021 Perkiomen Valley High School (COVID Testing Site), estimated 396 persons tested

A primary consideration in the development of the Health and Safety Transition Plan was to afford all students and staff the opportunity to be fully vaccinated. As of January 26, 2022, the Montgomery County Office of Public Health published the following countywide vaccination status:

| Status | Number Vaccinated | Percentage of Population | Percentage of 5+ Population | Percentage of 65+ Population |
|---|---|---|---|---|
| Partially Covered | 138,859 | 16.71% | 17.67% | 20.88% |
| Fully Covered | 517,450 | 62.27% | 65.86% | 82.6% |
| Total | 656,309 | 78.98% | 83.53% | 99.99% |
| Received at Least One Dose | 83,845 | 10.09% | 10.67% | 7.01% |
| Total Combined Estimate | 740,154 | 89.08% | 94.21% | 99.99% |

16

See attached <u>Exhibit HH</u>: Montgomery County COVID-19 Vaccination Dashboard, Jan. 26, 2022. Clearly, Montgomery County, with significant assistance from the District to target its own population, has achieved a high rate of vaccination.

Additionally, the District will continue to employ a layered system of mitigation strategies to include strongly recommending masks as well as making specialized KF94 and KN95 masks available to interested students and staff. In fact, the District has secured 2,500 KF94 student masks, with 1,930 distributed; 4,000 KF94 adult masks, with 2,500 distributed; and 5,000 KN95 masks, with 1,400 distributed. The District is also installing high efficiency particulate arrestance ("HEPA") filters in spaces hosting individuals with respiratory medical conditions and/or immunocompromised systems. The District remains focused on symptom monitoring, physical distancing, hand washing and sanitizing, and upgrades and maintenance to ventilation systems. The District administration confers weekly with the Montgomery County Office of Public Health, representatives of Childrens' Hospital of Philadelphia's PolicyLab and  monitors the Pennsylvania Department of Health and CDC updates. See attached Exhibit DD above.

In its most recent updated guidance, the Centers for Disease Control and Prevention (CDC) indicated the following:

- In addition to universal indoor masking, CDC recommends schools maintain at least 3 feet of physical distance between students within classrooms to reduce transmission risk. When it is not possible to maintain a physical distance of at least 3 feet, such as when schools cannot fully re-open while maintaining these distances, it is especially important to layer multiple prevention strategies, such as screening testing.

- Screening testing, ventilation, handwashing and respiratory etiquette, staying home when sick and getting tested, contact tracing in combination with quarantine and isolation, and cleaning and disinfection are also important layers of prevention to keep schools safe.

- Students, teachers, and staff should stay home when they have signs of any infectious illness and be referred to their healthcare provider for testing and care.

17

- This guidance emphasizes implementing layered prevention strategies to protect students, teachers, staff, visitors, and other members of their households and support in-person learning.

- Localities should monitor community transmission, vaccination coverage, screening testing, and occurrence of outbreaks to guide decisions on the level of layered prevention strategies (e.g., physical distancing, screening testing).

See attached Exhibit FF above. Whether masking actually contributes to the mitigation effect created by the layered approach has recently been questioned. Additionally, it is merely one of several mitigation efforts the District has implemented. Notably, with the exception of the CDC public transportation mask mandate, there are no public health mandates in Pennsylvania that require school-related universal masking. Although the CDC recommends universal masking, it does not require it. Similarly, the Pennsylvania Department of Education and Department of Health encourage, but do not require, masks in schools, especially in settings where individuals and students are not vaccinated. In fact, the Pennsylvania Secretary of Health declined to reinstate the school mask mandate as a public health measure despite being provided a road map for the lawful enactment of such a mandate by the Pennsylvania Commonwealth and Supreme Courts. See Corman v. Acting Sec'y of Pennsylvania Dep't of Health, No. 83 MAP 2021, 2021 WL 6071796 (Pa. Dec. 10, 2021); see also Corman v. Acting Sec'y of Pennsylvania Dep't of Health, No. 294 M.D. 2021, 2021 WL 5227124 (Pa. Commw. Ct. Nov. 10, 2021).

Although the Montgomery County and District COVID-19 incidence rates significantly spiked with the outbreak of the Omicron variant, this outbreak occurred notwithstanding the District's implementation of universal masking. Moreover, incidence and percent positivity rates as well as hospitalizations for Montgomery County and at the local level (the six municipalities constituting the District) have declined in recent weeks. See attached Exhibit II: Pennsylvania Department of Health Dashboard; and Exhibit JJ: Montgomery County COVID-19 Data Hub. The

130168686.1

COVID-19 incidence rate within the District's schools has also declined and to date this school year, there has been no linked transmission in any District schools. See attached <u>Exhibit KK</u>: District Chart of Positive COVID-19 Cases, September to December, 2021; and <u>Exhibit LL</u>: District Chart of 2021-2022 Positive COVID-19 Cases Weekly by Building, updated Jan. 31, 2022. [Exhibit KK presents data for September and October, 2021 and Exhibit LL presents data from November, 2021 until the present.]

Significantly, a neighboring school district, the Souderton Area School District, which the District administration had visited in January, 2021, as well as a majority of public school districts in Bucks County, which is immediately adjacent to Montgomery County, have not experienced significantly different rates of positive cases in school and in the community generally despite mask optional policies being in place. A statistical analysis of Bucks County community prevalence demonstrates no significant difference in incidence rates in mask optional school districts as opposed to mask required school districts. See attached <u>Exhibit MM</u>: District Chart of COVID-19 Cases per Student Enrollment in Area School Districts and Percentages (Aug., 2021 – Jan., 2022); Exhibit NN: COVID-19 Community Prevalence within Bucks County Municipalities.

Moreover, pursuant to recent updates to the CDC's mask guidance, the effectiveness of mask use is dependent upon the following factors:

- Consistency of wearing
- Well fitted to the face with little or no gaps
- Completely covers the nose, mouth and chin.
- Filtration effectiveness
- Type of mask used (cloth vs surgical)
- Frequency of cleaning or exchanging

See attached <u>Exhibit OO</u>: Centers for Disease Control: Your Guide to Masks, updated Jan. 21, 2022. Students in the District have overwhelmingly chosen a cloth mask as their preferred face

19

covering as permitted by the District's Health and Safety Plans since their inception. The use of cloth masks during the COVID-19 pandemic is under debate. In fact, the CDC reports that the filtration effectiveness of cloth mask is shown to be lower than that of medical masks and respirators. In 2015, the CDC conducted a 4-week randomized control trial in Vietnam to compare the efficacy of cloth masks vs medical masks. The authors concluded that the filtration, effectiveness, fit and performance of cloth masks are inferior to those of medical masks and respirators. According to the US Institute of Medicine, National Academy of Sciences, cloth masks used in the community should be held to standards that include the selection of appropriate material, number of layers, and appropriate fit. Cloth masks should be washed daily with high exposure. See attached Exhibit PP: Centers for Disease Control: Effectiveness of Cloth Masks for Protection Against Severe Acute Respiratory Syndrome Coronavirus 2, Oct., 2020.

