IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOHN DOE 1 and JANE DOE 1, in their own capacity and as parents of CHILD DOE 1, JOHN DOE 2 and JANE DOE 2, in their own capacity as parents of CHILD DOE 2, JANE DOE 3, in her own capacity and as a parent of CHILD DOE 3 and on behalf of those similarly situated,<br>　　　　　　　　Plaintiffs,<br><br>v.<br><br>PERKIOMEN VALLEY SCHOOL DISTRICT, a Pennsylvania governmental entity, JASON SAYLOR, MATTHEW DORR, ROWAN KEENAN, DON FOUNTAIN, KIM MARES, REENA KOLAR, SARAH EVANS-BROCKETT, LAURA WHITE, and TAMMY CAMPLI, all Individual elected officers sued in their official capacity as members of the BOARD OF SCHOOL DIRECTORS OF THE PERKIOMEN VALLEY SCHOOL DISTRICT, a Pennsylvania elected legislative body,<br>　　　　　　　　Defendants. | CIVIL ACTION<br><br><br><br>NO.  22-cv-287 |

## OPINION

This action is brought by children with disabilities and their parents, on behalf of themselves and a putative class of similarly situated children, in response to the Perkiomen Valley School Board's decision to move during the COVID-19 pandemic from universal indoor masking to optional masking in the school district.  Plaintiffs filed a Complaint on January 21, 2022 alleging violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 1201, *et seq*., and Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 701, *et seq*.

(collectively, the "Acts").[1]   A Motion for a Temporary Restraining Order ("TRO") followed on

January 23, which was granted.   A hearing was held on February 4, 2022, following full briefing

on Plaintiffs' Motion for a Preliminary Injunction.   For the reasons that follow, Plaintiffs'

Motion will be granted.

## I.   FACTUAL BACKGROUND

In March 2020, an infectious and deadly viral disease called COVID-19 plunged the

world into a global pandemic that has so far claimed the lives of hundreds of thousands of

Americans.[2]   COVID-19 is primarily spread by "exposure to respiratory fluids carrying

infectious virus," for example, when an individual inhales droplets emitted by other people when

they cough or speak.[3]   An individual can spread COVID-19 to others even if she does not have

symptoms of the disease—up to 50% of transmissions may stem from asymptomatic carriers.[4]

At the time of writing, the most prevalent variant of COVID-19, known as Omicron, is also the

most infectious yet.[5]   The pandemic has had a serious detrimental effect on the mental health of

---

[1] Plaintiffs seek to represent "all students with disabilities that make them medically vulnerable to severe infection and/or death from COVID-19 and who attend public school in the Perkiomen Valley School District."  The certification of the class is not at issue at this stage.

[2] *Covid Data Tracker*, Ctrs. for Disease Control & Prevention, https://covid.cdc.gov/covid-data-tracker/#datatracker-home (last visited Feb. 6, 2022).  A court may take judicial notice of information on a government website.  *See Vanderklok v. United States*, 868 F.3d 189, 205 n.16 (3d Cir. 2017).

[3] *Scientific Brief: SARS-CoV-2 Transmission*, Ctrs. for Disease Control & Prevention (updated May 7, 2021), https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/sars-cov-2-transmission.html (last visited Feb. 6, 2022).

[4] *Science Brief: Community Use of Cloth Masks to Control the Spread of SARS-CoV-2*, Ctrs. for Disease Control & Prevention (updated Jan. 21, 2022), available at https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/masking-science-sars-cov2.html (last visited Feb. 6, 2022). .

[5] *See Omicron Variant:  What You Need to Know*, Ctrs. for Disease Control & Prevention (updated Feb. 2, 2022), https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html (last visited Feb. 6, 2022).

children, through fear, missed social interactions and developmental opportunities, and interrupted access to the services provided by public schools, including nurses, counseling, and food security.[6]

The Perkiomen Valley School District is in Montgomery County.  Approximately 5,100 students from kindergarten to grade 12 from the Townships of Perkiomen, Skippack, and Lower Frederick, and the Boroughs of Trappe, Collegeville, and Schwenksville are enrolled.  It operates under the leadership of Superintendent Dr. Barbara Russell.  As Superintendent, Dr. Russell is ultimately responsible for ensuring a safe, quality school environment for Perkiomen Valley students, and she leads the District's COVID-19 response efforts.  The Board of Directors of the District (the "Board") has nine elected members, who each serve a term of four years.  The Board has focused its efforts on minimizing the transmission of COVID-19 among its students and staff and has approved several "health and safety plans" to achieve that end.

In response to the pandemic, from March 2020 through the remainder of the 2019-20 school year, students stayed home and the District educated them in a virtual learning environment.  During the summer of 2020, the Pennsylvania Department of Education required school districts to develop a health and safety plan, approved by the Board of School Directors, before the schools could return to in-person instruction.[7]  The District formed a re-opening task force comprised of administrators and community stakeholders for this purpose.  It continued to adjust its approach throughout that school year as local COVID cases fluctuated and public

---

[6] A.M. Hearing Tr. at 62:24-64:2.

[7] *Public Health Guidance for School Communities:  Phased Reopening of Pre-K to 12 Schools during COVID-19, July 16, 2020*, Pa. Dep't of Educ., available at
https://www.education.pa.gov/Schools/safeschools/emergencyplanning/COVID-
19/SchoolReopeningGuidance/ReopeningPreKto12/PublicHealthGuidance/Pages/default.aspx.

health guidance continued to be updated.  The District adopted the "layered approach" recommended by public health authorities, deploying multiple mitigation strategies to prevent the spread of the virus, including universal masking, social distancing, upgrading ventilation systems, and ensuring masks and hand sanitizer were readily available in the schools.  District students returned to school five days a week for the first time on March 22, 2021, with universal masking and other protections in place.

On March 11, 2021, Congress passed the American Rescue Plan Act of 2021, 15 U.S.C. § 9001 note (the "ARP").  Section 2001 of the ARP created the Elementary and Secondary School Relief Fund (the "ARP ESSER Program"), which provides funding to "State educational agencies and school districts to safely reopen and sustain the safe operation of schools and address the impact of the coronavirus pandemic on the Nation's students."[8]  Pursuant to the Act, states allocate funds to local educational agencies ("LEAs"), which include school districts, which must then "develop and make publicly available . . . a plan for the safe return to in-person instruction."  20 U.S.C. § 3401 note §§ 2001(d)(1), (i)(1).[9]

In preparation for the 2021-22 school year, Pennsylvania required LEAs to submit a health and safety plan meeting the requirements of the ARP by July 30, 2021.[10]  The ARP requires each plan "to implement prevention and mitigation strategies that are, to the greatest

---

[8] *American Rescue Plan Elementary and Secondary School Emergency Relief*, Dep't of Educ. (modified Jan. 12, 2022), https://oese.ed.gov/offices/american-rescue-plan/american-rescue-plan-elementary-and-secondary-school-emergency-relief/ (last visited Feb. 6, 2022).

[9] Dr. Russell testified that the District receives funding from the ARP ESSER Program.

[10] *American Rescue Plan Act Elementary and Secondary School Emergency Relief Fund*, 86 Fed. Reg. 21,195, 21,201 (Apr. 22, 2021).

extent practicable, consistent with the most recent [Centers for Disease Control and Prevention ("CDC")] guidance on reopening schools."[11]  Each plan must describe any policies that the LEA has adopted regarding the "safety recommendations established by the CDC" on topics including "universal and correct wearing of masks" and "[a]ppropriate accommodations for children with disabilities with respect to health and safety policies."[12]  LEAs must update their plans at least every six months, "taking into consideration the timing of significant changes to CDC guidance on reopening schools."[13]  Each "revised plan must address each of the aspects of safety currently recommended by the CDC or, if the CDC has updated its safety recommendations at the time the LEA is revising its plan, each of the updated safety recommendations."[14]

At the preliminary injunction hearing, Dr. Russell, who was an irreproachably credible witness, testified that the District's health and safety plans were founded on multiple considerations, including the recommendations of the CDC, the COVID-19 transmission rates in Montgomery County, the availability of personal protective equipment, and all that the District was continuing to learn about COVID-19, how it spread, and how it could best be mitigated. Each health and safety plan was reviewed by local stakeholders including parents, staff, teachers, and administrators, prior to its presentation to the Board for approval.[15]  Taken into consideration

---

[11] *Id.*; *see also* 20 U.S.C. § 3401 note § 2001(e)(2)(Q).

[12] 86 Fed. Reg. at 21,201; *see also* 20 U.S.C. § 3401 note, § 2001(e)(2)(F), (K), (M) & (N).

[13]  86 Fed. Reg. at 21,200.

[14] *Id.* In the Perkiomen Valley School District, 325 students qualify for accommodations under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and 826 students qualify for special education and related services under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.*  Of these 826 students, 184 qualified under the "other health impairment" disability category.

[15] *See, e.g.*, Defs. P.I. Ex. 5, at 2-3 (ARP ESSER Health and Safety Plan (version 11), dated Dec. 13, 2021).

was the CDC's method of rating the prevalence of COVID-19 from "low" to "high," based on the number of cases per 100,000 people and the rate of positive test results. For example, a county has a "high" rate of transmission if, in the last seven days, it has had 100 or more new cases of COVID-19 per 100,000 residents, or a COVID-19 test positivity rate of 10% or more.[16] The Montgomery County Office of Public Health ("MCOPH") uses the CDC's scale.[17]

On July 12, 2021, the Board approved a Health and Safety Plan that recommended but did not require masking indoors. By August 1, 2021, the transmission rate of COVID-19 in Montgomery County had increased to "high" (the highest transmission rate on the scale).[18] In light of the District's goal to keep students learning on-site as much as possible, of this increase in cases, and of the lack of vaccine availability for the youngest students at that time, the Board decided to revisit the July Plan.

Thus, on August 9, 2021, it approved Version 7 of the Health and Safety Plan, which mandated universal masking indoors (though it remained optional outdoors).[19] Under Version 7 of the Plan, the District would monitor community transmission rates and positivity rates, and anticipated that "[t]his information *may* be used as a basis . . . to determine instructional models

---

[16] *Covid Data Tracker*, Ctrs. for Disease Control & Prevention, https://covid.cdc.gov/covid-data-tracker/#county-view?list_select_state=all_states&list_select_county=all_counties (last visited Feb. 6, 2022).

[17] *See* Defs. P.I. Ex. 13, at 2-3 (Montgomery County Office of Public Health: Recommendation for COVID-19 Prevention for K to 12 Schools, 2021-2022 School Year, updated Jan. 11, 2021).

[18] *COVID-19 County Check Tool: Understanding Community Transmission Levels in Your County*, Ctrs. For Disease Control & Prevention (updated Sept. 30, 2021), https://www.cdc.gov/coronavirus/2019-ncov/more/aboutcovidcountycheck/index.html (last visited Feb. 6, 2022).

[19] Defs. P.I. Ex. 2 (ARP ESSER Health and Safety Plan (version 7), dated Aug. 9, 2021). Pursuant to an order of the CDC, every health and safety plan issued by the District in the 2021-2022 school year has mandated masks on school buses. *See Requirement for Persons to Wear Masks While On Conveyances and At Transportation Hubs*, Ctrs. for Disease Control and Prevention (Jan. 29, 2021).

during COVID-19."[20]  Students could request an exemption from universal masking by providing "evidence of a medical condition or mental health issue from a certified medical professional indicating the detrimental effects of wearing masks," or based on a disability accommodation.[21]  Currently, 44 students in the District have received mask exemptions, stemming from conditions including autism and anxiety.[22]

In late September or early October, in preparation for the beginning of the indoor sports season, Dr. Russell recommended, and the Board approved an update to the Health and Safety Plan providing that student athletes did not have to wear masks indoors while competing.[23] Masks were required when practicing or sitting on the sidelines indoors, but remained optional outdoors.  This update was made in response to new guidance from the CDC and the MCOPH concerning student participation in high-exertion activities.

After a municipal election on November 2, 2021, the Board's composition changed with four newly elected members.  Sometime that month, the District implemented the MCOPH's "Test-to-Stay" program, which allowed unvaccinated or partially vaccinated students who had been exposed to a confirmed case of COVID-19 at school to avoid isolating, if they were asymptomatic and agreed to an "antigen testing cadence" that yielded only negative results.[24] Without this program, such students would have had to quarantine at home for 7-10 days,

---

[20] *Id.* at 6 (emphasis added).

[21] *Id.*

[22] Defs. P.I. Ex. 11 (Mask Exemptions).

[23] Defs. P.I. Ex. 3 (ARP ESSER Health and Safety Plan (version 9), dated Sept. 23, 2021).

[24] Defs. P.I. Ex. 4, at 21 (11/2020 Education Updates).

regardless of whether they themselves had the virus.

On December 6, 2021, the new Board held its first monthly work session meeting in the high school auditorium.[25]  Dr. Russell was present, along with other administrative staff and members of the public.  The Health and Safety Plan proposed on December 6 required universal indoor masking, with the exception of students actively engaged in competition.  At the meeting, Dr. Russell presented a proposed revision to the Plan that would extend the masking exception enjoyed by athletes during competitions to include practices as well, while retaining the mask requirement for any athletes who were indoors and not actively participating.  Dr. Russell testified that this extension was based on four considerations: (1) no outbreaks or transmission had been observed during competitions; (2) an extension of the exception was consistent with the position of the Pennsylvania Department of Health; (3) it was viewed as healthier to engage in high-intensity exercise without a mask; and, (4) vaccines had been available for some time (to high schoolers since the spring and to children aged five and older since November 2021).  Dr. Russell did not recommend any other amendments to the masking policy at that time, advising the Board to "stay the course the get through the holidays and allow the youngest children to get vaccinated, then reconsider the health and safety plan in January."  The amendments were tabled for "further conversation" at the business meeting scheduled for the following week.