In the public school setting, these standards are difficult for students to meet. In particular, the District has experienced significant challenges in the consistency of wearing an appropriate covering of the nose, mouth and chin in several low-incidence special education elementary level classes. Students in these classes require ongoing reminders, physical prompting, and assistance to properly wear masks. In two of these classes, students interact with classmates with mask exemptions, Notwithstanding these matters, there has been no COVID-19 in-school transmission between students in these classes.

More generally, "As we enter the third year of the pandemic, a new camp is emerging in the school mask debate – people are pro-vaccine, pro-evidence-based restrictions but against masking kids. They're a growing chorus of pediatricians, neuroscientists, special education teacher and parents who are concerned about the effects of prolonged masking on children." See attached Exhibit QQ: NPR Ed, January 30, 2022. (Noting that the United States is an outlier in masking kids as the World Health Organization does not recommend masking children under 5, and the

European Center for Disease Control, Europe's CDC equivalent, does not recommend masking for children under 12).

Erin Bromage, a Biology Professor at the University of Massachusetts Dartmouth, recently opined:

> My position on this has evolved over the past 6 months as vaccines have become available for the youngest age groups.
>
> Schools should be moving toward masks coming off as the community infection numbers drop. Children are the least likely to have poor outcomes from infection, they have the opportunity to be vaccinated, and as long as the parent maintains the right to have their children masked if they choose, then we should be moving to a situation where masks are optional. There are just too many negative trade-offs in socialization and learning when children do not get to see faces and expressions. It will mean that we will have to fortify the protections on teacher and staff with vulnerability; they will need better masks. Schools must also invest in improving classroom ventilation and filtration, a benefit that goes beyond the pandemic.

See attached Exhibit RR: CNN's The Point with Chris Cillizza, Jan. 20, 2022. See also attached Exhibit SS: Frontiers in Psychology, Understanding the Impact of Face Masks on the Processing of Facial Identity, Emotion, Age and Gender, Nov. 3, 2021.

In a recent Washington Post opinion article, Shira Doron, an infectious disease physician and hospital epidemiologist at Tufts Medical Center, and Associate Professor at Tufts University of Medicine, Westyn Branch-Elleman, an infectious disease physician and Associate Professor of Medicine at Harvard Medical School, and Elissa Perkins, an Associate Professor of Emergency Medicine and Director of Emergency Medicine and Infectious Disease Management at Boston Medical Center/Boston University School of Medicine, opined that schools can finally safely make masks optional for students and staff. Although strongly supportive of universal masking policies in the fall of 2020, they opined that the CDC's updated guidance on masks, indicating that respirators and other high quality masks are highly effective at protecting their wearers, regardless

of what people around them are doing, , offers a pathway to compromise in a place where masking

policies are most hotly debated: schools. The authors' emphasized the negative effects of universal

masking policies. See attached <u>Exhibit TT</u>: Washington Post: Schools Can Safely Make Masks

Optional with CDC's New Guidelines, Jan. 5, 2022.

Margery Smelkinson, an infectious disease scientist whose research is focused on influenza

and SARS-COV-2, Leslie Bienen, a veterinarian and faculty member at OHSU-Portland State

University School of Public Health, and Jeanne Noble, an emergency medical doctor at the

University of California San Francisco, after calling into question, the CDC's flawed case for

wearing masks in school, conclude:

> Imposing on millions of children an intervention that provides little
> discernible benefit, on the grounds that we have not yet gathered
> solid evidence of its negative effects, violates the most basis tenant
> of medicine: First, do no harm. The foundation of medical and
> public health intervention should be that they work, not that we have
> insufficient evidence to say whether they are harmful. Continued
> mandatory masking of children in schools, especially now that most
> school children are eligible for vaccination fails this test.

See attached <u>Exhibit UU</u>: The Atlantic: The Case Against Masks, Jan. 26, 2022.

Finally, the District's Superintendent, Dr. Barbara A. Russell, has been in direct contact

with Monica Gandhi, MD, MPH, a Professor of Medicine and Associate Chief, Division of HIV,

Infectious Disease and Global Medicine at the University of California San Francisco-Bay Area

Center for AIDS Research. Dr. Gandhi reviewed Dr. Russell's proposed transition plan approach

and responded, "It sounds to me like you are doing everything right." See <u>Exhibit VV</u>: Jan. 31,

2022 email exchange between Dr. Russell and Dr. Gandhi. Dr. Gandhi is relying upon the

Children, COVID, and the Urgency of Normalcy Advocacy Toolkit, January 24, 2022, which she

co-authored and a Journal of Infection article entitled Immunocompromised Children and Young

People are at No Increased Risk of Severe COVID-19. See attached <u>Exhibits WW</u> and <u>XX</u>.

**D.      The District's Willingness and Ability to Accommodate Students with Disabilities Relating to COVID-9**

Subsequent to the Board of School Directors' approval of the District's Health and Safety Plan (v11) with the amendment that masks would be strongly recommended but not mandated for all students, staff, and administrators in District buildings as of January 2, 2022, the District's special education department received numerous requests from parents with students with disabilities as defined in the IDEA and/or Section 504, who expressed concern regarding the safety of their children in school without a universal mask mandate. Specifically, the District received requests from students attending Skippack Elementary School, South Elementary School and Schwenksville Elementary School for the provision of KF94 masks, staff reminders to the effected student to wear his mask throughout the day, social distancing and preferential seating with students who voluntarily wear masks. All of these requested accommodations were agreed to and provided by the District.

Pursuant to the procedural processes under the IDEA and Section 504, the District remains ready, willing and able to convene teams of persons directly knowledgeable regarding the effected students to meet with parents to develop and plan accommodations that meet the individual needs of the students by providing accommodations not generally available to their typically developing peers. To date the District was able to develop individual plans satisfactory to each and every one of these parents. Their students continue to attend the District's schools with the assurance that their health and safety is adequately protected by these individualized plans to the satisfaction of their parents.