On December 13, the Board gathered with Dr. Russell and various administrative staff for the business meeting.[26]  Community members voiced their opinions on the question of

---

[25] Defs. P.I. Ex. 33 (Perkiomen Valley School Board Work Session Minutes, Dec. 6, 2021).  Dr. Russell testified that the administration uses work session meeting to introduce action items and points of discussion that are acted on by the Board at the following business meeting.  Both work session meetings and business meetings are open to the public.

[26] Defs. P.I. Ex. 6 (Perkiomen Valley School Board Business Meeting Minutes, Dec. 13, 2021).

whether to keep the universal indoor masking requirement in place.  Dr. Russell recommended maintaining universal masking for the time being, advising that "[b]efore moving away from requiring masks, we want to be sure that all students and staff have the opportunity to be vaccinated."  She advised the Board to consider a variety of factors in considering an eventual shift to optional masking, including how Omicron would affect the County over the winter holidays, and the need for time to establish new contact tracing systems.

During this December 13 meeting, there was a motion to amend the Health and Safety After a robust discussion, the motion passed 5-4 and optional masking was introduced into the Health and Safety Plan, effective January 3, 2022.

Yet, as has so often happened during this unpredictable pandemic, circumstances soon changed, prompting a response from the District and the Board.  Dr. Russell testified that the first Omicron case was identified in Montgomery County on December 17, 2021, just four days after the Board voted to move to optional masking.  Soon after, transmission and positivity rates in the County began to surge.  Dr. Russell spoke with Montgomery County representatives and other school administrators, and soon approached the Board's President with a proposal to call a special meeting before January 3, for the purpose of reexamining the Health and Safety Plan and extending universal masking.[27]  Dr. Russell testified that she was motivated by two factors in making this proposal.  First, the surge in cases.  And second, the MCOPH had informed her that only schools with universal masking would be allowed to continue the Test-to-Stay program,

---

[27] It appears that a special meeting was required because the Health and Safety Plan had never introduced a mechanism by which authority could be delegated to the superintendent to make last-minute decisions based on pre-approved criteria, such as incidence rates.  As a result, each time there was new guidance or changes in local reported cases, the Plan had to be amended by a vote of the Board.

which she had found to be effective in minimizing school absences.

The special meeting was advertised, and the Board gathered on Sunday, January 2, 2022 to consider how best to proceed.[28]  Dr. Russell came prepared with a new plan—one she felt embodied "a more methodical and thoughtful approach,"[29] and which garnered support with many members of the community.[30]  The new plan was called the Health and Safety Transition Plan, Version 3 (the "Transition Plan"), and it was intended to delay the introduction of the optional masking policy.[31]

Specifically, from January 3 to 21, 2022, ("Phase One Transition Plan"), masking would remain *required* indoors during the school day.  After school hours, masking would be strongly recommended during optional extracurricular activities such as sporting events, music ensembles, meetings, and clubs.  As before, masking would remain optional outdoors, and optional for all students engaged in athletics practice or competition.

Then, on January 24, masking would be *recommended* indoors during school hours ("Phase Two Transition Plan").  Dr. Russell chose this date because it was expected to fall after the peak and decline of the Omicron surge and it would allow the youngest students more time to get vaccinated.  Dr. Russell testified that the proposal to delay optional masking was based on a number of considerations, including the holiday season, the need to allow the District's nursing

---

[28] Pls. P.I. Ex. X (Perkiomen Valley School Board Special Meeting Minutes, Jan. 2, 2022).

[29] A.M. Hearing Tr. 25:23-24.

[30] Pls. P.I. Ex. X, at 1-3 (Perkiomen Valley School Board Special Meeting Minutes, Jan. 2, 2022).

[31] Defs. P.I. Ex. 10 (ARP ESSER Health and Safety Transition Plan (version 3), dated Jan. 2, 2022).

staff time to respond to new MCOPH guidelines concerning isolation and quarantining, and the data on increasing cases.  Her thinking was that the proposed delay would allow time for the surge to pass.  Dr. Russell testified that she had intended for the District to do progress monitoring during the Phase One Transition Plan, and for the shift to Phase Two on January 24 to be "based on what we knew about what was predicted about this virus."[32]  She considered that one of the more significant provisions of the plan to support this shift would be the provision of KF94 masks to students and staff who wanted them.[33]

At the special meeting, she presented to the Board data on local COVID-19 rates, which had increased by that time to almost 600 cases per 100,000 individuals, with a 20% rate of positive COVID tests.[34]  Dr. Russell testified that she also drew the Board's attention to the World Health Organization's concerns about the long-term effects of masking on students' literacy skills, and social and emotional well-being, emphasizing that eventually, the District needed to move to optional masking, but that it had to be "at the right time, in my view, based upon conversations and what I knew about the virus."[35]  Her presentation also noted that "[s]etting thresholds for activities according to cases no longer makes sense," and that Omicron was characterized by milder symptoms and lower hospitalizations rates than previous variants.[36]

---

[32] A.M. Hearing Tr. 101:12-14.

[33] Dr. Russell testified that KF94 masks in particular were provided because they "were becoming more well-known as a mask that was very protective, 94-percent capacity at filtering particles."  A.M. Hearing Tr. 102:6-13.

[34] Defs. P.I. Ex. 9, at 12-15 (Updates to Health and Safety Presentation, Jan. 2, 2022).

[35] *Id.* at 19; A.M. Hearing Tr. 94:20-95:13.

[36] Defs. P.I. Ex. 9, at 26, 34 (Updates to Health and Safety Presentation, Jan. 2, 2022).

With the implementation of the Phase Two Transition Plan on January 24, the Defendants' Health and Safety Plan, for the first time, no longer followed CDC or MCOPH Guidance.  To date, only two out of the twenty-one school districts in Montgomery County, including Perkiomen Valley, have ended universal masking.[37]

Plaintiffs' suit challenges the Board's decision to replace universal indoor masking with optional masking.  Specifically, Plaintiffs argue that the optional masking discriminates against their disabled children (the "Child-Plaintiffs") in violation of the ADA and Section 504 because it "has the effect of excluding these children from their public institution, or otherwise denying them the opportunity to participate in the services of the school district."[38]

Plaintiffs filed suit on Friday, January 21 with the express purpose of preventing the optional masking policy from coming into effect the following Monday.  Although the Complaint initially targets the Board's December 13 vote to approve optional masking, it acknowledges that the implementation of optional masking was delayed by the Transition Plan. Indeed, Plaintiffs did not sue until the Phase One Transition Plan was over and the Complaint does not object to Phase One's policy of requiring masking indoors but strongly recommending masks after school hours, outdoors, and for athletes engaged in practice or competition. Therefore, it is evident that the Phase One Transition Plan represents the last peaceful status between the Parties.

## II.    STANDING

As a preliminary matter, Defendants challenge Plaintiffs' standing to pursue this

---

[37] Pls. P.I. Ex. J (Mask Policy by Montgomery County School Districts).

[38] Pls.' Br. Supp. Mot. Prelim. Inj. at 8, ECF No. 20 (hereinafter "Pls.' Br.").

litigation.  Article III of the United States Constitution limits federal courts to hearing cases or controversies.  *See, e.g.*, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  Standing is part of this case-or-controversy requirement and is measured at the commencement of the suit; it cannot be created retroactively. *Id.* at 559-60, 569-70 nn. 4 & 5.  To establish standing, a plaintiff must show:  (1) that it suffered an injury in fact, *i.e.*, a legally protected interest which is concrete and particularized, and actual or imminent; (2) a causal connection between the injury and the conduct complained of, namely, that the injury is fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party; and (3) that it is likely as opposed to merely speculative that the injury will be redressed by a favorable decision.  *Id.* at 560-61.  Defendants' standing challenge focuses on whether the Plaintiffs have suffered an injury-in-fact. Specifically, Defendants argue that Plaintiffs' claimed injury of an increased risk of contracting COVID-19 is too generalized and speculative to confer Article III standing.  For the following reasons, these arguments are unavailing.

First, "a risk of real harm" can qualify as an injury for purposes of standing, and can "satisfy the requirement of concreteness."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 331 (2016). Moreover, the Supreme Court has recognized that a risk of future harm can constitute an injury-in-fact*.  See Clapper v. Amnesty Int'l, USA*, 133 S. Ct. 1138, 1147-48 (2013).  The risk of harm need not be "literally certain" to constitute an injury for purposes of standing; a "substantial risk that the harm will occur" is sufficient.  *Id.* at 1150 n.5.  Indeed, a plaintiff may have suffered an injury where the defendant's conduct "substantially increased the risk of harm" to the plaintiff. *See, e.g., Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1621-22 (2020).  As discussed in detail below, Plaintiffs have provided evidence showing that optional masking policies increase the

rate of transmission of COVID-19 and, thus, the likelihood that they will become infected and suffer serious illness or worse.  Therefore, their injury is not speculative.  *Massachusetts v. E.P.A.*, 549 U.S. 497, 526 (2007) ("The risk of catastrophic harm, though remote is nevertheless real.").

For purposes of Article III standing, the alleged injury cannot be "undifferentiated and common to all members of the public."  *Lujan*, 504 U.S. at 575 (internal citation and quotation marks omitted).   Indeed, it must be "distinct," *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990), and "differentiated [] from a general population of individuals."  *Carney v. Adams,* 141 S.Ct. 493, 502 (2020).  Yet "[t]he fact that an injury may be suffered by a large number of people does not of itself make that injury a nonjusticiable generalized grievance."  *Spokeo, Inc.*, 578 U.S. at 339 n.7.  Rather, for an injury to be particularized within the meaning of Article III, it need only "affect the plaintiff in a personal and individual way."  *Id*. at 339 (internal citation and quotation marks omitted).  Here, as the evidence discussed below demonstrates, each Plaintiff has shown that the optional masking policy puts them uniquely at risk by virtue of their individual medical conditions and disabilities, given current transmission rates in Montgomery County.  Though the voluntary policy certainly has ramifications for all students enrolled in schools in the District, it also has a personal and individual impact on each of the named Plaintiffs.  *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 24 (1998) ("[W]here a harm is concrete, though widely shared, the Court has found 'injury in fact'").  Their injury is thus far from an abstract "generalized grievance" common to all members of the public.

Plaintiffs' alleged injuries are fairly traceable to District's optional masking policy.  To satisfy causality, a plaintiff must show that its injury is fairly traceable to the conduct complained of, which requires no more than "de facto causality."  *Dep't of Comm. v. New York*, 139 S.Ct.

14

2551, 2566 (2019) (internal citation and quotation marks omitted).  Plaintiffs have pointed to

evidence showing that the optional masking policy will directly contribute to an increased

likelihood of contracting COVID-19, as other students in the school district will choose to no

longer wear masks in school in the absence of a directive requiring them to do so.  *See id.* at

2566 (holding that a plaintiff has standing to sue for injuries caused by "the predictable effect of

Government action on the decisions of the third parties"); *Arc of Ia. v. Reynolds*, 2022 WL

211215 (8th Cir. Jan. 25, 2022).  The increased likelihood is attributable to the Board's decision

to move from a universal indoor mask policy to an optional policy.  *See, e.g.*, *Doe v. Delaware*

*Cnty. Sch. Dist.*, 2021 WL 5239734, at *15-16 (M.D. Pa. 2021).

Plaintiffs have also satisfied redressability because they have shown that it is "likely, as

opposed to be merely speculative that the injury will be redressed by a favorable decision."

*Lujan*, 504 U.S. at 561 (internal citation and quotation marks omitted).  A plaintiff "need not

show that a favorable decision will relieve his every injury," it will suffice to "show that a

favorable decision will relieve *a* discrete injury."  *Massachusetts*, 549 U.S. at 525 (emphasis

added (internal citation and quotations omitted).  When the alleged injury arises from "the

government's allegedly unlawful regulation (or lack of regulation) of someone else," causation

and redressability ordinarily hinge on the response of the . . . third party," and the plaintiff must

show that the third party will act "in such a manner as to produce causation and permit the

redressability of injury."  *Lujan*, 504 U.S. at 562.  In the absence of a directive requiring students

to wear masks, it is likely that many will choose not to do so.  Indeed, Dr. Russell testified that,

in the two days after the implementation of optional masking pursuant to the Phase Two

Transition Plan and before this Court's issuance of the TRO, the district principals observed only

about 70% of students wearing masks, and expected those numbers to wane over time.

Therefore, an injunction preventing the new policy from going into effect would redress the plaintiff's injury because it would maintain the status quo requiring all students to wear masks, thus lowering the increased likelihood of contracting COVID.  *See, e.g.*, *Delaware Cnty. Sch. Dist.*, 2021 WL 5239734, at *15-16.

For the reasons set forth above, the Child-Plaintiffs here have standing.  *See Doe 1 v. Del. Valley Sch. Dist.,* 2021 WL 5239734, at *15 (M.D. Pa. Nov. 11, 2021); *Doe 1 v. North Allegheny Sch. Dist.*, 2022 WL 170035, at *3 (W.D. Pa. Jan 17, 2022).  Given that only one of the plaintiffs needs to have standing for the litigation to proceed, there is no need to address here whether the Parent-Plaintiffs have standing.  *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2565 (2019); *see also Hassan v. City of New York*, 804 F.3d 277, 291 (3d Cir. 2015) ("Harm to all—even in the nuanced world of standing law—cannot be logically equated with harm to no one.").