**E.      Other Considerations**

As noted above, since the initial inception of a mask mandate in the District, over 44 students have been provided exemptions from wearing masks, 38 of these exemptions were

granted through the District's Health and Safety Plan exception provisions and 6 were provided pursuant to the IDEA and Section 504. These students have been fully integrated with their peers throughout the entire school day for the duration of the pandemic without any evidence of transmission from the students to their peers in school. Moreover, there have been several cases of students not wearing masks, pursuant to appropriate exemptions, in self-contained special education classrooms with low student-teacher ratios, where students have had significant direct routine contact for the duration of the pandemic, again without any evidence of in-school COVID-19 transmission.

Consistent with the District's experience, a similar scenario has been reported for a self-contained classroom for students with multiple disabilities located in the Central Bucks Middle School, consisting of students who are traditionally referenced as medically fragile students. In fact, in that classroom, both the teacher and the majority of the students did not wear masks pursuant to appropriate exemptions with no evidence of in-school transmission.

Of further note is the fact that since the entrance of the Temporary Restraining Order, reimposing universal masking in the District in this matter, the District has received correspondence from numerous parents of children with disabilities expressing their support for a mask optional policy and their extreme upset regarding any representation that they support Plaintiffs' litigation. See attached Exhibit YY: emails from parents.

Finally, the District has also been contacted by parents of athletes who are now required to wear masks during practices for the first time since January 3, 2022 and during competitions for the first time since October 4, 2021, pursuant to the guidance of the Pennsylvania Secretary of Health, recognizing the dangers of wearing masks during high exertion activities. The current Temporary Restraining Order requires universal masking during all athletic activities, including competitions, which is contrary to the rules and regulations of every other school district

24

participating in the Pioneer Athletic Conference to which the District belongs. See attached <u>Exhibit ZZ</u>: emails from parents.

## III.   <u>ARGUMENT</u>

A preliminary injunction is an extraordinary remedy granted only in limited circumstances. *Ferring Pharm., Inc. v. Watson Pharm., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014). Given the extraordinary nature of this form of relief, a motion for preliminary injunction places precise burdens on the moving party. The burden is high. In deciding to issue a preliminary injunction, "a district court must carefully weigh four factors: (1) whether the movant has shown a reasonable probability of success of the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest." *Gerardi v. Pelullo*, 16 F.3d 1363, 1373 (3d Cir. 1994). The movant bears the burden of showing that the factors weigh in favor of granting the injunction. *Kos Pharms. Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir.2004). "Only if the movant produces evidence sufficient to convince the [court] that all four factors favor preliminary relief should the injunction issue." *Opticians Ass'n of Am. v. Independent Opticians of Am.*, 920 F.2d 187, 192 (3d Cir. 1990). Further, the movant must demonstrate that the "preliminary injunction must be the only way of protecting the plaintiff from harm." *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir. 1992). A preliminary injunction "should not be granted unless the movant, by a *clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted). For that reason, "upon an application for a preliminary injunction to doubt is to deny." *Madison Square Garden Corp. v. Braddock*, 90 F.2d 924, 927 (3d Cir. 1937).

There is much to doubt in Plaintiffs' Motion regarding the jurisdiction of this Court, the efficacy of universal masking in preventing the transmission of and infection from COVID-19, the

need for universal masking to sufficiently accommodate Plaintiffs disabilities, and the risk of harm to Plaintiffs. Accordingly, the Court should deny Plaintiffs' Motion for a Preliminary Injunction.

### A. Plaintiffs are Unlikely to Prevail on the Merits.

The ADA and Section 504 both protect "qualified individual[s] with a disability." 42 U.S.C. § 12132; 29 U.S.C. § 794(a). Under the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Likewise, under Section 504, "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). The same substantive standards apply to claims under the ADA and Section 504 and therefore are addressed together. *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 282-83 (3d Cir. 2012); *Chambers v. Sch. Dist. of Philadelphia*, 587 F.3d 176, 189 (3d Cir. 2009). To establish a prima facie case of discrimination under either the ADA or Section 504, a plaintiff must show the following: "(1) [Plaintiff] has a disability, or was regarded as having a disability; (2) [Plaintiff] was 'otherwise qualified' to participate in school activities; and (3) [Plaintiff] was 'denied the benefits of the program or was otherwise subject to discrimination because of [his/her] disability.'" *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 269 (3d Cir. 2014) (*quoting Chambers*, 587 F.3d at 189).

Although Plaintiffs' Motion for a Preliminary Injunction indicates that they are proceeding under a disparate impact theory of discrimination, (ECF No. 20 at p. 13) their Complaint does not make any allegation disparate impact discrimination but, instead, focuses on allegations that Defendants have denied Plaintiffs reasonable accommodations under the ADA and Section 504

(ECF No. 1 at ¶¶106, 108, 109, 114, 134, 172). Under either theory, Plaintiffs claims will likely fail.

### 1.      Plaintiffs Lack Standing.

Because this Court lacks Article III standing, it must deny Plaintiffs' Motion for a Preliminary Injunction. A plaintiff bears the burden of demonstrating that Article III standing. *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 301 (3d Cir. 2012). To satisfy this burden, a plaintiff must show: (1) that he is under a threat of suffering an injury in fact that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of; and (3) a likelihood that a favorable judicial decision will prevent or redress the injury. *Id.* (*citing Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)) (internal quotation marks omitted). "[E]ach element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e. with the manner and degree of evidence required at the successive stages of litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Plaintiffs do not have standing here because (1) the alleged harm is speculative, (2) there is not a causal connection between the injury and the conduct complained of, and (3) there is not a likelihood that a favorable judicial decision will prevent the alleged injury.