### III.    EXHAUSTION OF ADMINISTRATIVE REMEDIES

Defendants next argue that the Court has no jurisdiction over Plaintiffs' ADA and Section 504 claims because they were required to—and did not—exhaust their administrative remedies pursuant to the exhaustion provision of the IDEA, which states in relevant part:

> Nothing in [the IDEA] shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the [ADA], title V of the Rehabilitation Act [including § 504], or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under [the IDEA], the [IDEA's administrative procedures] shall be exhausted to the same extent as would be required had the action been brought under [the IDEA].

20 U.S.C. § 1415(l).  In determining whether an education-based lawsuit is brought under the ADA and Section 504 (which do not necessarily require exhaustion) or the IDEA (which does), "[t]he use (or non-use) of particular labels and terms is not what matters."  *Fry v. Napoleon*

*Cmty. Sch.*, 137 S. Ct. 743, 755 (2017).  Rather, courts must look to the "gravamen" of the lawsuit, informed by the purposes of each of the statutes.  *Id*.

The core guarantee of the IDEA is a "free appropriate public education" ("FAPE"). 20 U.S.C. § 1412(a)(1)(A).  "Under the IDEA, an individual education program, called an IEP for short, serves as the primary vehicle for providing each child with the promised FAPE." *Fry*, 137 S. Ct. at 749 (internal citation and quotations omitted).  The IEP is a "a personalized plan to meet all of the child's educational needs." *Id*. (internal quotations omitted).  The statute's goal is to provide each child with meaningful access to education by offering individualized instruction and related services appropriate to their "unique needs." *Id*. at 755-56.

On the other hand, the goals of the ADA and Section 504 are "to root out disability-based discrimination, enabling each covered person (sometimes by means of reasonable accommodations) to participate equally to all others in public facilities and federally funded programs." *Id.* at 756.  "In short, the IDEA guarantees individually *tailored educational services*, while Title II and § 504 promise non-discriminatory *access to public institutions*." *Id*. (emphasis added).  These claims may overlap in a single lawsuit as well. *Id*.

With the purposes of these statutes in mind, the Supreme Court recommends considering hypothetical questions to determine whether the lawsuit at issue is brought under the ADA or the IDEA. *Id*. at 756.  "First, could the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public facility that was *not* a school—say, a public theater or library?  And second, could an *adult* at the school—say, an employee or visitor—have pressed essentially the same grievance?" *Id*. (emphasis in original).  When the answer to those questions is yes, the suit is likely to involve the ADA or Section 504 rather than the IDEA. *Id*.  Thus, a lawsuit brought by a student in a wheelchair claiming inadequate access to his school is likely

indicative of an ADA/Section 504 claim, whereas a student with a learning disability suing his school for failure to provide remedial tutoring is indicative of an IDEA claim.  *Id.* at 756-57.

Following the Supreme Court's guidance in *Fry*, the two hypotheticals suggest that this is an access-based suit.  First, the students may have brought essentially the same claim if they alleged that the conduct (failure to impose a mask mandate) occurred at a public facility that was not a school, because they are alleging that they are being excluded from these facilities due to their underlying health issues.  Second, an adult at the school—for example, a teacher—could have brought the same claim.  In other words, the claims do not center on the quality of the children's education, evinced by the fact that IEPs are nowhere mentioned in the Complaint.  *See id.* at 755 (finding no need to exhaust where the complaint "allege[d] only disability-based discrimination, without making any reference to the adequacy of the special education services" and the suit did not suggest "any implicit focus on the adequacy of [the child's] education.").

Because this case concerns Plaintiffs' alleged inability to access on-site school learning, due to the optional masking policy, at its core, it involves accessing the facility rather than accessing the curriculum.  The case is therefore not a FAPE-based claim and no administrative exhaustion requirement applies.  *See, e.g.*, *Arc of Iowa v. Reynolds*, 2022 WL 211215, at *7 (8th Cir. Jan. 25, 2022) (finding that exhaustion was not required because student "d[id] not challenge the substantive quality of his education; only the physical safety associated with it"); *Doe 1 v. North Allegheny Sch. Dist.*, 2022 WL 170035, at *4 (W.D. Pa. 2022); *c.f. Wellman v. Butler Area Sch. Dist.*, 877 F.3d 125, 134 (3d Cir. 2017) (finding that exhaustion was required because student's claims about accommodations for his post-concussive syndrome were "intertwined with his complaints about the school's failure to accommodate his educational needs")

The one counterpoint to this position, one pressed by Defendants at the preliminary

injunction hearing, is that Plaintiffs have referenced the phrase "Least Restrictive Environment" in their Complaint.  The term "Least Restrictive Environment" is most closely associated with a means of complying with the IDEA, and stands for "the principle of federal special education policy that students with disabilities should be placed in an environment with children who do not have disabilities to the maximum extent appropriate." *Definitions, Rothstein, Disabilities and the Law,* Appendix A (4th ed.).  The "least restrictive" language is not limited to the IDEA, however, as "[v]irtually all federal disability rights statutes include the principle of least restrictive environment," *i.e.*, the proposition that disabled individuals should not be segregated from the population at large. *Basic principles of laws relating to disabilities*, Rothstein, Disabilities and the Law § 1:11 (4th ed.); *see, e.g.*, Developmentally Disabled Assistance and Bill of Rights Act, 89 Stat. 502, 42 U.S.C. § 6010(2) (1976 ed.) ("[t]he treatment, services, and habilitation for a person with developmental disabilities . . . should be provided in the setting that is least restrictive of the person's personal liberty."); 28 C.F.R. § 35.130(d) (under the ADA, "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities").  Thus, the use of the "least restrictive" language does not necessarily lead to the conclusion that this is an IDEA lawsuit, particularly as its gravamen concerns access to public facilities rather than any individualized educational plan.

For the reasons set forth above, there is no need for the Plaintiffs to have exhausted any administrative remedies.[39]

---

[39] Even if the gravamen of the lawsuit were characterized as concerning the IDEA, exhaustion of administrative remedies would likely not be required because it would be futile. *See Wellman*, 877 F.3d at 131 (explaining that the "exhaustion requirement can be excused, for example, if it is futile or if there are emergent circumstances that justify coming directly to federal court").  Disagreements between parents and educational authorities under the IDEA are

## IV.   PRELIMINARY INJUNCTION

Having determined that Plaintiffs have standing and that the Court has jurisdiction, it remains to consider whether Plaintiffs merit preliminary injunctive relief.  "A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Id*. at 20.

"While these factors structure the inquiry, however, no one aspect will necessarily determine its outcome.  Rather, proper judgment entails a 'delicate balancing' of all elements."  *Constructors Ass'n of Western Pa. v. Kreps*, 573 F.2d 811, 815 (3d Cir. 1978).  The first two factors—the likelihood of success on the merits and likely irreparable injury—are "prerequisites for a movant to prevail."  *Holland v. Rosen*, 895 F.3d 272, 286 (3d Cir. 2018) (declining to consider the third and fourth factors because the plaintiff had not made "the threshold showing on both of the prerequisite factors").  Thus, "a district court—in its sound discretion—should balance those four factors so long as the party seeking the injunction meets the threshold on the first two."  *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017).

In balancing the four factors, the Third Circuit applies the "sliding scale" approach, under which "[h]ow strong a claim on the merits is enough depends on the balance of the harms: the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be

---

subject to the due process procedures in 34 CFR §§ 300.504 through 300.520.  These procedures include filing a due process complaint with the Pennsylvania Department of Education against the School District and requesting a hearing before an officer who may "find that a child did not receive a FAPE."  34 CFR §§ 300.513.  Nothing in the regulations suggests that hearing officers have the power to reverse a mask mandate approved by a school board.

while still supporting some preliminary relief." *Id.* at 177-78 (quoting *Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009)); *see also Kreps*, 573 F.2d at 815 ("[I]n a situation where factors of irreparable harm, interests of third parties and public considerations strongly favor the moving party, an injunction might be appropriate 'even though plaintiffs did not demonstrate as strong a likelihood of ultimate success as would generally be required.'" (quoting *Del. River Port Auth. v. Transamerican Trailer Transp. Inc.*, 501 F.2d 917, 923 (3d Cir. 1974)).[40]

The main purpose of preliminary injunctive relief "is maintenance of the status quo until a decision on the merits of a case is rendered." *Acierno v. New Castle Cnty.*, 40 F.3d 645, 647 (3d Cir. 1994). "Status quo" refers to "the last, peaceable, noncontested status of the parties." *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (internal citation and quotation marks omitted).

While the decision to grant or deny a motion for a preliminary injunction must be based on facts presented at the hearing, or through affidavits, deposition testimony, or other documents—and cannot be based on "common sense," which is "no substitute for evidence," *see Adams v. Freedom Forge Corp.*, 204 F.3d 475, 487 (3d Cir. 2000), "[d]ue to the urgency of obtaining a preliminary injunction at a point when there has been limited factual development, the rules of evidence do not apply strictly to preliminary injunction proceedings." *Herb Reed Enters, LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 n.5 (9th Cir. 2013); *see also Kos*

---

[40] Defendants relied on *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187 (3d Cir. 1990) for the proposition that "[o]nly if the movant produces evidence sufficient to convince the [court] that all four factors favor preliminary relief should the injunction issue." *Id.* at 192. This reliance is misplaced because the Third Circuit rejected that approach in *Reilly*, 858 F.3d at 177-79 (explaining that *Opticians Ass'n of Am.* began "an inconsistent line of cases" but did not overrule the Circuit Court's prior precedent according to which a court should balance all four factors if the first two are met).

*Pharms., Inc.*, 369 F.3d at 718 (courts "customarily grant[] [preliminary injunctions] on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390 (1981)); *Sierra Club, Lone Star Chapter v. FDIC*, 992 F.2d 545, 551 (5th Cir. 1993) ("[A]t the preliminary injunction stage, the procedures in the district court are less formal."); *Star Creations Inv. Co. v. Alan Amron Dev., Inc.*, 1995 WL 495126, at *10 (E.D. Pa. Aug. 18, 1995) ("evidentiary requirements are relaxed" during preliminary proceedings.).

As such, "[t]he trial court may give even inadmissible evidence some weight, *when to do so serves the purpose of preventing irreparable harm before trial*." *Flynt Distrib. Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984) (emphasis added) (citing 11 C. Wright & A. Miller, *Federal Practice and Procedure, Civil* § 2949 at 471 (1973))); 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2949 (3d ed. Apr. 2021 Update) ("[I]nasmuch as the grant of a preliminary injunction is discretionary, the trial court should be allowed to give even inadmissible evidence some weight when it is thought advisable to do so in order to serve the primary purpose of preventing irreparable harm before a trial can be had.").  For example, hearsay evidence may be considered, *Sierra Club, Lone Star Chapter*, 992 F.2d at 551, as may affidavits that do not meet the requirements of Federal Rule of Civil Procedure 56(e), *i.e.*, "they need not be made on personal knowledge or set forth facts that the affiant would be competent to testify to at trial." *Star Creations Inv. Co.*, 1995 WL 495126, at *10.  And, at this stage, it may be appropriate to consider studies relied upon by experts, *see Doe v. Nat'l Bd. of Med. Examiners*, 199 F.3d 146, 152 (3d Cir. 1999), as well as guidance issued by agencies such as the CDC.  *Mays v. Dart*, 974 F.3d 810, 823-24 (7th Cir. 2020) (holding that it was proper to consider guidance issued by the CDC in determining what, if any, preliminary injunctive relief was

necessary).

### A. Likelihood of Success on the Merits

A finding that a plaintiff has shown a likelihood of success on the merits depends on whether it has "a reasonable probability of success." *Am. Exp. Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 366 (3d Cir. 2012). This "requires a showing significantly better than negligible but not necessarily more likely than not." *Reilly*, 858 F.3d at 179 n.3. "[T]he movant need only prove a 'prima facie case,' not a 'certainty' she'll win." *Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 131 (3d Cir. 2017). "A plaintiff's failure to establish a likelihood of success on the merits 'necessarily result[s] in the denial of a preliminary injunction.'" *Ass'n of N.J. Rifle & Pistol Clubs, Inc v. Att'y Gen. N.J.*, 910 F.3d 106, 115 (3d Cir. 2018) (alteration in original) (quoting *Am. Express Travel Related Servs., Inc.*, 669 F.3d at 366). The question here is, thus, whether the Plaintiffs are likely to succeed on their ADA and Section 504 claims.

"For decades," the two statutes "have served as twin pillars of federal disability discrimination law." *Berardelli v. Allied Servs. Inst. of Rehab. Med.*, 900 F.3d 104, 109 (3d Cir. 2018). "Both statutes secure the rights of individuals with disabilities to independence and full inclusion in American society." *Id.* at 109-10. Specifically, Section 504 provides:

> No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance

29 U.S.C. § 794(a). Title II of the ADA "incorporates the non-discrimination principles of section 504 of the Rehabilitation Act and extends them to state and local governments." *Helen*

*L. v. DiDario*, 46 F.3d 325, 331 (3d Cir. 1995) (internal quotation marks omitted).[41]  Not

surprisingly therefore, the language of Section 504 reverberates through the ADA, which

provides in relevant part:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132; *see also* 28 C.F.R. § 35.130 (2016) (ADA Title II regulations).  Thus, case

law on Section 504 "is an appropriate guide to interpret the ADA" and vice versa.  Henry H.