Plaintiffs contend that there are three layers of speculative harm subsumed in Plaintiffs' argument. First, Plaintiffs assume that they will contract COVID-19 at school, as opposed to elsewhere in the community, even though they acknowledge the high rate of transmission of COVID-19 in the county at large. Second, they speculate that a universal mask mandate in schools will prevent them from contracting COVID-19 in school. And third, the they speculate that even if they were to contract COVID-19, that the infection would be so severe that they could be hospitalized or even die as a result of contracting the virus. As the court found in *Doe v. Upper*

*Saint Clair Sch. Dist.*, No. 2:22-112, 2002 WL 189691 at *6-8 (Jan. 21, 2022), denying plaintiffs'

request to enjoin enforcement of the district's mask-optional policy, an increased risk of harm does

not constitute the injury-in-fact required to establish a case or controversy under Article III, nor is

the alleged harm concrete and particularized, actual or imminent. The court in *Doe v. Upper Saint*

*Clair* reasoned:

> At its core, the Complaint alleges that the School Board's Plan
> creates an increased risk of infection from Covid-19 (and attendant
> injury) which is beyond Plaintiffs' toleration and will cause them to
> keep their children from physically attending school. But Plaintiffs
> cannot plead or prove that absent universal masking they will
> contract COVID-19. Nor, conversely, can they plead or prove that
> even with universal masking they will not contract COVID-19. Both
> scenarios are entirely speculative. As such, Plaintiffs present what
> must be characterized as a claim relating to an increased risk of a
> hypothetical future injury that may never occur, or which may still
> occur even if the relief that they seek is granted.

*Id.* at *7.

Under the Third Circuit's holding in *Reilly v. Ceridian Corporation*, 664 F.3d 38, 41 (3d Cir.

2011), "allegations of hypothetical, future injury do not establish standing under Article III.

Accordingly the court in *Upper Saint Clair*, properly determined that plaintiffs lacked standing.

This Court should follow suit now.

Further, the alleged harm the Plaintiffs would suffer is the exact same as that which would

affect every other student and staff member in the District. It is well-established that "when the

asserted harm is a 'generalized grievance' shared in substantially equal measure by all or a large

class of citizens, that harm alone normally does not warrant exercise of jurisdiction", *Warth v.*

*Seldin*, 422 U.S. 490, 499 (1975) and that a generalized grievance against allegedly illegal

governmental conduct is therefore not sufficient for standing to invoke the federal judicial power.

*United States. v. Hays*, 515 U.S. 737, 742-743 (1995).

Although this Court and Plaintiffs have pointed to the Third Circuit's decision in *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 635-641 (3d Cir. 2017) for the proposition that a breach of a statute is sufficient to cause a cognizable injury, and thus permit individuals "to sue to remedy violations of their statutory rights, even without additional injury," that case is not relevant here because as explained below Plaintiffs cannot establish a breach of a statute. And because Plaintiffs have not alleged sufficient facts to demonstrate harm that is more than speculative, they do not have Article III standing, and the Court lacks jurisdiction to grant their request for a preliminary injunction.

### 2. The Court is Without Jurisdiction to Hear Plaintiffs' Disparate Impact Claim.

As a threshold issue, this Court lacks jurisdiction to hear Plaintiffs' claims that Defendants have discriminated against Plaintiffs under the ADA and Section 504 under a disparate impact theory of discrimination because neither statute affords individuals a private right of action to enforce disparate impact disability discrimination claims. The plain language of both statutes is limited to instances of intentional discrimination only. Title II of the ADA provides that "no qualified individual with a disability shall, *by reason of such disability*, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 (emphasis added). The phrase "by reason of" means "because of" or "due to." *Merriam-Webster Dictionary*, available at https://www.merriam-webster.com/dictionary/by%20reason%20of.  In other words, Title II bars only discrimination "because of" or "due to" an individual's disability status. Similarly, Section 504 prohibits discrimination "*solely by reason of her or his disability*." 29 U.S.C. § 794a (emphasis added). Both statutes therefore only bar intentional discrimination. Neither statute prohibits actions taken for nondiscriminatory reasons. And by its very nature, disparate impact discrimination

occurs when an entity acts for a nondiscriminatory reason but nevertheless disproportionately harms a protected group, a fact acknowledged by Plaintiffs: "Unlike a claim for disparate treatment, a claim for disparate impact doesn't require proof of intentional discrimination." (ECF No. 20 at p. 13 (citation omitted)); *see also Ricci v. Stefano*, 557 U.S. 577 (2009) (addressing facially neutral practices that are discriminatory in operation). Thus, for better or worse, under the plain language of the ADA and Section 504, Congress barred only intentional discrimination against the disabled. It did not permit a disparate impact theory of discrimination, and this Court should decline to infer a private right of action that Congress did not authorize. *See Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 365 (1991) (Scalia, J., concurring in part and concurring in judgment) ("Raising up statutory causes of action where a statute has not created them may be a proper function for common-law courts, but not for federal tribunals.").

Although not yet specifically addressed in our Circuit, the Sixth Circuit has determined that the plain language of the ADA and Section 504 bars a disparate impact theory of liability based on the plain language of the respective statutes. *Doe v. Bluecross Blueshield of Tennessee, Inc.*, 926 F.3d 235, 241-42 (6th Cir. 2019). In *Bluecross Blueshield*, the Sixth Circuit addressed a putative class action filed against the administrator of plaintiff's health insurance plan, alleging that the insurance plan's policy which requires individuals who uses certain high-cost drugs to get their medicine by mail or at a specialty pharmacy discriminated against the plaintiff on the basis of his disability because plaintiff could not obtain his high-cost HIV prescription medication from a local pharmacy. *Id.* at 237. The crux of plaintiff's argument thus targeted a facially-neutral policy that allegedly had a disparate impact on the plaintiff and other individuals with disabilities.

The *Bluecross Blueshield* Court closely examined the language of the ADA and Section 504 in ultimately concluding that it did not have authority to consider a disparate impact theory of discrimination. In so finding, the Sixth Circuit also compared the ADA and Section 504 to other

antidiscrimination statutes. Reasoning that like Section 504, Title VI prohibits a person from "be[ing] excluded from participation in, be[ing] denied the benefits of, or be[ing] subjected to discrimination" on the basis of a protected classification. 42 U.S.C. § 2000d, the court noted that the Supreme Court has determined that "Title VI does not reach disparate-impact discrimination" *Bluecross Blueshield,* 926 F.3d at 242 (*citing Alexander v. Sandoval*, 532 U.S. 275, 280-81 (2001) (determining that Title VI does not prohibit disparate-impact discrimination). "By contrast, when the Court has found that a statute prohibits disparate-impact discrimination, it has relied on language like 'otherwise adversely affect' or 'otherwise make unavailable,' which refers to the consequences of an action rather than the actor's intent." *Bluecross Blueshield,* 926 F.3d at 242 (citing *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, —— U.S. ——, 135 S. Ct. 2507, 2518–19, (2015) (Fair Housing Act); *Smith v. City of Jackson*, 544 U.S. 228, 235–36 (2008) (1967 Age Act); *Griggs v. Duke Power Co.*, 401 U.S. 424, 429–31 (1971) (Title VII)). "That language is missing from § 504, just as it is missing from Title VI." *Bluecross Blueshield,* 926 F.3d at 242. The Supreme Court's decision in *Sandoval* is instructive here. Because the Court determined that it is "beyond dispute . . . that § 601 [of title VI] prohibits only intentional discrimination" and the "authorizing portion of § 602 reveals no congressional intent to create a private right of action [to enforce disparate-impact regulations], no such private right of action exists to enforce disparate-impact regulations. *Sandoval*, 532 U.S. at 280-93. "Language in a regulation may invoke a private right of action that Congress through statutory text created, but it may not create a right that Congress has not." *Id.* at 291.