Perritt Jr., *Americans with Disabilities Act Handbook* § 1.02 (5th ed. 2018); *see also Berardelli*,

900 F.3d at 110 (observing that the ADA and Section 504 "have been constant companions in

our case law as it has developed to effect those rights"); *Helen L.*, 46 F.3d at 334-35 (applying

the Supreme Court's analysis of Section 504 to the ADA).

"[A]lthough the statutes may diverge as to the entities they cover and remedies they

provide, they impose the same substantive liability standard." *Berardelli*, 900 F.3d at 117.[42]

Under either the ADA or Section 504, a plaintiff must establish: (1) that he or she is a qualified

individual with a disability; (2) that he or she will be excluded from participation in or denied the

benefits of services, programs, or activities of the public entity, or subjected to discrimination by

---

[41] Plaintiffs' few citations to Title III of the ADA have been disregarded because Title III applies only to specific types of private entities that are "public accommodations" within the meaning of the statute.  *See, e.g.*, 42 U.S.C. § 12181(6) (defining "private entity" as "any entity other than a public entity"); 42 U.S.C. § 12181(7) (defining the types of "private entities" that constitute "public accommodations"); 28 C.F.R. § 36.104 (2016) ("Place of public accommodation means a facility, operated by a private entity.").  Title III does not apply to public entities such as public school districts.  *Sandison v. Michigan High Sch. Athletic Ass'n, Inc.*, 64 F.3d 1026, 1036 (6th Cir. 1995) (public school grounds and public parks where high school athletic events took place were operated by public entities and thus did not constitute public accommodations under Title III).

[42] Title II of the ADA prohibits discrimination by "public entities," 42 U.S.C. § 12131, while Section 504 only covers entities that receive federal financial assistance.  29 U.S.C. § 794(a).

the public entity; and, (3) that such exclusion, denial, or discrimination occurred by reason of his or her disability. *Furgess v. Pa. Dept. of Corr.*, 933 F.3d 285, 288-89 (3d Cir. 2019); 42 U.S.C. § 12132.

### i.    *Cognizability of Disparate Impact Claims*

Defendants do not dispute, at least for the purposes of the Preliminary Injunction Motion, that the Plaintiffs have established the first and third elements of their claims. They do, however, contend that Plaintiffs have not sufficiently shown that they "will be excluded from participation in or denied the benefits of services, programs, or activities of the public entity, or subjected to discrimination by the public entity." *Furgess*, 933 F.3d at 288-89; 42 U.S.C. § 12132. To satisfy this element, a plaintiff may advance "one of three theories of liability: disparate treatment, disparate impact, or failure to make a reasonable accommodation." *Payan v. Los Angeles Cmty. Coll. Dist.*, 11 F.4th 729, 738 (9th Cir. 2021) (quoting *Davis v. Shah*, 821 F.3d 231, 260 (2d Cir. 2016) (citation omitted)); *B.C. v. Mount Vernon Sch. Dist.*, 837 F.3d 152, 158 (2d Cir. 2016) ("Exclusion or discrimination may take the form of disparate treatment, disparate impact, or failure to make a reasonable accommodation."). Plaintiffs here premise their claims on a disparate impact theory.

Defendants argue that the Third Circuit has not decided whether disparate impact claims are cognizable under the ADA and Section 504, and urge the Court to rely on the Sixth Circuit's decision in *Doe v. Bluecross Blueshield of Tennessee, Inc.*, 926 F.3d 235 (6th Cir. 2019) to hold that they are not. To do so, however, would be inconsistent with Supreme Court and Third Circuit precedent. In *Alexander v. Choate*, the Supreme Court found that, in passing Section 504, "[d]iscrimination against the handicapped was perceived by Congress to be most often the product, not of invidious animus, but rather of thoughtlessness and indifference—of benign

neglect. . . .  [M]uch of the conduct that Congress sought to alter in passing the Rehabilitation

Act would be difficult if not impossible to reach were the Act construed to proscribe only

conduct fueled by a discriminatory intent."  469 U.S. 287, 297 (1985).  On this basis, the Court

"assume[d] without deciding that § 504 reaches at least some conduct that has an unjustifiable

disparate impact upon the handicapped."  *Id*. at 299.

Ten years later, the Third Circuit relied on *Choate's* reasoning to hold that the ADA's

protections extend beyond "deliberate discrimination":

> Because the ADA evolved from an attempt to remedy the effects of
> "benign neglect" resulting from the "invisibility" of the disabled,
> Congress could not have intended to limit the Act's protections and
> prohibitions to circumstances involving deliberate discrimination. Such
> discrimination arises from "affirmative animus" which was not the focus
> of the ADA or section 504. . . . "[M]uch of the conduct that Congress
> sought to alter in passing the Rehabilitation Act [and the ADA] would be
> difficult if not impossible to reach were the Act[s] construed to proscribe
> only conduct fueled by a discriminatory intent."  *Alexander v. Choate,* 469
> U.S. at 296-97, 105 S.Ct. at 718.  Thus, we will not eviscerate the ADA
> by conditioning its protections upon a finding of intentional or overt
> "discrimination."

*Helen L.*, 46 F.3d at 335.  *Helen L.* may not have used the words "disparate impact," but its

holding that the ADA's protections extend beyond cases involving "deliberate," "intentional,"

and "overt" discrimination as well as "affirmative animus," amounts to the same thing.  *See*

*Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003) (explaining that disparate impact claims may

succeed "without evidence of the employer's subjective intent to discriminate that is required in

a 'disparate-treatment' case").  Indeed, in the context of a claim brought under Title I of the

ADA, the Supreme Court has held that "[b]oth disparate-treatment and disparate-impact claims

are cognizable under the ADA."  *Id.* at 53 (citing 42 U.S.C. § 12112(b)).  Although *Raytheon* fell

under Title I of the ADA, the reasoning in *Helen L.* leads inexorably to the conclusion that

disparate impact claims are cognizable under Title II of the ADA and, hence, under Section 504.[43]

### ii.    *Disparate Impact Analysis*

"To assert a disparate impact claim, a plaintiff must allege that a facially neutral government policy or practice has the 'effect of denying meaningful access to public services' to people with disabilities." *Payan*, 11 F.4th at 738 (internal citation and quotation marks omitted) (claim of systemic accessibility barriers to higher education were "appropriately considered under the disparate impact framework"); *CG v. Pa. Dep't of Educ.*, 734 F.3d 229, 236-37 (3d Cir. 2013) (holding that a plaintiff must show a disparate impact and "depriv[ation] of meaningful access to a benefit to which he or she was entitled" (citing *Choate*, 469 U.S. at 299, 301)).[44]  Defendants do not dispute that the Phase Two Transition Plan is facially neutral. Therefore, the analysis below focuses on whether it resulted in a denial of meaningful access to in-person schooling for students with disabilities.

---

[43] True, the Supreme Court has held that Title VI of the Civil Rights Act, which prohibits discrimination on the basis of race, color, and national origin, does not contemplate disparate impact claims.  *Alexander v. Sandoval*, 532 U.S. 275 (2001).  But, there is reason not to extend *Sandoval's* analysis to the ADA.  First, in *Choate*, the State had argued that an earlier Supreme Court decision on Title VI, *Guardians Ass'n v. Civil Serv. Cmm'n*, 463 U.S. 582 (1983), meant that Section 504 did not cover disparate impact claims.  (In *Guardians Ass'n*, a plurality of the Court had held that Title VI reaches only intentional discrimination.)  The *Choate* Court rejected this argument and "counsel[ed] hesitation before reading Title VI and § 504 *in pari materia* with respect to" disparate intent.  *Choate*, 469 U.S. at 294, n.11.  Moreover, the *Choate* Court noted in favor of disparate impact ADA claims that *Guardians Ass'n* "suggests that the regulations implementing § 504 . . . *could* make actionable the disparate impact challenged in this case."  *Id.* at 295 (emphasis added).  Of course, the Department of Justice ("DOJ"), the agency charged with promulgating regulations implementing Title II of the ADA and Section 504, has since done just that—the implementing regulations for each Act prohibit practices that cause a discriminatory effect.  *See, e.g.*, 28 C.F.R. § 35.130(b)(3)-(4) (barring practices with discriminatory "effect"); 34 C.F.R. § 104.4(b)(4)-(5) (same).  *See also Payan v. Los Angeles Cmty. Coll. Dist.*, 11 F.4th 729, 737 (9th Cir. 2021) (holding that "*Sandoval* does not disturb *Choate*.").

[44] Both Parties allude to the *McDonnell Douglas* burden-shifting standard, but that evidentiary standard does not apply before the conclusion of discovery.  *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510-12 (2002).

a.   <u>Meaningful Access</u>

In determining whether disabled students have been granted meaningful access to the benefits of education,[45] "courts should be mindful of the need to strike a balance between the rights of the student and [their] parents and the legitimate financial and administrative concerns of the school district." *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 281 (3d Cir. 2012) (internal quotation marks omitted) (cleaned up) (quoting *J.D. ex rel. J.D. v. Pawlet Sch. Dist.*, 224 F.3d 60, 70-71 (2d Cir. 2000)).  Meaningful access requires "evenhanded treatment and the opportunity for handicapped individuals to participate in and benefit from programs" but it does not "guarantee the handicapped equal results." *Choate*, 469 U.S. at 304 (citing *Se. Cmty. Coll. v. Davis*, 442 U.S. 397 (1979)).

Plaintiffs contend that optional masking during periods of substantial or high transmission of the virus "disparately impacts Plaintiffs' medically fragile children by preventing their in-person access to education and other services at the District's facilities without incurring a substantially increased risk of severe illness or death."[46]  This, they say, prevents "Plaintiffs' children, and similarly situated disabled students, from accessing the school building on equal terms as students without disabilities."[47]  Specifically, Plaintiffs, linking their concerns to specific portions of the Acts and/or the Acts' regulations, contend that, by implementing an optional masking policy:

Defendant Board is excluding and/or are causing the schools to exclude

---

[45] That education qualifies as a "service" or "benefit" protected under the ADA and Section 504 is firmly established in the Third Circuit.  *See, e.g.*, *Chambers ex rel. Chambers v. Sch. Dist. Of Phila. Bd. of Educ.*, 587 F.3d 176, 189 (3d Cir. 2009) (applying ADA and Section 504 to claim that plaintiff was deprived the benefits of an education program); *CG*, 734 F.3d at 236-37 (same); *Ridley Sch. Dist.*, 680 F.3d at 282 (same).

[46] Pls.' Br. 14, ECF No. 20.

[47] *Id.* at 16.

Plaintiffs from participation in public education, in violation of 42 *U.S.C. § 12132; 28 C.F.R. § 35.130; 29 U.S.C. § 794(a)* and *34 C.F.R. § 104.4(b)(l)(i)*;

Defendant Board is failing to make and/or causing the schools to fail to make, their services, programs, and activities "readily accessible" to disabled individuals, in violation of *28 C.F.R. § 35.150*;

Defendants are administering policies that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability and that has the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities, in violation of *28 C.F.R. § 35.130(b)(3))* and *34 C.F.R. § 104.4(b)(4)*.

Defendants are using methods of administration that have the effect of subjecting Plaintiffs to discrimination on the basis of disability, in violation of *34 C.F.R. § 104.4(b)(4)*.[48]

Of course, all children face certain risks pertaining to transmissible diseases when they go to school, from the common cold to the chicken pox.  The question is whether the Child-Plaintiffs face such a heightened risk, due to the impact of the optional masking policy and of their disabilities, that they can no longer be considered to have "meaningful access" to the benefits of their education.  In weighing the evidence, the Court relies on the risk assessments conducted by public health authorities like the CDC.[49]  Indeed, Dr Russell, in managing the COVID-19

---

[48] *Id.* at 9.

[49] Of course, guidelines or recommendations of agencies and associations do not set the standard of liability.  *See Bell v. Wolfish*, 441 U.S. 520, 543 n.27 (1979) (noting that the recommendations of the American Public Health Association, and a Department of Justice task force, among others, did not set the constitutional standard).  But where an agency such as the CDC "provide[s] the authoritative source of guidance" in a given area, its views on best practices are "certainly relevant."  *Mays*, 974 F.3d at 823 (internal citation omitted) (holding that district court properly relied on CDC guidelines where pretrial detainees sought preliminary injunctive relief and challenged conditions of confinement during COVID-19 outbreak).  Reliance on CDC guidelines is particularly apt here because the ARP required the District to "implement prevention and mitigation strategies that are, to the greatest extent practicable, consistent with the most recent CDC guidance on reopening schools."  86 Fed. Reg. at 21,201; 20 U.S.C. § 3401 note § 2001(e)(2)(Q).

response in the District, carefully considered the information available through the CDC, the MCOPH, and PolicyLab at Children's Hospital of Philadelphia's ("CHOP").[50]  This reliance is particularly warranted here where the MCOPH "encourages that schools/districts adopt as part of their health and safety plan masking requirements aligned with current CDC guidelines."[51]

Evidence shows that the degree of risk of contracting COVID-19 is higher during periods of an elevated rate of community transmission.  According to the CDC, "[a] person's risk for SARS-CoV-2 infection is directly related to the risk for exposure to infectious persons, *which is largely determined by the extent of SARS-CoV-2 circulation in the surrounding community*."[52] According to CDC guidance published in July 2021, "[u]nvaccinated persons, as well as persons with certain immunocompromising conditions, remain at substantial risk for infection, severe illness, and death, *especially in areas where the level of SARS-Co V-2 community transmission is high*."[53]

The evidence also shows that certain underlying medical conditions exacerbate the risk of serious illness and/or death, should an individual contract COVID-19.  Specifically, according to the CDC, children with certain medical conditions, including "genetic, neurologic, metabolic conditions, [] congenital heart disease, . . . obesity, diabetes, asthma or chronic lung disease,

---

[50] A.M. Hearing Tr. 19:20-25, 58:22-59:19.