The Sixth Circuit in *Bluecross Blueshield* further found that "[e]ven entertaining the idea of disparate-impact liability in [the area of disability discrimination] invites fruitless challenges to legitimate, and utterly nondiscriminatory, distinctions." *Id.* So is the case here. The District's proposed policy of strongly recommending, but not mandating, masks for all students, staff, and

administrators is a legitimate neutral policy decision enacted by the Board, after a careful balancing of risk regarding the possible transmission of COVID-19 and the benefits to be enjoyed by individuals having the option to not wear a mask while teaching, learning, and socializing in District buildings. As this Court is without jurisdiction to hear a disparate-impact theory of discrimination under ADA or Section 504, Plaintiffs are unlikely to succeed on the merits of their claim of disparate-impact discrimination.

### 3. Even if This Court Has Jurisdiction, Plaintiffs Cannot Show Disparate Impact Discrimination.

To the extent this Court were to determine that the ADA and Section 504 do allow a private cause of action under a disparate impact theory of discrimination, Plaintiffs prove a claim under either the ADA or Section 504. The Supreme Court has "reject[ed] the boundless notion that all disparate-impact showings constitute prima facie cases" under Section 504. *Alexander v. Choate*, 469 U.S. 287, 299 (1985). As the Court instructed in *Alexander*, Section 504 requires that "an otherwise qualified handicapped individual must be provided with meaningful access to the benefit" offered. *Id.* 301. To establish liability under Section 504 therefore, Plaintiffs must prove that they have been deprived of meaningful access to a benefit to which they were entitled. The same analysis applies to claims arising under the ADA. *Ridley*, 680 F.3d 260 at 282-83; *Chambers*, 587 F.3d at 189. Plaintiffs cannot demonstrate this. Although they contend that the Board's recommended-but-not-required masking policy prevents Plaintiffs and other medically fragile children from accessing in-person education without incurring a substantially increased risk of severe illness or death (ECF No. 20), they have not set forth concrete evidence to support this sweeping claim. None of the evidence put forward by the Plaintiffs thus far has shown that universal masking is the single most important measure to combat the transmission of COVID-19 or that without a universal masking policy in effect in all District buildings, students will incur a

32

substantially increased risk of severe illness or death, much less be denied meaningful access to a public education.

The court explored a similar issue in *Doe v. Delaware Valley Sch. Dist.*, No. 3:21-cv-1778, 2021 WL 5239734 at *28 (M.D. Pa. Nov. 11, 2021), denying Plaintiffs' request for a preliminary injunction enjoining the District from enforcing a policy that allowed parents to submit an exemption to the District's universal masking policy for their child without supporting medical documentation. In denying Plaintiffs' request, the court explained, "Although there is no question that the presence of unmasked individuals in the schools is a serious consideration which the parent of a 'medically fragile' student must take into consideration, there is no allegation, or evidence, that the School District has in any way limited [plaintiff's] daughter's ability to attend any classes she (or her parent) may choose or that the District has not worked with [plaintiff] to provide her with any accommodations she may deem necessary to her daughter's education and well-being." *Id.* So too here.

In addition, the District has become aware of changing information regarding the efficacy of masks in preventing the spread of COVID-19. Significantly, a neighboring school district, the Souderton Area School District, which the District administration had visited in January, 2021, as well as a majority of public school districts in Bucks County, which is immediately adjacent to Montgomery County, have not experienced significantly different rates of positive cases in school and in the community generally despite mask optional policies being in place. In fact, a statistical analysis of Bucks County community prevalence demonstrates no significant difference in incidence rates in mask optional school districts as opposed to mask required school districts. See attached <u>Exhibit MM</u>: District Chart of COVID-19 Cases per Student Enrollment in Area School Districts and Percentages (Aug., 2021 – Jan., 2022); Exhibit NN: COVID-19 Community Prevalence within Bucks County Municipalities.

33

Further, even accepting Plaintiffs' argument that the Second Circuit's standard governing disparate impact disability claims applies here, Plaintiffs have not set forth a prima facie case of disparate impact discrimination.  The Second Circuit has stated that a prima facie case of a disparate impact claim requires the plaintiff to show: (1) the occurrence of certainly outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially-neutral acts or practices. *B.C. v. Mount Vernon Sch. Dist.*, 837 F.3d 152, 158 (2d Cir. 2015). Once the plaintiff makes a prima facie showing, the burden shifts to the defendant to "'prove that its actions furthered, in theory and in practice, a legitimate bona fide governmental interest and that no alternative would serve that interest with less discriminatory effect.'" *C.D. v. New York Dept. of Educ.*, No. 05 Civ. 7945, 2009 WL 400382, (S.D.N.Y. Feb. 11, 2009) (quoting *Huntington Branch, NAACP v. Huntington*, 844 F.2d 926, 936 (2d Cir. 1998). It is undisputed that the District's recommended-but-not-required masking policy is facially neutral as it applies to all individuals entering District buildings. Defendants do however dispute that this policy has a significantly adverse or disproportionate impact on persons of a particular type, including the individual Plaintiffs and putative class they represent.