[51] Defs. P.I. Ex. 13 (Montgomery County Office of Public Health: Recommendation for COVID-19 Prevention for K to 12 Schools, 2021-2022 School Year, updated Jan. 11, 2021).

[52] Athalia Christie, *et al*., *Guidance for Implementing COVID-19 Prevention Strategies in the Context of Varying Community Transmission Levels and Vaccination Coverage*, Ctrs. For Disease Control and Prevention (July 30, 2021), https://www.cdc.gov/mmwr/volumes/70/wr/mm7030e2.htm?s_cid=mm7030e2_w (last visited Feb. 6, 2022) (emphasis added).

[53] *Id.* (emphasis added).

sickle cell disease, or immunosuppression can [] be at increased risk for severe illness from

COVID-19."[54]  For example, "[p]eople with moderate-to-severe or uncontrolled asthma are more

likely to be hospitalized from COVID-19."[55]  Defendants do not directly respond to this

evidence about high-risk individuals.  Instead, they contend, without citing to any source, that

"neither epidemiologists nor medical professionals have solved the persistent question as to why

certain individuals appear more susceptible to serious illness from COVID-19, particularly under

previous variants as opposed to the Omicron variant circulating now, even without known

preexisting conditions."  The question of "why" the risk may be heightened for some individuals,

however, is neither here nor there for the purposes of this preliminary injunction proceeding.

The relevant question is *whether* they face a heightened risk, and the evidence presented

confirms that they do.

The Child-Plaintiffs in this matter, who are designated as "otherwise health impaired" by

the District, have underlying health conditions in the increased-risk categories identified by the

CDC.  All three Child-Plaintiffs have asthma.  In addition, Child Doe 1 has a vocal cord

dysfunction that requires daily breathing exercises and treatments administered by the school

nurse.  Child Doe 2 suffers from chronic bronchitis and pneumonia, and takes

immunosuppressant medications.  All three children are vaccinated, but not yet eligible for a

---

[54] *COVID-19: People with Certain Medical Conditions*, Ctrs. for Disease Control and Prevention (updated Dec. 14, 2021), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Feb. 6, 2022); *see also* Pls. P.I. Ex. Q (CDC Science Brief: Evidence Used To Update the List of Underlying Medical Conditions Associated with Higher Risk for Severe COVID-19), available at https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/underlying-evidence-table.html.

[55] Pls. P.I. Ex. M (CDC Guidance for People with Moderate to Severe Asthma), available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html#:~:text=Avoid%20your%20asthma%20triggers.,talking%20to%20your%20healthcare%20provider.

booster shot.  Each child's medical team has found that universal masking is "essential" to their safe in-person schooling.

To minimize the spread of COVID-19, public health authorities including the CDC[56] and the MCOPH[57] recommend masking in indoor public spaces, alongside other preventive measures.  The CDC explained that "[m]ask use *and* layered prevention strategies, such as receiving all recommended vaccination and booster doses, physical distancing, screening testing, and improved ventilation, are key to preventing COVID-19 and decreasing transmission."[58]  The United States Environmental Protection Agency has also concluded that "[i]t is essential to implement a multifaceted, layered approach to reduce the risk of indoor airborne transmission of COVID-19," including "wearing masks."[59]  According to the CDC, "[n]o one strategy is sufficient to prevent transmission, and multiple interventions should be used concurrently to reduce the spread of disease.  Proven effective strategies against SARS-CoV-2 transmission, beyond vaccination, include using masks consistently and correctly."[60]  The American Academy

---

[56] Pls. P.I. Ex. H (CDC Guidance for COVID-19 Prevention in K-12 Schools), available at https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/k-12-guidance.html.

[57] Defs. P.I. Ex. 13, at 3 (Montgomery County Office of Public Health:  Recommendation for COVID-19 Prevention for K to 12 Schools, 2021-2022 School Year, updated Jan. 11, 2021) (recommending "masking for all individuals indoors and outdoors, regardless of vaccination status, except while eating, drinking, and during mask breaks" in times of high transmission, and, during periods of "substantial" transmission, recommending "masking for all individuals" indoors and optional masking outdoors).

[58] *What We Know About Quarantine and Isolation*, Ctrs. for Disease Control and Prevention (Jan. 31, 2022), https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/quarantine-isolation-background.html (last visited Feb. 6, 2022) (emphasis added).

[59] *Implementing a Layered Approach to Address COVID-1 in Public Indoor Spaces*, U.S. Env't Prot. Agency https://www.epa.gov/coronavirus/implementing-layered-approach-address-covid-19-public-indoor-spaces (last accessed Feb. 6, 2022).

[60] Christie *et al., supra* note 52 (emphasis added).

of Pediatrics ("AAP"),[61] agrees, explaining that "although layered prevention strategies, in which multiple interventions are used, provide the most comprehensive protection against transmission, there is no dispute that such strategies are substantially less effective if the crucial tool of universal masking is ruled out."[62]  On February 4, PolicyLab at CHOP likewise confirmed that masks are effective at reducing transmission of COVID-19.[63]

Masking is an especially important mitigation strategy when the incidence of COVID-19 in the community is elevated.  The CDC specifically "recommends community leaders encourage vaccination and universal masking in indoor public spaces in addition to other layered prevention strategies" in "*areas of substantial or high transmission*."[64]  PolicyLab at CHOP recommended that the effectiveness of masks should not be the only factor in decision-making regarding mask mitigation strategies—decisionmakers should also consider "community case incidence, the risk of severe disease following infection, [and] the competing risk of maintaining strict requirements."  PolicyLab at CHOP "continue[s] to support mask requirements in schools located in counties yet to experience a significant reduction in their case incidents and hospitalization burden."[65]

---

[61] The AAP, a "national, not-for-profit professional organization" with a membership comprising "over 67,000 primary care pediatricians, pediatric medical subspecialists, and pediatric surgical specialists," submitted an amicus brief addressing masking and COVID-19 to the Third Circuit in a matter which (while unrelated to this case) concerns mandatory masking mandates in public schools.  *Brief of Amici Curiae Pa. Ch. Am. Acad. Pediatrics, et al. in Support of Plaintiffs-Appellants*, at 1, *Doe 1 v. Upper St. Clair Sch. Dist.*, No.22-141 (3d Cir. filed Jan. 19, 2022) (hereinafter "AAP Amicus Br.").  The AAP's amicus brief was attached by Plaintiff as an Exhibit to its brief in support of a preliminary injunction.

[62] *Id.* at 19.

[63] Defs. P.I. Ex. 34, at 3 (PolicyLab at CHOP: COVID-19 Outlook).

[64] Christie *et al., supra* note 52 (emphasis added).

[65] Defs. P.I. Ex. 34, at 3 (PolicyLab at CHOP: COVID-19 Outlook).

The MCOPH created a chart, using the CDC's COVID-19 prevalence scale, that listed the kind of masking that it recommends be adopted during periods of low, moderate, substantial, or high transmission of COVID-19.[66]  During periods of substantial or high transmission, it recommends mandatory indoor masking.[67]  Though now declining from the Omicron peak, transmission rates in Montgomery County as of January 28, 2022 (the last date for which the Parties provided evidence) were at 464.4 per 100,000 residents with a positivity rate of 20.9%. This puts the County significantly above the "high" threshold.[68]  As of February 4, 2020—the most recent date for which the State has provided data, as of the time of writing—cases continued to trend downward, but remained in the "high" category, sitting at 229.4 per 100,000 residents and 13.8% of tests reporting a positive result.[69]

The AAP explained that "[n]umerous studies undertaken earlier in the pandemic have shown that increasing the rate of mask-wearing, including through universal masking policies in particular, significantly reduces the spread of COVID-19."[70]  Specifically, the AAP found that "[f]or children who are at high risk of severe consequences if they have a breakthrough infection,

---

[66] Defs. P.I. Ex. 13, at 2-3 (Montgomery County Office of Public Health:  Recommendation for COVID-19 Prevention for K to 12 Schools, 2021-2022 School Year, updated Jan. 11, 2021).

[67] Defs. P.I. Ex. 13, at 3 (Montgomery County Office of Public Health:  Recommendation for COVID-19 Prevention for K to 12 Schools, 2021-2022 School Year, updated Jan. 11, 2021); A.M. Hearing Tr. 29:8-31:12.

[68] Defs. P.I. Ex. 15 (Pa. Dep't of Health COVID-19 Early Warning Monitoring System Dashboard).

[69] *COVID-19 Early Warning Monitoring System Dashboard*, Pa. Dep't of Health (updated Feb. 4, 2022), https://www.health.pa.gov/topics/disease/coronavirus/Pages/Monitoring-Dashboard.aspx (last accessed Feb. 7, 2022).

[70] AAP Amicus Br., at 16.  The AAP cites for example: John T. Brooks & Jay C. Butler, *Effectiveness of Mask Wearing to Control Community Spread of SARS-CoV-2*, 325 J. of Am. Med. Ass'n 998 (2021), available at https://bit.ly/3Fi8Hh7; Miriam E. Van Dyke *et al., Trends in County-Level COVID-19 Incidence in Counties With and Without a Mask Mandate—Kansas, June 1-August 23, 2020*, 69 Morbidity & Mortality Wly. Rep. 1777 (2020), available at https://bit.ly/31SbU8H.

or children whose medical conditions prevent them from obtaining the full benefit of immunization, relatively low rates of vaccination means that universal masking remains the most effective and least intrusive means of protecting them from contracting COVID-19."[71] Accordingly, the AAP recommends that "[a]ll students older than 2 years and all school staff should wear face masks at school (unless medical or developmental conditions prohibit use), regardless of vaccination status ."[72]

Masking is specifically effective at reducing transmission in schools.  A CDC study published in October 2021 (before the more contagious Omicron variant was detected in Pennsylvania) found that counties without uniform mask requirements in schools faced more than double the rate of new pediatric COVID-19 cases per day than those with them.[73]  An Arizona State University study published on the CDC's website reported that "[i]n the two largest Arizona counties, with variable K–12 school masking policies at the onset of the 2021–22 academic year, the odds of a school-associated COVID-19 outbreak were 3.5 times higher in schools with no mask requirement than in those with a mask requirement implemented at the time school started.  Lapses in universal masking contribute to COVID-19 outbreaks in school settings."[74]  Incidentally, Dr. Russell testified that there have been no transmissions of COVID-

---

[71] AAP Amicus Br., at 18.

[72] *COVID-19 Guidance for Safe Schools and Promotion of In-Person Learning*, Am. Acad. of Pediatrics (updated Jan. 27, 2022), https://www.aap.org/en/pages/2019-novel-coronavirus-covid-19-infections/clinical-guidance/covid-19-planning-considerations-return-to-in-person-education-in-schools/ (last accessed Feb. 6, 2022).

[73] Samantha E. Budzyn, *et al., Pediatric COVID-19 Cases in Counties With and Without School Mask Requirements—United States, July 1 - September 4, 2021*, Ctrs. for Disease Control and Prevention (Oct. 1, 2021), https://www.cdc.gov/mmwr/volumes/70/wr/mm7039e3.htm (last accessed Feb. 6, 2022).

[74] Megan Jehn, *et al*., *Association Between K-12 School Mask Policies and School-Associated COVID-19 Outbreaks—Maricopa and Pima Counties, Arizona, July-August 2021*, Ctrs. for Disease Control and Prevention

19 in the District during the 2021-20 school year, during which time universal masking has been

in place except for January 24-25.[75]

This body of evidence shows that there is a reasonable probability that the named Child-

Plaintiffs, and disabled children with the same medical disabilities as the Child-Plaintiffs

(including asthma, chronic bronchitis and pneumonia), are at heightened risk of serious illness or

death if they contract COVID-19.  It further shows that universal masking meaningfully reduces

the transmission of COVID-19 in schools, and is especially valuable when the community

incidence of the virus is substantial or high.  Thus, without universal indoor masking, the Child-

Plaintiffs face a significant risk of serious illness and/or death if they attend school in-person

while transmission are substantial or high.[76]  Children without underlying medical conditions do

---

(Oct. 1, 2021), https://www.cdc.gov/mmwr/volumes/70/wr/mm7039e1.htm (last accessed Feb. 6, 2022).

[75] Plaintiffs did submit a declaration from a parent of two immune-compromised children, who attested that the children returned to school for the first time on January 17, 2022, on the basis of the District's assurance that they would be accommodated to ensure they were protected from unmasked students.  Pls. P.I. Ex. Z ¶¶ 3-6 (Declaration of Parent Doe 1).  Both children have since been diagnosed with COVID-19 and are "extremely ill."  *Id.* ¶ 6.  The affidavit asserts that, based on the date of symptom onset, "it is almost certain" that the first child contracted COVID-19 at school on January 24 or 25, when masking was optional. *Id.* ¶ 8.