Although Plaintiffs contend that Board's recommended-but-not-required masking policy prevents Plaintiffs and other medically fragile children from accessing in-person education without incurring a substantially increased risk of severe illness or death (ECF No. 20), this is the same risk that ***all*** children and parents of children in the District must contend with in weighing whether children should attend school in-person during the ongoing COVID-19 pandemic. The pandemic affects everyone, not just children covered by the protections of the ADA and Section 504. Indeed, two years into the COVID-19 pandemic, neither epidemiologists nor medical professionals have solved the persistent question as to why certain individuals appear more susceptible to serious illness from COVID-19, particularly under previous variants as opposed to the Omicron variant

circulating now, even without known preexisting conditions.  For that reason, *every* student and parent in the District must weigh the risk of contracting COVID-19 along with the benefit of in-person education. There are also members of the District community, who, though they themselves, might not be eligible for the protections of the ADA and Section 504, have members of their household who have preexisting conditions that could make them more susceptible to the effects of a COVID-19 infection, and these individuals must also weigh whether it is worth sending their children for in-person instruction, while the virus persists in the community.

In addition, Plaintiffs have not set forth any evidence that the District's recommended-but-not-required masking policy will result in an increased risk of transmission of COVID-19. The evidence presented by Plaintiffs does not demonstrate that universal masking is the silver bullet for preventing the risk of COVID-19 infection, much less a hypothetical illness, severe illness, or death from a COVID-19 infection. In fact, the evidence relied upon by the Defendants in crafting their recommended-but-not-required masking policy, shows that it is not. The argument and evidence put forth by Plaintiffs repeatedly emphasizes that masking is just one part of a multi-layered approach to prevent the spread of COVID-19. But at this point in the pandemic, it is not even ***the most important*** weapon in our arsenal to combat the virus. Far and away, that weapon is vaccination. The CDC's current "Guidance for COVID-19 Prevention in K-12 Schools," last updated on January 13, 2022, unequivocally states: "Vaccination is the leading public health prevention strategy to end the COVID-19 pandemic. Promoting vaccination can help schools safely return to in-person learning as well as extracurricular activities and sports."[2] Although the CDC recommends universal masking, it does not require it. *Id.* The Pennsylvania Department of Education and Department of Health likewise encourage, but do not mandate, schools to require

---

[2] "Guidance for COVID-19 Prevention in K-12 Schools," available https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/k-12-guidance.html, last updated Jan., 13, 2022.

masks because "[m]asking in school settings minimizes the spread of COVID-19, *particularly in settings where individuals and students are not vaccinated . . . .*"[3]

The District and its surrounding community, unlike school districts in other parts of the country, have a high rate of vaccination, making universal masking not as clinically significant in combating the transmission of COVID-19 as it might have been before school-age children were eligible for vaccination. The Montgomery County Office of Public Health reports that as of January 26, 2022, 83.7% of the population in the County has received at least one dose of the COVID-19 vaccine, and 66.6% of the population is fully vaccinated. This high vaccination rate is more significant in preventing the transmission of COVID-19 in District schools than universal masking, a fact which Plaintiffs cannot deny. And the District has been a leader in promoting vaccination among both children and adults in the community holding nine COVID-19 vaccination clinics between February and December 2021, during which 7,188 individuals were vaccinated. In light of this, Plaintiffs cannot demonstrate that the District's recommended-but-not-required masking policy will have a significantly adverse or disproportionate impact on Plaintiffs or the putative class members.

Indeed, with the rise of vaccination rates in the community, the District and other entities are moving away from universal masking toward "one-way masking," whereby individuals may choose to wear masks as an extra protection for themselves, but universal masking is not necessary to prevent the spread of COVID-19. This is because high vaccination rates in the community make the benefits gained from universal masking negligible, particularly since the CDC reports that the filtration effectiveness of cloth mask is shown to be lower than that of medical masks and

---

[3] "COVID-19 Resources for Pre-K to 12 Schools," available at https://www.education.pa.gov/Schools/safeschools/emergencyplanning/COVID-19/SchoolReopeningGuidance/ReopeningPreKto12/MaskingOrder/Pages/MasksSupremeCourtRuling.aspx, last accessed Feb. 1, 2022.

respirators, and most students in the District have chosen cloth masks over medical masks or respirators. Plaintiffs have not requested that the District require all individuals in District buildings to wear medical masks or respirators, even though those masks are indisputably more effective than cloth ones at preventing the transmission of COVID-19.   And the Plaintiffs, themselves, as well as anyone else who desires to, could wear these masks to school to protect themselves, which when worn correctly, help protect the wearer.

Additionally, as noted previously, there's a growing chorus of pediatricians, neuroscientists, special education teacher and parents who are concerned about the effects of prolonged masking on children. In fact, some of those parents are parents of children purported to be covered by the putative class. The District has received multiple emails from parents of District students with disabilities opposing a universal mask requirement in schools. As one Parent wrote to Dr. Russell and the Board:

> My child is a 6th grader [. . .]. She has an IEP, for Autism Spectrum disorder. My child has immense trouble with social skills. Wearing masks have made it nearly impossible to help her make a friend. . . . I am extremely upset that my child was spoken for without my consent. And I am very, very upset that this group of parents feel as if their child's needs are above all other children.

Exhibit YY. Although it is understandable that Plaintiffs have concerns for their children's well-being and purport to speak for all District students with disabilities, the reality is that they do not.

The District's neutral recommended-but-not-required mask policy does not have a disparate impact on Plaintiffs or the putative class. Plaintiffs and others who desire to may continue to wear masks to school under the District's recommended-but-not-required mask policy, thereby giving themselves added protection from potentially being infected with COVID-19, an added layer of protection on top of the community's high vaccination rate and other COVID-19 mitigation strategies adopted by the District including physical distancing,

handwashing/sanitizing, and District-wide upgrades to the District's ventilation systems. However, were this Court to enjoin the District from implementing its recommended-but-not-required mask policy, all individuals in the District would be forced to mask, ***creating a potential disparate impact on other students with disabilities***, like the above 6th grader, who may have their access to the educational benefits of an in-person education compromised by a universal mask mandate.

> [T]he "main thrust" of the ADA and RA "is to assure handicapped individuals receive the same benefits as the non-handicapped" . . . as well to prohibit discrimination against one "subgroup" of disabled people as compared to another subgroup if the characteristic distinguishing the two subgroups is the nature of their respective disability.

*C.G. v. Pennsylvania Dept. of Educ.*, 734 F.3d 229, 236 (3d Cir. 2013) (*quoting Easley v. Snider*, 36 F.3d 297, 305 (3d Cir. 1994).