[76] Plaintiffs also argue that the School Board violated the ADA and the Rehabilitation Act in part by failing to consider "whether permitting children to be unmasked in school created a direct threat to medically fragile students who are disabled."  Plaintiffs misapply the "direct threat" provision of the ADA, which is found in Title III and provides in relevant part:

> Nothing in this subchapter shall require an entity to permit an individual to participate in or benefit from the goods, services, facilities, privileges, advantages and accommodations of such entity where such individual poses a direct threat to the health or safety of others.  The term "direct threat" means a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures or by the provision of auxiliary aids or services.

42 U.S.C. § 12182; *see also* 29 U.S.C. § 705 (providing that, in employment cases under Section 504, the term "individual with a disability" "does not include an individual who has a currently contagious disease or infection and who, by reason of such disease or infection, would constitute a direct threat to the health or safety of other individuals.").  The plain text of the statute shows that the principle of "direct threat" excuses sued entities from their obligations under the Acts if the disabled plaintiff presents "a significant risk to the health or safety of others."  *See, e.g.*, *EEOC v. Wal-Mart Stores, Inc.*, 477 F.3d 561, 571 (8th Cir. 2007).  Neither the statutes nor the case law provide a basis for applying this principle to consider whether a *defendant created* a direct threat.

not face this heightened risk.

For the reasons set forth *supra*, the optional masking policy reflected in the Phase Two Transition Plan prevents the Child-Plaintiffs from "meaningfully accessing" the benefits of in-person education at this time because they cannot attend school alongside their unmasked peers without incurring a real risk of serious illness or worse.

### b. Reasonable Accommodations

Plaintiffs maintain that "[t]here are no reasonable accommodations in an optional masking environment that would permit Plaintiffs' children to access the School District's buildings and educational, social, and developmental services on equal terms as those students without disabilities."

"[T]o assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made." *Choate*, 469 U.S. at 301.[77] "The test to determine the reasonableness of a modification is whether it alters the essential nature of the program or

---

[77] Although the test for a failure-to-accommodate claim differs from that applicable to a disparate impact claim, the concept of "reasonable accommodations" remains relevant in the disparate impact context because the DOJ regulations require public entities to make reasonable accommodations, as necessary, in order to ensure "meaningful access." *See* 28 C.F.R § 35.130(b)(7). *See Payan*, 11 F.4th at 738 ("Although disparate impact and failure to accommodate are distinct theories of liability, they share some overlap. . . . [A]lthough failure to make a reasonable accommodation and disparate impact are two different theories of a Title II claim, a public entity may be required to make reasonable modifications to its facially neutral policies which disparately impact people with disabilities."); *Hollonbeck v. U.S. Olympic Comm.*, 513 F.3d 1191, 1197 (10th Cir. 2008), *cert. denied*, 555 U.S. 938 (2008) ("[A]ctionable disparate impact requires analysis of whether the individual is otherwise qualified and whether reasonable accommodations may provide meaningful access." (citing *Choate*, 469 U.S. at 299-301)).

The Ninth Circuit explained that "[t]he important difference between these two theories is that a reasonable accommodation claim is focused on an accommodation based on an individualized request or need, while a reasonable modification in response to a disparate impact finding is focused on modifying a policy or practice to improve systemic accessibility." *Payan*, 11 F.4th at 738. Because the focus in a disparate impact case is on "systemic accessibility," it is appropriate to consider evidence of the impact on disabled students as a group. *See id.*, at 738-39 (considering evidence that student web portal presented an accessibility barrier to blind students).

imposes an undue burden or hardship in light of the overall program." *Helen L.*, 46 F.3d at 337

(quoting *Easley ex rel. Easley v. Snider*, 36 F.3d 297, 305 (3d Cir. 1994)).   A public entity need

not make "fundamental" or "substantial" alterations to accommodate a disabled individual.

*Choate*, 469 U.S. at 300.

      In preparing for the 2021-22 school year, the Board had initially approved an optional

masking policy.   But on August 9, it changed course, a decision Defendants concede was made

in reaction to an increase in transmission and positivity rates in Montgomery County, and

universal indoor masking became the order of the day.   Since then, the Board has slowly

expanded exceptions to masking while leaving the foundational mandate of universal indoor

masking during school hours largely untouched.   In September, exceptions were made for

competing athletes, in November, test-to-stay prevented unnecessary absences, in December,

practicing athletes were brought into the exceptions, and in January, optional masking was

extended to after-school extracurriculars.   This deliberate progress followed Dr. Russell's

"methodical and thoughtful" strategy and CDC guidance.   The Board, however, made a change

when they approved optional masking in the Phase Two Transition Plan, despite the fact that the

CDC's guidance had not changed and transmission rates in the community remained "high."

      Thus, from August 9 to January 24, the Defendants successfully implemented and

adapted a universal masking policy at their schools.   Defendants have not argued that the

"essential nature" of their programs were altered during that period.   Absent any evidence

showing that returning to the Phase One Transition Plan (the last, peaceable, uncontested plan)

would impose an undue burden or hardship on Defendants, its reinstatement constitutes a

reasonable accommodation that will ensure the Child-Plaintiffs have meaningful access to in-

person instruction.   This conclusion finds support in the Eighth Circuit, where the court recently

held that "mask requirements are reasonable accommodations required by federal disability law

to protect the rights of Plaintiffs' children. *Arc of Ia v. Reynolds*2022 WL 211215, at *1.

"Where these schools can, did, and do impose mask requirements, continuing to maintain some

mask requirements does not constitute a "fundamental alteration." *Id*. at *10.

### iii.    *Segregation as Discrimination*

Plaintiffs assert that Defendants have a "stated intention to separate, segregate, and

isolate Plaintiffs and disabled students by putting plastic barriers around them and seating them

away from non-disabled students," which would violate the ADA and Section 504.  Although

Defendants did not address this legal argument in their opposition brief, at the hearing, they

elicited general statements from Dr. Russell that the District does not segregate disabled

students, but no witness clarified what the District plans with respect to children who share the

same concerns of the Child-Plaintiffs here should the universal masking policy be lifted.

The teachings of the Third Circuit on segregation as discrimination may be gleaned from

two opinions: *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260 (3d Cir. 2012) and *Helen L. v. DiDario*, 46

F.3d 325 (3d Cir. 1995).[78]  *Ridley* considered a segregation-based claim where parents alleged

that their child, who had learning disabilities and severe allergies, was not receiving meaningful

access to educational benefits under Section 504 because she was being "singled out, isolated

and denied full participation with her classroom peers."  *Ridley Sch. Dist.*, 680 F.3d at 281.  The

court found no violation of Section 504, explaining that the defendants had taken "reasonable

steps to accommodate [the child's] disabilities and include her in all class activities."  *Id*. at 282.

These reasonable steps included requiring "all students in the classroom to wash their hands

---

[78] Although neither *Ridley* nor *Helen L.* concern infectious diseases, their analysis and reasoning are instructive.

before and after meals," and requiring the disabled child to wear protective equipment when handling glue and to only eat food provided by her parents. *Id*. at 281. With protective measures such as these in place, the child was able to participate in classroom activities. *Id*. at 282. In reaching its holding, the *Ridley* court, citing *Helen L.*, 46 F.3d at 338, distinguished the case before it from one in which "a school district *attempted to provide separate-but-equal services* to a disabled student." *Id.* (emphasis added) (citing *Helen L.*, 46 F.3d at 338).

*Helen L.* concerned a complaint brought by a woman who had been paralyzed from the waist down by a meningitis infection. *Helen L.*, 46 F.3d at 328. At the time, the Pennsylvania Department of Public Welfare ("DPW") offered two different assisted living programs: one providing care to individuals in a nursing home setting, and one where individuals received care in their own home. *Id*. at 328-29. Although the plaintiff was eligible for at-home care, the DPW had required her to reside in a nursing home due to budgetary constraints. *Id.* at 329. The plaintiff alleged that this decision violated Title II of the ADA because it failed to serve her in the "most integrated setting appropriate" to her needs as required by 28 C.F.R. § 35.130(d), an ADA regulation which provides that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." *Id.* at 327-28 (citing 28 C.F.R. § 35.130(d)).

The Third Circuit agreed. Looking to the purpose of the ADA to interpret the scope of the integration mandate found in Section 35.130, the Third Circuit noted that:

> In enacting the ADA, Congress found that "[h]istorically, society has tended to isolate and segregate individuals with disabilities, and . . . *such forms of discrimination* . . . continue to be a serious and pervasive social problem." 42 U.S.C. § 12101(a)(2) (emphasis added). Congress also concluded that "[i]ndividuals with disabilities continually encounter *various forms of discrimination, including . . . segregation.* . . .", 42

40

U.S.C. § 12101(a)(5) (emphasis added).

*Id.* at 332.  The DOJ has also recognized that "[i]ntegration is fundamental to the purposes of the Americans with Disabilities Act," *id*. at 332-33 (quoting 28 C.F.R. Part 35, App. A. § 35.130), and positioned the integration mandate under the heading "[g]eneral prohibitions against *discrimination*."  *Id*. at 333.

On the strength of this history, the Third Circuit held that "the ADA and its attendant regulations clearly define unnecessary segregation as a form of illegal discrimination against the disabled."  *Id*.  "The ADA is intended to insure that qualified individuals receive services in a manner consistent with basic human dignity rather than a manner which shunts them aside, hides, and ignores them."  *Id*. at 335.  "Separate-but-equal services do not accomplish th[e] central goal" of the ADA—that is, "eradicat[ing] the 'invisibility of the handicapped'"—and therefore "should be rejected."  *Helen L.*, 46 F.3d at 338 (quoting H.R. Rep. 485(III), 101st Cong.2d Sess. 50, *reprinted in* 1990 U.S.C.C.A.N. at 473).

The determination of whether Plaintiffs are receiving educational services in "the most integrated setting appropriate to the needs of qualified individuals with disabilities" as required by 28 C.F.R. § 35.130(d) is necessarily a fact-based inquiry.  The DOJ's Guidance explains that such a setting should "enable[] individuals with disabilities to interact with nondisabled persons to the fullest extent possible."  28 C.F.R. § 35, App. B, Subp. B § 35.130.

Here, Plaintiffs argue that the optional masking policy forces them to choose between two segregated settings: stay at home and learn remotely, in complete physical segregation from their peers; or, despite the risks, go to school, there to be segregated by Defendants' alternative safety precautions from unmasked, non-disabled children, either with enforced physical distancing or plexiglass barriers.

Whether the Child-Plaintiffs would suffer segregation at school under an optional masking policy is not clear from the evidence.  At the preliminary injunction hearing, both Dr. Russell and Dr. Kimberly Boyd, the District Director of Special Education, testified that the District does not segregate students who are not wearing masks from other students.  Since the onset of the pandemic, however, the optional masking policy that might require such segregation was only in place for two school days (January 24-25, 2022).  Dr. Russell could not say what conditions were in place on those two days of optional masking and no witness offered any testimony concerning whether some kind of physical separation would be necessary to keep the Child-Plaintiffs and others like them safe in that environment.

The evidence does show that, for the Child-Plaintiffs, the "most integrated setting appropriate" to their needs is learning in the classroom, in a manner that enables them to interact with their classmates "to the fullest extent possible."  In-person learning is recognized as the ideal by the CDC[79] and the AAP, because "not being able to attend school in person can negatively affect children's cognitive, educational, and social development, as well as children's short- and long-term mood, behavior, and mental health."[80]  Indeed, in their brief, the District readily accepted that its objective must be "educating students onsite and in-person as much as possible," and Dr. Russell testified at length about the serious and particular attention which the District has devoted to this objective since the onset of the pandemic.

Ideal for all children, in-person learning is also particularly necessary to each Child-

---

[79] Pls. P.I. Ex. H (CDC Guidance for COVID-19 Prevention in K-12 Schools), available at https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/k-12-guidance.html.

[80] AAP Amicus Br., at 11.

Plaintiff because of his or her disabilities, according to the statements of their respective medical advisors.  For example, Plaintiffs aver that Child Doe 1 demonstrated difficulty learning in a virtual school setting and has already fallen behind their peers as a result.[81]  In addition to medical disabilities, Child Doe 2 was also recently diagnosed with an emotional disturbance disability and had to be withdrawn from school during the 2020-21 school year due to difficulty with virtual learning.  Child Doe 2's 504 Plan is expected to include learning support in an emotional support program, school-based therapy, and social work services.[82]  Similarly, Child Doe 3 has fallen behind their peers after struggling with remote learning.[83]

At-home learning, therefore, is not the "most integrated setting appropriate" to the Child-Plaintiffs' needs, and the evidence presented at the preliminary injunction hearing is sufficient to demonstrate that Plaintiffs cannot, at present, access that "most integrated setting" under an optional masking policy, by reason of their disabilities.

As noted earlier, like the obligation to ensure "meaningful access," the "obligation to provide appropriately integrated services is not absolute as the ADA does not require that [defendants] make fundamental alterations in [their] program."  *Helen L.*, 43 F.3d at 336.  A defendant need only make "reasonable accommodations" to fulfil this obligation.  *Id.* at 336-37 (quoting *Choate*, 469 U.S. at 300 n.20).  In making this inquiry, the defendants' "legitimate financial and administrative concerns" are balanced against the students' rights to determine whether the specific segregational conditions defendants propose are justified.  *Ridley Sch. Dist.*,

---

[81] Pls. P.I. Ex. R ¶ 5 (Declaration of Jane Doe 1).

[82] Pls. P.I. Ex. S ¶¶ 5-6 (Declaration of Jane Doe 2).

[83] Pls. P.I. Ex. T ¶ 5 (Declaration of Jane Doe 3).