In light of all the above, this Court cannot find that Plaintiffs have carried their burden to show a significantly adverse or disproportionate impact on the Plaintiffs' ability to receive the benefits of an in-person education without a universal mask mandate in place. To the contrary, were the Court to enjoin the District from implementing its recommended-but-not-required mask policy, thereby requiring universal masking District-wide, other students with disabilities not sufficiently represented by the putative class, might have their own rights infringed upon, in violation of the ADA and Section 504. Surely, that is neither reasonable nor desirable.

**4.      Plaintiffs Are Unlikely to Succeed on a Failure to Accommodate Claim.**

As a threshold matter, because Plaintiffs have failed to exhaust their administrative remedies, this Court is without jurisdiction to hear their claims under the ADA and Section 504. Generally speaking, the IDEA and its implementing regulations specifically require parties to exhaust all remedies at the administrative level before seeking relief in this Court. 20 U.S.C. §

38

130168686.1

1415(l); 34 C.F.R. § 300.516(e); *see Fry v. Napoleon Comty. Schs.*, 137 S. Ct. 743, 749-50, 754-55 (2017); *Batchelor v. Rose Tree Media Sch. Dist.*, 759 F.3d 266, 272-73 (3d Cir. 2014); *S.D. v. Haddon Heights Bd. of Educ.*, 722 Fed. Appx. 119, 125 (3d Cir. 2018). This exhaustion requirement also applies to an action brought under Section 504 and the ADA that seeks relief that is also available under the IDEA.  20 U.S.C. § 1415(l). More specifically:

> Nothing in this title . . . shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, title V of the Rehabilitation Act of 1973, . . . *except that before the filing of a civil action under such laws seeking relief that is also available under this part, the procedures under subsection (f) and (g) shall be exhausted to the same extent as would be required had the action been brought under this part.*

20 U.S.C. § 1415(l) (emphasis added).

Based on this language, courts have repeatedly held that to the extent that any claim seeks relief that is also available under the IDEA, the IDEA's administrative remedies must be exhausted before such an action is brought. *Batchelor*, 759 F.3d at 273-274; *R.R. v. Manheim Twp. Sch. Dist.*, 412 Fed. Appx. 544, 548 (3d Cir. 2011) (non-precedential opinion); *L.R. v. Manheim Twp. Sch. Dist.*, 540 F. Supp. 2d 603, 611 (E.D. Pa. 2008); *I.H. ex. rel. D.S. v. Cumberland Valley Sch. Dist.*, 842 F. Supp. 2d 762, 776 (M.D. Pa. 2012); *Swope v. Central York Sch. Dist.*, 796 F. Supp. 2d 592, 599-600 (M.D. Pa. 2011). Courts must look to the "gravamen of the plaintiff's complaint, setting aside any attempts at artful pleading." *Fry*, 137 S. Ct. at 747. A court's "examination of a plaintiff's complaint should consider substance, not surface: § 1415(l) requires exhaustion when the gravamen of a complaint seeks redress for a school's failure to provide a FAPE, even if not phrased or framed in precisely that way." *Id.* Courts may evaluate the gravamen of a complaint by asking a pair of hypothetical questions: "First, could the plaintiff have brought essentially the same claim

if the alleged conduct had occurred at a public facility that was not a school? Second, could an adult at the school have pressed essentially the same grievance?" *Id.* at 747.

Here, the answer to both questions is no. Plaintiffs' contention that they could bring the same claims at another public facility or that an adult such a teacher of staff member could bring the same ones (ECF No. 20 at p. 11), is belied by the crux of their claims, which concern the students' receipt of a free appropriate public education. As stated in Plaintiffs' brief in support of their Motion for a Preliminary Injunction, "Plaintiffs' ADA and RA claims are based on the Perkiomen Valley School Board masking policy depriv[ing] disabled students of a benefit that non-disabled students receive simply by attending school in the normal course—a free, appropriate public education." (ECF No. 20 at pp. 12-13). Plaintiffs thus could not bring their ADA or Section 504 claims against another public facility such a library or park. Nor could a teacher or staff member in the District bring this claim against the District. Plaintiffs' claims thus squarely fall within the purview of the IDEA. Because Plaintiffs have not exhausted their administrative remedies under the IDEA before resorting to federal court, this Court lacks jurisdiction to grant their Motion for a Preliminary Injunction.

Even assuming for the sake of argument that this Court does have jurisdiction to hear Plaintiffs' claims, for all of the reasons explained in detail above, a universal District-wide mask requirement, is not a reasonable accommodation for the individual Plaintiff students. In addition, the named Plaintiffs are 7, 8, and 10 years-old. It is difficult to imagine how a wide-sweeping District-wide universal mask mandate in all District buildings elementary through high school would be a reasonable accommodation for them to continue accessing their educational program.

Dr. Russell will testify that the District has taken reasonable steps to accommodate all students, like Plaintiffs, whose parents have requested accommodations from the District including: providing KF94 masks for students, directing staff to remind students to wear their

40

masks throughout the day, enforcing social distancing, and implementing preferential seating of medically-fragile students among other students who are willing to wear masks during the day. Indeed, the District remains ready, willing, and able to convene teams of staff with direct knowledge of specific students to develop and plan accommodations that meet the individual needs of medically-fragile students, including Plaintiffs, by providing accommodations not generally available to other students in the general student population. Importantly, though, this process necessitates Plaintiffs to utilize the IDEA or Section 504's administrative process—something which has not occurred here. *Patton v. Phoenix Sch. of Law LLC*, No. CV–11–0748–PHX–GMS, 2011 WL 1936920, at *4 (D. Ariz. May 20, 2011) ("Under the ADA, an educational institution's 'obligation to engage in an interactive process with the [student] to find a reasonable accommodation is triggered by [the student] giving notice of the [ ] disability and the desire for accommodation.'").

Further, although Plaintiffs argue that a universal masking policy is necessary for them to be reasonably accommodated under the ADA and Section 504, a school district "is not required to grant the specific accommodations required by Parents or otherwise make substantial modifications to the programs that were used for all other students" *Ridley School Dist. v. M.R.*, 680 F.3d 260, 282. (3d Cir. 2012), particularly when other reasonable accommodations are available. The law is clear that a public entity need only provide a reasonable accommodation, not a plaintiff's preferred or requested accommodation. *See*, *e.g*., *Berardelli v. Allied Services Institute of Rehabilitation Medicine,* 900 F.3d 104, 125 (3d Cir. 2018); *Pahlavan v. Drexel University College of Medicine*, 438 F. Supp. 3d 404, 421 (E.D. Pa. 2020). Plaintiffs thus are unlikely to succeed in their claim that the District has failed to accommodate them in violation of the ADA or Section 504.