680 F.3d at 280 (quoting *J.D. ex rel. J.D. v. Pawlet Sch. Dist.*, 224 F.3d 60, 70-71 (2d Cir. 2000)).  While "legitimate" concerns may move the needle, "[t]he fact that it is more convenient, either administratively or fiscally, to provide services in a segregated manner, does not constitute a valid justification for separate or different services" under Section 504 or the ADA.  *Helen L.*, 46 F.3d at 338 (quoting H.R. Rep. 485(III), at 473).

In *Helen L.*, the DPW argued that it could not accommodate the plaintiff because the reallocation of budgeted funds would constitute a "fundamental alteration" to its program.  The Third Circuit viewed this budgetary dilemma as an "administrative convenience" argument insufficient to overcome DPW's duty to provide services in the "most integrated setting appropriate."  *Id.* at 338.  Noting that the plaintiff had not asked DPW to "alter its requirements for admission to the program [or] . . . the substance of the program," the court held that providing at-home care would not require a fundamental alteration and that DPW's refusal to provide it violated the ADA.  *Id.* at 337.

An integrated learning setting *was* available to the Plaintiffs under the universal indoor masking policy that was in place in the District under the Phase One Transition Plan, prior to January 24, 2022.  The question is therefore whether maintaining Phase One instead of proceeding to Phase Two would require Defendants to make alterations to their programs on the basis of something more than convenience.

Like the plaintiff in *Helen L.*, Plaintiffs are not asking Defendants to alter the "requirements for admission to the program" or "the substance of the program."  The masking policies do not concern admission to the schools or the curriculum taught within their walls— they just require masks as students receive those services.  And, as explained above, it would be difficult for Defendants to persuasively contend that serious administrative difficulties would

attend their implementation of the policy, because they already have five months of experience with universal indoor masking during full-time student attendance, and have amended their policies every single month, with no substantive alteration to school services.[84]  Maintaining universal indoor masking during school hours would cause no significant changes to the school's programs.

## B.  Irreparable Harm

To satisfy the second prong of the preliminary injunction test, Plaintiffs must produce affirmative evidence indicating that they will be irreparably harmed should relief be denied. *Marxe v. Jackson*, 833 F.2d 1121, 1127 (3d Cir. 1987).  To show "irreparable harm," a plaintiff must demonstrate that there is a "potential harm which cannot be redressed by a legal or an equitable remedy following a trial" such that a preliminary injunction is "the only way of protecting the plaintiff from harm."  *Instant Air Freight Co. v. C.F. Air Freight, Inc*., 882 F.2d 797, 801 (3d Cir. 1989).

The alleged irreparable injury must be likely, not merely possible.  *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 22 (2008).  But, the injury need *only* be likely—it need not be certain to occur.  *Id.*; Wright & Miller, *supra* at 22 § 2948.1 (3d ed. Apr. 2021 Update) ("[T]he injury need not have been inflicted when application is made or be certain to occur; a strong threat of irreparable injury before trial is an adequate basis.").  Additionally, the injury must be "actual and of serious consequence, not merely theoretical."  *A.L.K. Corp. v. Columbia Pictures Indus., Inc*., 440 F.2d 761, 764 (3d Cir. 1971) (loss of contractual licensing rights was not

---

[84] Indeed, one of the "reasonable measures" that prevented the Third Circuit from finding a violation of the ADA in *Ridley* was the school's requirement that *all* the children in the plaintiff's class wash their hands before and after meals to protect her from an allergic reaction.  *Ridley Sch. Dist.*, 680 F.3d at 281.  Therefore, "reasonable measures" can include asking other children to take precautionary steps on behalf of other students.

irreparable harm); *Franks GMC Truck Ctr., Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 102-03 (3d Cir. 1988) (loss of sales and customers not irreparable harm).

"What makes an injury 'irreparable' is the inadequacy of, and the difficulty of calculating, a monetary remedy after a full trial." *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 806 (10th Cir. 2019) (holding that a showing of likelihood of success on the merits of a constitutional rights claim satisfies the irreparable harm factor); *Hohe v. Casey*, 868 F.2d 69, 73 (3d Cir. 1989) ("[i]rreparable harm is suffered where monetary damages are difficult to ascertain or are inadequate.'" (alteration in original)); *Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("Mere injuries, however substantial, in terms of money, time and energy expended in the absence of a stay, are not enough.").

Plaintiffs allege that optional masking forces them into a catch-22 of irreparable injuries. If they send their children to school, "[i]n order to access equal educational services and critical social and development services," the children would face irreparable injury in the form of "death or hospitalization due to their undisputed health and developmental related disabilities." If they instead choose to keep their children at home, they would suffer the irreparable harm of an inability to access the services and benefits attendant to in-person learning, for which they have a unique need, given their disabilities.

Defendants assert that Plaintiffs have not established a risk of irreparable harm for three reasons, all of which concern the underlying question of whether Plaintiffs have alleged a sufficient risk of contracting COVID-19 and suffering serious illness or death.

They argue first that denying injunctive relief would not harm Plaintiffs because of "the high rate of vaccinated individuals in the District community." The evidence shows that 65.86% of Montgomery County residents aged five and older are fully vaccinated, and an additional

17.67% are partially vaccinated.[85]  It is not clear, however, how that might mitigate Plaintiffs'

harm and Defendants presented no evidence suggesting that it does so.  Indeed, although the

CDC recognizes vaccination as "the most critical strategy to help schools safely resume full

operations," as of January 13, 2022 (the most recent CDC update), it still "recommends universal

indoor masking for all students (aged 2 years and older), staff, teachers, and visitors to K-12

schools, *regardless of vaccination status*."[86]  Accordingly, this argument does not overcome

Plaintiffs' showing of irreparable harm.

Defendants next contend that denying Plaintiffs' Motion is unlikely to cause them

irreparable harm because injunctive relief "would not reduce the possibility that any one of the

Plaintiff students could contract COVID-19 during lunch periods or other times when students'

masks are off because they are eating and drinking or because students are not wearing them

correctly."  This argument essentially contends that Plaintiffs are already suffering irreparable

harm because (1) the students always take off their masks at lunchtime,[87] and (2) some students

may not fully comply.

Defendants' first shot misses the mark because Plaintiffs have not challenged the

District's lunchtime masking exception.  As to the question of compliance and enforcement of

masking policies, these issues are not before the Court on the present Motion.  In any case, Dr.

Russell credibly testified that the teaching staff are cognizant that some students struggle to mask

properly and are diligent in reminding students to adjust their masks when needed.  School

---

[85] Defs. P.I. Ex. 14 (Montgomery County COVID-19 Vaccination Dashboard, Jan. 26, 2022).

[86] Pls. P.I. Ex. H, at 1, 4 (CDC Guidance for COVID-19 Prevention in K-12 Schools), available at
https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/k-12-guidance.html (emphasis added).

[87] *See* A.M. Hearing Tr. 18:4-18 (testimony of Dr. Russell).

teachers and staff, who have been corralling recalcitrant children into lines, pressing middle schoolers to do their homework, and badgering teenagers to school rules since time immemorial, are no doubt equipped to handle such minor instances of non-compliance.  Indeed, Dr. Russell testified that the District has even added security in the schools as part of a "very dedicated effort to make sure that our students are wearing masks and wearing them properly."[88]

Finally, Defendants contend that updated CDC guidance on masks "indicates that respirators and other high quality masks are highly effective at protecting their wearers, regardless of what people around them are doing," which allegedly "afford[s] Plaintiffs adequate masking protection even in the absence of a universal masking requirement."  This statement about the effectiveness of high-quality masks in protecting the wearer is a quote from an opinion piece published by the Washington Post on January 5, 2022, authored by three infectious disease physicians.[89]  The article, however, cites to no authority for this statement, and it is not clear why Defendants attribute it to the CDC.  In any case, the individual opinion of three physicians, however venerable, regardless of their expertise in the field of infectious diseases, does not, without more, weigh as heavily in the balance as the recommendations of the CDC, which is the federal body responsible for providing medical guidance on the COVID-19 pandemic and public health matters generally.

The AAP relied on CDC guidance from September 2020 to explain that "[a] mask's primary benefit is as 'source control,' preventing infected carriers from spreading viral particles

---

[88] P.M. Hearing Tr. 38:2-7.

[89] Defs. P.I. Ex. 24 (Washington Post: Schools Can Safely Make Masks Optional with CDC's New Guidelines, Jan. 5, 2022).

widely . . . 'masks are not designed to reduce the particles that the wearer will inhale.'"[90]  The AAP explains that there is a "difference between a mask's ability to block *exhalation* and *inhalation* of viral particles."[91]  This difference "explains why it is so important for schools to have the ability to make masking policies universal."[92]  "Because wearing a mask provides only limited protection against contracting COVID-19 if the wearer is near one or more *unmasked* carriers, universal masking is needed as source control for COVID-19 carriers."[93]

The CDC confirmed this guidance in December 2021: "[t]he prevention benefit of masking is derived from the combination of source control and wearer protection.  The relationship between source control and wearer protection is likely complementary and possibly synergistic, so that individual benefit increases with increasing community mask use."[94]  A CDC study released on February 4, 2022 found that an individual's "[c]onsistent use of a face mask or respirator in indoor public settings was associated with lower odds of a positive SARS-CoV-2 test result," and that "[u]se of respirators with higher filtration capacity was associated with the most protection, compared to no mask use."[95]  While this study shows that the CDC is researching the protection that masking offers to the wearer alone, the CDC has not yet updated its guidance to recommend one-way masking as an effective mitigation strategy.

---

[90] AAP Amicus Br., at 15 (citing CDC, *Respiratory Protection vs. Source Control—What's the Difference?* (Sept. 8, 2020), https://bit.ly/3pn0y6s).

[91] *Id*. at 15 (emphasis added).

[92] *Id*.

[93] *Id.*

[94] *Science Brief: Use of Masks to Control the Spread of SARS-CoV-2*, Ctrs. for Disease Control & Prevention (Dec. 6, 2021), https://bit.ly/3utvxOA (citations omitted).

[95] Defs. P.I. Ex. 34, at 1 (PolicyLab at CHOP: COVID-19 Outlook).

Even more importantly, Defendant's argument about one-way masking errs in imposing a duty on the Child-Plaintiffs to shield themselves from the disparate impact of Defendants' policy.  The Acts do not require disabled individuals to make reasonable accommodations to protect themselves from discriminatory practices—the onus is on Defendants to make reasonable accommodations to provide the Child-Plaintiffs with meaningful access to their education. *Choate*, 469 U.S. at 300-01.  To find that the Child-Plaintiffs would suffer no harm from the discriminatory impact of an optional masking policy because there are actions they could take to lessen that harm would erode the broad protections that the ADA and Section 504 were intended to provide.[96]

An increased risk of contracting a life-threatening disease like COVID-19 easily constitutes an irreparable injury.  *See, e.g.*, *Arc of Iowa v. Reynolds*, 2022 WL 211215, at *12 (8th Cir. Jan. 25, 2022) (irreparable harm demonstrated through evidence showing that exposure to COVID-19 placed plaintiffs at heightened risk of severe illness or death)(citing *Harris v. Blue Cross Blue Shield of Mo.*, 995 F.2d 877, 879 (8th Cir. 1993)); *Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 333 (2d Cir. 1995) (district court did not err in finding irreparable harm where disabled plaintiff faced risk of injury, infection, and humiliation); *Harris v. Bd. of Supervisors*, 366 F.3d 754, 766 (9th Cir. 2004) (County Board of Supervisors' decision to eliminate hospital

---

[96] Defendants also rely on the Washington Post piece and an October 2020 CDC Report for the premise that "the filtration effectiveness of cloth masks is shown to be lower than that of medical masks and respirators."  Defs. P.I. Ex. 20 (CDC Report Regarding Effectiveness of Cloth Masks for Protection Against Severe Acute Respiratory Syndrome Coronavirus 2 (Oct. 2020)).  The evidence undisputedly shows that cloth masks are not as effective as high-filtration masks.  However, that does not mean that no mask is better than a cloth mask.  To the contrary, the CDC's guidance as of December 6, 2021, was that "[m]ulti-layer cloth masks can both block 50-70% of [] fine droplets and particles," and some studies found "[u]pwards of 80% blockage."  *Science Brief: Use of Masks to Control the Spread of SARS-CoV-2*, Ctrs. for Disease Control & Prevention (Dec. 6, 2021), https://bit.ly/3utvxOA (citations omitted).  The AAP similarly stated that "[a]lthough respirators, such as N95 and KN95 masks, are generally more effective than cloth masks, even well-fitted cloth masks can provide some protection."  AAP Amicus Br.*,* at 17-18.  Thus, the fact that some students choose to wear cloth masks instead of high-filtration masks, is not dispositive on the question of whether Plaintiffs have shown irreparable harm.

beds would lead to irreparable harm including "pain, infection, amputation, medical complications, and death"); *Doe 1 v. North Allegheny Sch. Dist.*, 2022 WL 170035, at *7 (W.D. Pa. 2022) (finding irreparable harm where "immunocompromised students at higher risk are less able to safely attend classes in-person with an optional masking environment").  Plaintiffs have shown a sufficient risk of serious illness under the optional masking policy to meet this standard.