**B.** **Plaintiffs Have Not Established They Will Be Irreparably Harmed by a Denial of Their Motion.**

As explained in detail in the preceding sections, Defendants have taken a myriad of preventative measures, as recommended by the CDC, the Pennsylvania Department of Education, the Pennsylvania Department of Health, and the Montgomery County Office of Public Health to prevent the transmission of COVID-19 in District buildings—perhaps the most significant of which, is promoting vaccination among students and staff. Given the importance of vaccination in preventing the transmission of COVID-19 as well reducing the risk of an individual developing serious illness from COVID-19, the high rate of vaccinated individuals in the District community is significant and mitigates against Plaintiffs being irreparably harmed should this Court decline to further enjoin the District from implementing its recommended-but-not-required masking policy.

Additionally, Plaintiffs have failed to acknowledge the reality that even with a universal masking mandate in effect, students are not masked in schools all day. Elementary-aged students, in particular, of which all the individually-named Plaintiffs are, have difficulty wearing masks correctly all day and require ongoing reminders, physical prompting and assistance for proper mask wearing. Further, every time students eat and drink during snack or lunch time, they are around other people with their masks off. Plaintiffs have not indicated that they have sought an accommodation from the District to be in a separate space for lunch during the school day away from other students who are eating and drinking unmasked. Thus, even a universal masking requirement in the District would not reduce the possibility that any one of the Plaintiff students could contract COVID-19 during lunch periods or other times when students' masks are off because they are eating and drinking or because students are not wearing them correctly. As Plaintiffs are already in school each day with students who are unmasked at various times, denying

Plaintiffs' Motion for a Preliminary Injunction is unlikely to cause any irreparable harm.

Moreover, as stated previously, the CDC's updated guidance on masks, indicates that respirators and other high quality masks are highly effective at protecting their wearers, regardless of what people around them are doing, affording Plaintiffs adequate masking protection even in the absence of a universal masking requirement. *See* attached Exhibit TT: Washington Post: Schools Can Safely Make Masks Optional with CDC's New Guidelines, Jan. 5, 2022.

### C. The Balance of Equities Weighs in Favor of Defendants and Granting Plaintiffs' Motion is Not in the Public Interest.

As described above, it is unlikely that denying Plaintiffs' Motion for a Preliminary Injunction will result in irreparable harm to the Plaintiffs. On the other hand, granting their Motion will likely cause significant harm to District community. The issuance of the TRO has resulted in the District expending numerous hours addressing recalcitrant students who do not wish to mask as well as the reasonable concerns from parents, who believe that universal mask-wearing has impeded their children's ability to obtain the full educational and social benefit of in-person instruction. It has also resulted in the cancellation of home athletic competitions, out of concern that visiting teams and spectators would not properly mask in District buildings. Further, there is a real concern that granting Plaintiffs the relief they seek could open the door for similar actions in the future. Once the COVID-19 pandemic has ended, what would stop—these—or a different, but similarly-situated group of plaintiffs from asking the court to intervene to require universal masking every winter during cold and flu season? Indeed, the risks of influenza, particularly, are similar to those of COVID-19 for medically-fragile individuals. As noted by the court in *Upper Saint Clair*,

> [a]lthough immunocompromised children have always been present in our schools, and communicable diseases have always circulated, prior to COVID-19 there was never an argument for mandatory, indefinite, universal masking in schools—much less the argument

43

that the failure of a school district to mandate universal masking constitutes a violation of federal law. Aside from cases addressing COVID-19, the Court was unable to locate a single case where a court held that a reasonable accommodation for an immunocompromised or otherwise vulnerable person was to require all other students and staff of a school, or constituents of an institution or community, to wear a mask or any other type of personal protective equipment.

*Upper Saint Clair*, 2002 WL at \*15.

Moreover, granting Plaintiffs a preliminary injunction, enjoining the Board from implementing its recommended-but-not-required masking policy will thrust this Court into the improper role of a "super school board." It is well-established in Pennsylvania that courts are "restrained, when dealing with matters of school policy, by the long-established and salutary rule that courts should not function as super school boards." *Zebra v. School Dist. of the City of Pittsburgh*, 449 Pa. 432, 437 (Pa. 1972). To that end, courts should "not interfere with the discretionary exercise of a school board's power unless the action was based on 'a misconception of law, ignorance through lack of inquiry into facts necessary to form an intelligent judgment or the result of arbitrary will or caprice.'" *Id.* (*quoting Hibbs v. Arsenberg*, 276 Pa. 24, 26 (Pa. 1923)). As the Board's decision to adopt a recommended-but-not-required masking policy was not based on a misconception of law, ignorance through a lack of inquiry into facts necessary to form an intelligent judgment and was not arbitrary or capricious, this Court should decline to intervene in their thoroughly-considered and well-reasoned decision. "'It is only when the board transcends the limits of its legal discretion that it is amenable to the injunctive process of a court of equity.'" *Zebra*, 449 Pa. at 750 (*quoting Landerman v. Churchill Area School Dist.*, 414 Pa. 530, 534 (Pa. 1964). Just as the courts in *Upper Saint Clair* and *Delaware Valley* determined, this Court should decline to "overrule the vote" of the Board because "it is not for this Court to substitute its own judgment for that of the elected representatives of the School Board." *Upper Saint Clair*, 2002 WL

130168686.1

at \*16; *Delaware Valley*, 2021 WL 5239734 at \*20 (citation omitted). Granting Plaintiffs a preliminary injunction would thus be contrary to the public interest and should therefore be denied.

## IV.   **CONCLUSION**

Based on the foregoing, Defendants respectfully request that Plaintiffs' Motion for a Preliminary Injunction be denied.

Respectfully submitted,

**FOX ROTHSCHILD LLP**

Dated: February 1, 2022

  /s/ *Brian E. Subers*
Brian E. Subers, Esq.
Beth N. Shore, Esq.
Timothy E. Gilsbach, Esq.
10 Sentry Parkway, Suite 200
P.O. Box 3001
Blue Bell, PA 19422-3001
Telephone:  (610) 397-6500
Fax:  (610) 397-0450
bsubers@foxrothschild.com
bshore@foxrothschild.com
tgilsbach@foxrothschild.com
*Attorneys for Defendant*

45