Plaintiffs have also proffered evidence showing that the Child-Plaintiffs have a particular need to attend school in person, but cannot—because of their disabilities—do so if the Phase Two Transition Plan is implemented at this time.[97]  The inability to access education constitutes irreparable harm because it is of critical importance to child development and its loss cannot be compensated with monetary damages.  "[A] sound educational program has power to change the trajectory of a child's life, . . . while even a few months in an unsound program can make a world of difference in harm to a child's educational development."  *Issa*, 847 F.3d at 142 (internal quotation marks and citations omitted) (quoting *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 121-22 (1st Cir. 2003)); *see also Plyler v. Doe*, 457 U.S. 202, 221 (1982) (noting the "lasting impact of [education's] deprivation on the life of a child"); *Issa*, 847 F.3d at 142 (plaintiffs demonstrated irreparable harm because, without injunctive relief, they would have been forced to remain enrolled at a school that provided an unsound education in light of their unique need for English language instruction).

For the reasons set forth above, Plaintiffs have set forth sufficient evidence to show a likelihood of irreparable harm in the form of a heightened risk of serious illness and death, and an inability to access the benefits of their education.  As Plaintiffs have met the first two factors

---

[97] Pls. P.I. Ex. R (Declaration of Jane Doe 1 dated 2/3/2022); Pls. P.I. Ex. S (Declaration of Jane Doe 2 dated 2/3/2022); Pls. P.I. Ex. T. (Declaration of Jane Doe 3 dated 2/3/2022).

of the test, the third and fourth must be considered as well.  *Reilly*, 858 F.3d at 176.

## C.  Balance of the Equities

The third factor to consider in deciding whether a preliminary injunction should issue is the balance between "the potential injury to the plaintiffs without [an] injunction" to "the potential injury to the defendant" with an injunction.  *Issa*, 847 F.3d at 143.

As described above, without an injunction, the Child-Plaintiffs face irreparable harm to their health and well-being, as well as to their ability to access education.  On the other side of the scale rest Defendants' alleged harms: "numerous hours addressing recalcitrant students who do not wish to mask as well as the reasonable concerns from parents"; "the cancellation of home athletic competitions, out of concern that visiting teams and spectators would not properly mask in District buildings"; and because "the relief [Plaintiffs] seek could open the door for similar actions in the future . . . every winter during cold and flu season."

Although addressing the concerns of students and parents is understandably difficult, the District has already shown itself up to the task during the five months in which the mandatory masking policy has been in place.  To the extent that the District is arguing that time spent enforcing a Court order is a "legitimate administrative or financial concern" that would overcome Plaintiffs' rights or excuse Defendants from making reasonable accommodations, the argument is not well-taken.  *Hutto v. Finney*, 327 U.S. 678, 690 (1978) ("In exercising their prospective powers . . . federal courts are not reduced to issuing injunctions against state officers and hoping for compliance.  Once issued, an injunction may be enforced."); *Taberer v. Armstrong World Indus., Inc.*, 954 F.2d 888, 897 (3d Cir. 1992) ("The power to punish those who refuse to obey the court's order to appear is essential to maintenance of the court's authority.").  The inconvenience that may result from compliance with the Phase One Transition

Plan "does not constitute a valid justification for separate or different services." *Helen L.*, 46 F.3d at 338 (quoting H.R. Rep. No. 485, at 473).

Assuming, without deciding, that the cancellation of athletic services is a legitimate administrative concern, it is one that need not be realized.  The purpose of injunctive relief is to maintain the status quo, to turn back the clock to the last time the Parties were at peace.  Plaintiffs conceded at the preliminary injunction hearing that they did not dispute the implementation of the Phase One Transition Plan.  Therefore, any preliminary injunctive relief would reinstate Phase One, which required masking only while indoors, and contained an exception for athletes actively engaged in practice or competition.[98]

Defendants' contention that granting a preliminary injunction in this case will open the courts to annual cold and flu season does not outweigh the potential harm to Plaintiffs.  The Court's decision rests on the specific facts presented by the Parties for the purpose of determining Plaintiffs' eligibility for preliminary injunctive relief in this case.  This Opinion does not address the potential success or failure of plaintiffs who may bring disability discrimination claims related to the transmission of infectious diseases other than COVID-19 in schools.  Such attenuated concerns about how third parties may behave in the future weigh but little in the balance against the statutory rights of these specific Plaintiffs.

Defendants also point to cases in which the Pennsylvania Supreme Court declined to "interfere with the discretionary exercise of a school board's power." *See, e.g.*, *Zebra v. Sch. Dist. of the City of Pittsburgh*, 449 Pa. 432, 437 (Pa. 1972) (courts are "restrained, when dealing with matters of school policy, by the long-established and salutary rule that courts should not

---

[98] Defs. P.I. Ex. 10, at 4 (ARP ESSER Health and Safety Transition Plan (version 3), dated Jan. 2, 2022).

function as super school boards.").  Indeed, in matters of educational policy, the courts' "lack of specialized knowledge and experience counsels against premature interference with the informed judgments made at the state and local levels."  *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 42 (1973).

However, the Board's discretion meets its limit at the bounds of federal statutory law, including the ADA and Section 504.  "It is only when the board transcends the limits of its legal discretion that it is amenable to the injunctive process of a court of equity.'"  *Zebra*, 449 Pa. at 437 (*quoting Landerman v. Churchill Area Sch. Dist*., 414 Pa. 530, 534 (Pa. 1964)).  This tension between the deference that must be afforded to a school district's decision-making and the need for a court to evaluate alleged statutory violations is addressed in *Issa*, where school-age refugees invoked the Equal Educational Opportunities Act ("EEOA") to seek a preliminary injunction compelling the School District of Lancaster to permit their transfer to a high school with an English as a second language program.  *Issa*, 847 F.3d at 129.  The school district argued that the equities tipped in its favor because an injunction would erode its authority and usurp its decision-making authority.  *Id.* at 143.  The Third Circuit disagreed, because the school district had "no interest in continuing practices that violate" statutory law, and "[u]nder the EEOA, we reject an educational agency's call for unfettered decision-making authority when its programs fall short of [the statute's] mandate."  *Id*. (citing *Gomez v. Ill. State Bd. of Educ*., 811 F.2d 1030, 1037, 1040-42 (7th Cir. 1987) ("[W]e cannot accord such sweeping deference to state and local agencies that judicial review becomes in practice judicial abdication.")).

Although Defendants have a strong interest in deference to their policy choices, Plaintiffs have shown a likelihood of success on the merits and because Defendants can have no interest in violating statutory law, their countervailing interest does not tip the balance in Defendants'

favor.

### D.  The Public Interest

"If a plaintiff proves 'both' a likelihood of success on the merits and irreparable injury, it 'almost always will be the case' that the public interest favors preliminary relief."  *Issa*, 847 F.3d at 143 (quoting *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994)).

Here, several public interests support the issuance of a preliminary injunction.  First, protecting public health, and specifically, preventing the spread of COVID-19, is a compelling public interest.  *See Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (stating that although [s]temming the spread of COVID–19 is unquestionably a compelling interest," regulations limiting religious service attendance were not "narrowly tailored.") (per curiam); *ARC of Iowa v. Reynolds*, --- F.4th ---, 2022 WL 211215, at *12 (8th Cir. Jan. 25, 2022) ("the public interest also benefits from enjoining current enforcement because it enables schools to require masks that reduce the spread of a dangerous, highly transmissible disease.").  Given the evidence presented in this case concerning the efficacy of universal masking in slowing the spread of COVID-19, it is evident that enjoining the enforcement of the optional masking policy would serve this interest.

An injunction would also serve the public interest in public education.  The "American people have always regarded education and [the] acquisition of knowledge as matters of supreme importance."  *Plyler*, 457 U.S. at 221; *see also Issa*, 847 F.3d at 142.  As mentioned above, the

CDC has also recognized the benefits of in-person instruction.[99]  An injunction would serve this interest by ensuring that disabled children can safely access in-person education.

Furthermore, the public has an interest in ensuring compliance with the ADA and the accomplishment of its objectives.  *See Issa*, 847 F.3d at 143 (agreeing with the district court's holding that "it was undeniably in the public interest for providers of public education to comply with the requirements" of the applicable statute); *Kathleen S. v. Dep't of Pub. Welfare of Pa.,* 10 F. Supp.2d 476, 481 (E.D. Pa. 1998) ("[i]t is clearly in the interest of the public to enforce the mandate of Congress under the Americans with Disabilities Act.").  The ADA declares that "the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals."  42 U.S.C. § 12101(a); *Ramsay v. Nat'l Bd. of Med. Examiners*, 968 F.3d 251 (3d Cir. 2020) ("[i]n enacting the ADA, Congress demonstrated its view that the public has an interest in ensuring the eradication of discrimination on the basis of disabilities.").  An injunction would assure that children with disabilities have meaningful access to public schools in the District, thus furthering the objectives of the ADA.

Weighing in the balance against these interests is the fundamental liberty interest of parents in making decisions concerning the "care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 66 (2000).  A universal mask mandate undoubtedly restrains the decisions of parents as to whether or not their child wears a mask at school.  It is notable, however, that society already tolerates such restrictions in the name of public health, including early childhood immunizations.  *See ARC of Iowa v. Reynolds*, --- F.4th ---, 2022 WL 211215, at

---

[99] Pls. P.I. Ex. H (CDC Guidance for COVID-19 Prevention in K-12 Schools), available at https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/k-12-guidance.html.

*10 (8th Cir. Jan. 25, 2022) (citing Iowa Code §§ 280.10, 280.11 (requiring eye and ear protection in some classes); *id.* § 139A.8(2) (prohibiting enrollment in "elementary or secondary school in Iowa without evidence of adequate immunizations" against various communicable diseases)); *see also* 28 Pa. C.S.A. § 23.81 *et seq.* (requiring certain immunizations "against diseases which spread easily in schools and interrupt school life and learning for individuals and groups" as a prerequisite for public school attendance in Pennsylvania).

## V.   BOND REQUIREMENT

Federal Rule of Civil Procedure 65(c) states that a court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined."  "[T]he amount of the bond is left to the discretion of the court," *Frank's GMC Truck Center, Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 103 (3d Cir. 1988), and a district court may require a nominal bond even absent an exception to Rule 65.  *Temple Univ. v. White*, 941 F.2d 201, 220 n.28 (3d Cir. 1991).  Accordingly, each Plaintiff will be ordered to post a bond of $1 for each named Defendant.

## VI.   CONCLUSION

In these uncertain times, parents and school administrators face excruciating choices about how best to protect the health of the school community while ensuring equal access to education.  Each parent is understandably anxious to ensure his or her own child's needs are met at school.  The District and the Board have a responsibility—which they have undertaken with admirable care and commitment—to grapple with the various and sometimes conflicting

interests of many students—those who cannot mask due to a disability, those who are immunocompromised, and those who just want things to get back to "the normal we know" as soon as possible.[100]

The courts play no role in generating educational policy or in questioning the wisdom of elected officials in making such difficult decisions.  And this case is not a referendum on mask-wearing in schools or elsewhere.  The only issue before this Court is whether Plaintiffs have marshalled sufficient evidence to merit a preliminary injunction under the applicable legal standards.

Prior to January 24, 2022, and since the entry of the TRO, schools in the District have followed a policy of universal indoor masking.  If the Phase Two Transition Plan approved by the Board on January 2, 2022 were executed under current conditions, the Child-Plaintiffs would face two possible outcomes: (1) they could attend school remotely, while their peers attend in-person; or (2) they could attend school with their peers under a real risk of serious illness or worse.  Under the evidence before the Court, the Plaintiffs have shown a likelihood of success on the merits because, under either scenario, there is a reasonable probability that Plaintiffs would suffer a disparate impact by reason of their disabilities, and an inability to access services in the "most integrated setting appropriate" to their needs.

The Court does not opine one way or another as to whether the Phase One Transition Plan approved by the Board on January 2, 2022 is the only way to manage the risks of COVID-19 transmission at the school in harmony with the ADA and Section 504—very likely, other solutions are possible.  But it is not up to the Court to craft any other solution.  *See Helen L.*, 46

---

[100] A.M. Hearing Tr. 60:17-19.

F.3d at 338.  The only question presented is whether Defendants' adoption and implementation of the Phase Two Transition Plan rescinding the universal indoor masking policy during school hours in favor of recommended masking is likely under the circumstances presented here to be a violation of the Acts: the Court finds it that they likely would.  Additionally, Plaintiffs have shown irreparable harm in the form of a heightened risk of serious illness or death, and in the form of a deprivation of education, and the two remaining factors lean in Plaintiffs' favor.

Plaintiffs have therefore carried their burden and their Motion for a Preliminary Injunction will be granted.  To re-establish the status quo between the Parties, the enforcement of Phase Two Transition Plan will be preliminarily enjoined, which will bring the Phase One back into effect.  Specifically, the District must apply the rules and policies that applied from January 3 to January 21, 2022, pursuant to the terms of the ARP ESSER Health and Safety Transition Plan, approved by the Board on Jan. 2, 2022.[101]

The policies applicable under the Transition Plan are not tied to any matrix, table, or apparent criteria that would define when the Plan would no longer be needed or when it would need to be updated.  If Defendants wish to amend the Transition Plan to incorporate such limiting criteria, or should circumstances change—for example, if the CDC releases new and applicable guidance, or if there are relevant changes in the incidence rates of COVID-19 in the community—such that Defendants believe Plaintiffs would no longer meet the threshold of eligibility for injunctive relief, they may file a motion to lift the preliminary injunction or otherwise seek relief from the Court.

An appropriate order follows.

---

[101] Defs. P.I. Ex. 10, at 3 (ARP ESSER Health and Safety Transition Plan (version 3), dated Jan. 2, 2022).

**BY THE COURT:**

**/S/Wendy Beetlestone, J.**

_____

**WENDY BEETLESTONE, J.**